IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

UNITED STATES OF AMERICA,

    and

THE STATE OF ILLINOIS,

           Plaintiffs,

     v.

CITY OF CAHOKIA HEIGHTS, ILLINOIS,

           Defendant.

**CONSENT DECREE**

**APPENDIX G - Attachment 1**
**October 2022 CMOM**
**Part 1**

# CITY OF CAHOKIA HEIGHTS

## SANITARY SEWER SYSTEM

# CAPACITY, MANAGEMENT, OPERATION AND MAINTENANCE (CMOM) PROGRAM

Prepared by

**HURST-ROSCHE, INC.**
**5 BANK SQUARE**
**EAST ST. LOUIS, IL 62203**

**FEBRUARY 2022**
**Revised July 2022**
**Revised September 2022**
**Revised October 2022**

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................. 4
      A.    SANITARY SEWER SYSTEM DESCRIPTION................................... 4
      B.    SANITARY SEWER SYSTEM FUNDING.......................................... 7
II.   CMOM PROGRAM GUIDELINES................................................................... 8
      A.    CMOM PROGRAM COMPONENTS.................................................. 8
      B.    PROGRAM GOALS.......................................................................... 8
      C.    ADMINISTRATIVE AND MAINTENANCE FUNCTIONS.................... 9
      D.    LEGAL AUTHORITIES...................................................................... 9
      E.    MEASURES AND ACTIVITIES........................................................ 10
      F.    DESIGN AND PERFORMANCE PROVISIONS................................ 14
      G.    MONITORING, MEASUREMENT, AND PROGRAM MODIFICATIONS............. 14
III.  PROGRAM GOALS AND MISSION STATEMENT......................................... 15
IV.   ADMINSTRATIVE AND MAINTENANCE FUNCTIONS............................... 16
      A.    ORGANIZATIONAL CHART............................................................. 16
      B.    STAFFING PLAN............................................................................. 17
      C.    SPECIFIC STAFFING....................................................................... 17
      D.    RECORD KEEPING......................................................................... 18
      E.    EMERGENCY RESPONSE PROCEDURES.................................... 20
      F.    SANITARY SEWER OVERFLOW (SSO) NOTIFICATION................ 21
V.    LEGAL AUTHORITIES.................................................................................. 23
      A.    SEWER RATE ORDINANCES.......................................................... 23
      B.    SEWER USE REQUIREMENTS........................................................ 23
      C.    MUNICIPAL SATELLITE COLLECTION SYSTEMS.......................... 24
      D.    WASTEWATER TREATMENT........................................................... 24

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

VI.  MEASURES AND ACTIVITIES....................................................................................... 25

    A.  MAINTENANCE FACILITIES AND EQUIPMENT............................................... 25

    B.  MAINTENANCE OF WASTEWATER COLLECTION SYSTEM MAPS.............. 26

    C.  USE OF TIMELY AND RELEVANT INFORMATION.......................................... 27

    D.  ROUTINE PREVENTATIVE OPERATION AND MAINTENANCE ACTIVITIES. 28

    E.  CAPACITY OF THE COLLECTION SYSTEM................................................... 30

    F.  IDENTIFICATION AND PRIORTIZATION OF DEFICIENCIES AND
       CORRESPONDING REHABILATION ACTIONS................................................. 30

    G.  TRAINING........................................................................................................... 30

    H.  EQUIPMENT AND REPLACEMENT PARTS INVENTORIES............................ 31

    I.  BACKWATER VALVES AND SUMP PUMPS.................................................... 31

    J.  GREASE CONTROL PROGRAM....................................................................... 32

VII.  DESIGN AND PERFORMANCE PROVISIONS................................................................ 33

VIII.  MONITORING, MEASUREMENT, AND PROGRAM MODIFICATIONS......................... 34

## APPENDICES

A.  WATER AND SEWER ORDINANCES
B.  WASTEWATER COLLECTION SYSTEM MAPS
C.  PUMP STATION INFORMATION
D.  MANHOLE INSPECTION SHEET
E.  PUMP STATION INSPECTION CHECKLIST & DAILY JOB SHEETS
F.  SANITARY SEWER SYSTEM COMPLAINT FORM
G.  SANITARY SEWER OVERFLOW OR BYPASS NOTIFICATION SUMMARY REPORT
H.  SANITARY SEWER SYSTEM, BACKWATER VALVE, AND SUMP PUMP
    INFORMATION
I.  SAFETY AND TRAINING INFORMATION
J.  EMERGENCY RESPONSE PLAN
K.  MAINTENANCE PROGRAM
L.  STAFFING INFORMATION
M.  OPERATIONS AND MAINTENANCE INFORMATION
N.  GREASE CONTROL PROGRAM

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

# I. INTRODUCTION

The City of Cahokia Heights has developed a collection system's Capacity, Management, Operation, and Maintenance (CMOM) program designed to help optimize the performance of the sanitary sewer system. In accordance with Environmental Protection Agency (EPA) documents, the major objectives of Cahokia's CMOM program include:

1. Manage, operate and maintain at all times, all parts of the collection system so that the City of Cahokia Heights fully complies with the Clean Water Act

2. Provide sufficient capacity to convey base and peak flows without sanitary sewer overflows for all parts of the collection system

3. Implement feasible steps to stop and mitigate the impact of sanitary sewer overflows from any portion of the collection system

4. Provide timely notification of sanitary sewer overflows from the collection system to persons with reasonable potential for exposure to pollutants from such sanitary sewer overflows

5. Develop a written summary of the CMOM program and make it, and required program audits, available to the public upon request

There are no piped overflow points within the City's sanitary sewer collection system, therefore, any system overflows are related to sewer line blockages and/or excessive infiltration and inflow. When sewer line blockages occur, they are corrected and mitigated in accordance with City emergency response procedures. Generally, sewer line blockages are not directly related to wet weather conditions.

## A. SANITARY SEWER SYSTEM DESCRIPTION

The City of Cahokia Heights sanitary sewer system services approximately 15 square miles of land within the City limits, serving a population of 22,000 residents according to the 2020 census. The City of Cahokia Heights sanitary sewer system is separate from the City's storm water system (there are no combined sewers in the City of Cahokia Heights).

Other significant statistics of the City of Cahokia Heights sanitary sewer system include:

1.  An average annual precipitation of 42 inches

2.  More than 90 miles of gravity sewers ranging in size from 8 inches to 30 inches in diameter

3.  More than 4 miles of force mains

4.  More than 2,000 manholes

5.  Sixty-nine (69) pump stations

A copy of the Wastewater Collection System Maps for the City of Cahokia Heights and adjoining communities are included in Appendix B. Areas within the City of Cahokia Heights Sewer District are those identified as Sewer Districts C1 through C8, as well as parts of Districts E6 and E7, lying outside the City of East St. Louis corporate limits. A small portion of this system in the extreme northern part of the City (formerly known as Centreville or Centreville Township) is tributary to the collection system owned and operated by the City of East St. Louis. The predecessor owner/operator of these sewers in the northern part of the City, the Commonfields of Cahokia Public Water District, had an agreement to discharge these sewers into the East St. Louis system. That agreement is included as Appendix A. The new City has Ordinances and Resolutions agreeing to absorb all the assets and liabilities of the former Commonfields PWD as part of its dissolution and incorporation into the new City. The long-term plan is to install interceptor sewers in this area to redirect flows southward into the Cahokia Heights sewer system. As such, there is no plan to pursue a new agreement for sewer conveyance into East St. Louis by the new City of Cahokia Heights. The rest of the City sewer system flows south to a large pump station at the south end of Cahokia Heights. Both of these systems, (Cahokia Heights and East St. Louis) pump their total flow to the American Bottoms Regional Wastewater Treatment Plant (ABRWWTP) in Sauget, IL.

The system varies in age of original construction as the areas of the city were developed. See below:

| Sewer District | Age in Years |
| --- | --- |
| C1 | 75 |
| C2 | 55 |
| C3 | 50 |
| C4 | 60 |

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

| | |
|---|---|
| C4-2 | 35 |
| C5 | 55 |
| C6 | 55 |
| C7 | 60 |
| C8 | 70 |
| E6 | 65 |
| E7 | 75 |
| Centreville/Alorton | 35 |
| Racehorse Business Park | 15 |
| Phase 3 Centreville | 20 |

For further clarification, the Centreville/Alorton sewer area consists of sewers constructed in the area between Bond Avenue and Lake Drive (mainly the Golden Gardens area), the Racehorse Business Park is a commercial/industrial development located along the north side of IL Rt. 15 between I-255 and IL Rt. 157, and Phase 3 Centreville is s small area of homes added to Centreville/Centreville Township in the vicinity of Church Road between IL Rt. 157 and Mousette Lane. All three of these areas were constructed after the SSES sewer plans were compiled in the 1980's by Hurst-Rosche, and plans for some these sewers are a mixture of as-builts, design plans, and other information that need to be incorporated into the database for the CMOM. This will be accomplished in the next 6 months as the CMOM is finalized and implemented.

Information regarding the 69 pump stations within the City of Cahokia Heights, including pump station name, location, number of pumps, pump manufacturer, and horsepower, are included in Appendix C. Also included are the list of current bypasses as of the present time. This list is fluid, in that as sewer and pump stations are repaired, the bypasses will be eliminated.

All interceptor sewers and pump stations are operated and maintained by the City of Cahokia Heights.

## B. SANITARY SEWER SYSTEM FUNDING

The City of Cahokia Heights's sanitary sewer system is funded by a utility fee. The utility fee provides a dedicated source of funds for the operation, maintenance, rehabilitation, and improvement of the City's sanitary sewer system.

Because the sanitary sewer utility fee is a user fee and not a tax, all properties regardless of ownership are required to pay for the services provided by the City's sanitary sewer system. This includes non-profit entities such as churches, schools and institutions, as well as properties owned by the City of Cahokia Heights, the State of Illinois, and the federal government.

In 2021 the City approved a new Water and Sewer Ordinance No. 21-1404, which amended and adopted previous ordinances establishing rates and other conditions for sewer users. Under the utility structure, all residential dwelling units and churches are charged a flat rate sewer utility fee, and all commercial and industrial customers are charged a graduated sewer utility fee based on their amount of water usage. The sanitary sewer utility charges are calculated to recover the full cost of operating, maintaining, rehabilitating, and improving the sanitary sewer collection system.

A copy of the new Ordinance 21-1404 is included in Appendix A, along with other preceding ordinances regarding water and sewer use and fees.

1.    6,251 customers billed

2.    $295,073 in sewer user fees billed monthly

In addition to the sanitary sewer system funding provided through utility fees, the City of Cahokia Heights also receives funding for sanitary sewer system operations, maintenance, rehabilitation, and improvement expenses from the following sources:

1.    TIF funding

2.    Grants

The City employs a full time Grants Coordinator to help secure grant funding, supported by Hurst-Rosche and staff. Currently, the City has been awarded a $10 million dollar grant from the IEPA for repairs to the city sewer system. Those monies are intended to be spent on community outreach, engineering, construction, and needed operations equipment for the department, with the condition that all dollars are scheduled to be spent over the next three years, 2022-2025. Additional sanitary sewer system funding is also anticipated from future video gaming revenues.

Projected expenditures have not been determined at the time of the writing of this plan

as the annual budget for the new City is still being developed and approved. It is anticipated that the departmental budget will be completed by November 2022. Once a budget is finalized and approved, the CMOM will be updated with this information, according to the EPA CMOM Guidance, Section IV.A.

# II. CMOM PROGRAM GUIDELINES

## A. CMOM PROGRAM COMPONENTS

EPA's proposed CMOM program identifies six components that are generally necessary to meet the five performance standards identified in the Section I of this report. These components are:

1. Identify program goals consistent with the general standards

2. Identify administrative and maintenance functions responsible for implementing the CMOM program and the chain of communication for complying with reporting requirements for sanitary sewer overflows (SSOs), including a community outreach program for local residents and businesses.

3. Include legal authorities necessary for implementing the CMOM program

4. Address appropriate measures and activities necessary to meet the performance standards

5. Provide design and performance provisions

6. Monitor program implementation and measure its effectiveness

## B. PROGRAM GOALS

Program goals help determine the course of action needed to set a CMOM program in motion. Goals define the purpose and desired results of the CMOM program. Goals may reflect performance, safety, customer service, resource use, compliance, and other considerations.

## C.   ADMINISTRATIVE AND MAINTENANCE FUNCTIONS

Responsibilities for managing and implementing CMOM program activities need to be clearly defined, documented, and communicated. Job descriptions help ensure that all employees know specific responsibilities and individuals have proper credentials. Determination of staff requirements for a collection system requires a working knowledge of the system and consideration of key variables.

The community outreach program will be developed during the fall of 2022, utilizing various tools to detail department activities and programs, including:

- Website information
- Community and stakeholder meetings
- Direct mailings regarding specific department initiatives

In the interim while the new outreach program is in development, customers are notified directly by employees when a task is being done that may affect their property, such as smoke testing, CCTV, cleaning, bypass operations, etc.   Notification of major construction or maintenance work that affects customers is done by the City's robo-call system and/or door hangers. In addition, the department website is being updated as part of the outreach program so customers can be kept up to date on the progress of work in their area.

## D.   LEGAL AUTHORITIES

In order to implement an effective CMOM program, the City must have sufficient legal authority to authorize implementation activities. The proposed CMOM provision identifies five classes of activities that EPA generally believes are necessary for implementing a CMOM program:

1.   Control of infiltration and connections from inflow sources

2.   Requirement that sewers and connections be properly designed and constructed

3.   Ensure proper installation, testing, and inspection of new and rehabilitated sewers

4.   Address flows from municipal satellite collection systems

5.   Implement the general and specific prohibitions of the national pretreatment program (see 40 CFR 403.5)

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

## E. MEASURES AND ACTIVITIES

Measures, activities and program requirements need to be tailored to the size, complexity and specific features of the collection system. The proposed CMOM provision specifically identifies ten general classes of measures and activities that are generally appropriate and applicable for most municipal sanitary sewer collection system programs. The ten general measures and activities are described below:

1. MAINTENANCE FACILITIES AND EQUIPMENT

    Permittees need to provide adequate maintenance facilities and equipment. Maintenance facilities are locations where equipment, materials and personnel are dispatched and where operations records are kept. Increasingly, computer systems are used to manage maintenance records. Industry guidance recognizes that a properly planned and supported equipment yard is essential to collection system operation.

2. MAINTENANCE OF WASTEWATER COLLECTION SYSTEM MAPS

    One of the most typical problems in collection system management and maintenance is determining the locations of sewer lines and manholes. Determining such locations is best done by keeping appropriate collection system maps up-to-date. Many agencies keep large paper maps divided into overlapping, large-scale sections that can be bound into books that can be stored easily and taken into the field as needed. Maps and plans should be kept current by updating them when alterations or system additions occur.

3. USE OF TIMELY AND RELEVANT INFORMATION

    Timely and relevant information plays a critical role in an effective CMOM program. A dynamic CMOM program focuses on planning, implementing, reviewing, evaluating and taking appropriate actions in response to available information. The key to these approaches is the ability to get information from staff in the field to managers. The use of timely, relevant information does not require that a computer or electronic database be used. A paper copy system to track information and data may be adequate. Regardless of the method for managing information, operators should have a written description of the procedures used, including procedures for operating and updating the system. If the system is computer-based, procedures should present any unique hardware and software requirements.

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

4. ROUTINE PREVENTATIVE OPERATION AND MAINTENANCE ACITIVITIES

A good preventive maintenance program is one of the best ways to keep a system in good working order and prevent service interruptions and system failures which can result in overflows and/or backups. In addition to preventing service interruptions and system failures, a preventive maintenance program can protect the capital investment in the collection system.

Preventive maintenance activities should ensure that the permittee:

a. Routinely inspects the collection systems and addresses defects or other problems

b. Investigates complaints and promptly corrects faulty conditions

c. Provides maintenance records, an adequate workforce and appropriate equipment in working order

d. Maintains and updates a schedule of planned activities


Preventive maintenance activities typically address:

a. Planned, systematic, and scheduled inspections to determine current conditions and plan for maintenance and repairs

b. Planned, systematic, and scheduled cleaning and repairs of the system based on past history

c. Proper sealing and/or maintenance of manholes

d. Regular repair of deteriorating sewer lines

e. Remediation of poor construction

f. A program to ensure that new sewers and connections are properly designed, inspected and constructed and new connections of inflow sources are prohibited

g. A program to oversee lateral and private collection system installations that tie in to public wastewater collection systems

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

h.  A program to eliminate existing illegal inflow sources, and a strategy for informing and educating the public about such sources. Illegal inflow sources, such as sump pump discharges, rain gutters/downspouts, detached building, shed, and garage drains, swimming pool drains, and landscaping drainage, are all prohibited from entering the sanitary sewer system

5.  CAPACITY OF THE COLLECTION SYSTEM

A critical function of a collection system is to provide adequate capacity for wastewater flows. The capacity needs of a collection system change as the system ages, new connections are made, and existing connections change their water usage. Identifying reserve capacity, hydraulic deficiencies, and capacity needs is critical for effective asset management. The capacity assessment program should ensure procedures exist and are implemented for:

a.  Determining whether adequate capacity exists in downstream portions of the collection system and treatment facilities that will receive wastewater from new connections

b.  Identifying existing capacity deficiencies in the collection system and at treatment facilities

Capacity assurance also implies the need to expand of the collection system due to community growth and system improvements. System improvements can include rehabilitation and replacement of sewer piping and manholes due to deterioration, as well as the need for greater conveyance capacity due to increased contribution to the system.

6.  IDENTIFICATION AND PRIORTIZATION OF DEFICIENCIES AND CORRESPONDING REHABILATION ACTIONS

Sanitary sewers are exposed to harsh internal and external environments. Structural condition assessment is a principal objective of any pipeline system inspection program and is important to cost-effective management of the collection system. The collection system agency should clearly identify the techniques used in the program, such as field inspections or closed-circuit television, identify areas of the collection system where various measures are employed, and describe criteria for identifying priorities for inspection and for correction. Efforts to rate the condition of system components can be used to help prioritize actions. Where rating systems are used for identifying the condition of individual components of the collection system, the rating system should be explained.

7. TRAINING

Collection system employees are exposed to numerous challenging conditions, and adequate training, including safety training, is necessary for employees to meet these challenges. An organized training program is a necessity, regardless of agency size. Training programs should address safety procedures and include training in general operations and maintenance procedures to ensure employees are adequately prepared to implement appropriate provisions of the CMOM program.

8. EQUIPMENT AND REPLACEMENT PARTS INVENTORIES

Providing adequate maintenance facilities and equipment typically includes a process for identifying critical parts needed for system operation, and maintenance of an adequate inventory of replacement parts. Without an adequate inventory of replacement parts, the collection system may experience extended overflow events in the event of a breakdown or malfunction including extended service outages for customers. The process for identifying critical parts can be based on a review of equipment and manufacturer's recommendations, supplemented by the experience of the maintenance staff. The amount and types of equipment and tools held by a utility depend on the size, age and condition of the system. The less corrective maintenance required and more scheduled preventive maintenance done, the fewer emergency supplies are required to be kept in stock.

9. BACKWATER VALVES AND SUMP PUMPS

The City of Cahokia Heights requires that backwater valves be installed in building drain lines when the lowest plumbing drain in the building is lower than the top of the nearest upstream sanitary sewer manhole in order to eliminate, or substantially reduce, sanitary sewer backups. Such backwater valves are required for all new construction or changes in building ownership or title, unless the property owner signs a waiver releasing the City of any liability due to the occurrence of a sanitary sewer backup. Backwater valves must be properly installed and maintained by the property owner.

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

10.    GREASE CONTROL PROGRAM

All commercial and industrial property owners are required to develop and implement a formal grease control program for their facilities. Each facility's grease control practices, grease control equipment, and maintenance records are subject to periodic, unannounced inspection by the City of Cahokia Heights. See Appendix N for more information.

## F.    DESIGN AND PERFORMANCE PROVISIONS

An effective program that ensures that new sewers (including building laterals/connections) are properly designed and installed can help avoid permanent system deficiencies that could create or contribute to future overflow events and/or operation and maintenance problems. Similarly, major rehabilitation and repair projects are opportunities to ensure that work is done correctly in a way that will minimize future problems. The proposed CMOM provision would require permittees to develop and implement programs to ensure:

1.    Requirements and standards are in place for the installation of new collection system components and for major rehabilitation projects

2.    Procedures and specifications exist for inspecting and testing the installation of new sewers, pumps, and other appurtenances and for rehabilitation and repair projects that are implemented

## G.    MONITORING, MEASUREMENT, AND PROGRAM MODIFICATIONS

Accurate sewer performance information is an important part of improving collection system performance and is a core task of any asset management program. EPA's proposed CMOM provision would require permittees to monitor the implementation and, where appropriate, measure the effectiveness of elements of their CMOM programs. Satisfaction of this requirement typically would include identifying performance indicators to describe and track the implementation of various aspects of their CMOM programs. Performance indicators are ways to quantify and document the results and effectiveness of control efforts. Performance indicators also can be used to measure and report progress towards achieving goals and objectives and to guide management activities.

Performance indicators for the City's system to be monitored include:

- Number of customer/resident complaints
- Number of line breaks
- Number of backups reported
- Number of SSOs
- I/I source locations addressed (by investigation and corrective action)

These indicators will be monitored and tallied on an annual basis, with results used to indicate any changes needed to the CMOM or O&M of the system.

## III. PROGRAM GOALS AND MISSION STATEMENT

The Mission Statement for Cahokia's Water and Sewer Department is "to prolong the life of the collection system infrastructure and transport wastewater to the point of treatment without disruption or overflows, while meeting the needs of its customers, protecting surface and ground water resources, and complying with all Federal and State regulations."

Program goals for Cahokia's Water and Sewer Department include:

1. Manage, operate and maintain the collection system to provide uninterrupted sanitary sewer service for all customers in the service area

2. Maintain manpower and machinery at levels sufficient to adequately operate and maintain the system in good working order.

3. Implement programs and procedures to reduce and mitigate the impact of sanitary back-ups and sewer overflows in the sanitary sewer system

4. Ensure that new sewers (including building laterals/connections) are properly designed and installed

5. Identification and prioritization of capacity and structural deficiencies in the sanitary sewer system

6. Implementation of cost-effective rehabilitation action on identified and prioritized structural or capacity deficiencies

7. Receive, document, and respond to all customer complaints or problems relating to the sanitary sewer system. Response on backups and overflows shall be within 2-hours of the report of the incident. Response on all other complaints or problems shall be within 72 hours of the report of the incident

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

8.  Provide timely notification of sanitary sewer overflows from the collection system to all persons with reasonable potential for exposure to pollutants from such sanitary sewer overflows

9.  Comply with all state and federal regulations pertaining to the sanitary sewer system

10. Develop a written summary of the CMOM program and make it, and required program audits, available to the public

# IV. ADMINSTRATIVE AND MAINTENANCE FUNCTIONS

## A.  ORGANIZATIONAL CHART

A sanitary sewer utility requires good organization and competent staff to provide the quality services demanded by its customers. To facilitate this effort, the City has developed an organizational structure designed to be responsive to the needs of its customers while being fiscally responsible at the same time. The organizational chart presented below depicts the general decision making hierarchy for the City of Cahokia Heights Water and Sewer Department. More detailed organization and personnel information is provided in Appendix M, Operation and Maintenance Information, and in Section C below.

**CITY OF CAHOKIA HEIGHTS**

**SEWER DEPARTMENT ORGANIZATION**



CITY OF CAHOKIA HEIGHTS CMOM PROGRAM

## B.   STAFFING PLAN

The Water and Sewer Department is staffed during the hours of 8:30 A.M. to 4:30 P.M. on Monday through Friday. Calls to the Water and Sewer Department after normal working hours are routed to the after hours call center. The call center then contacts the Water and Sewer Department to respond to any reported problems. To insure quick, reliable notification of a problem, mobile telephones are carried by the on-call staff.


## C.   SPECIFIC STAFFING

The City of Cahokia Heights Water and Sewer Department is staffed by a total of 28 full-time employees organized by specific duties, including three operators (one EPA certified and two pending testing), 15 laborers, 2 field directors, a maintenance supervisor, a department director, an assistant director, a billing director, and four full time billing clerks. All operations staff assigned to the operation and maintenance of the sanitary sewer system are supervised by the licensed and certified department director.

The following positions are assigned to the sewer portion of the department:

> Field Staff:
>
> 1 – Field Supervisor
>
> 1 – Foreman
>
> 6 – Laborers (4 scheduled for operator training)
>
> Administrative Staff:
>
> 1 – Department Director
>
> 1 – Assistant Director
>
> 1 – Assistant Director - Billing
>
> 5 – Billing Clerks


The Water and Sewer Department staff is also supported by a part-time electrician from the City's Electrical Department, as well as additional manpower from Street and Parks Department employees as needed for operations and maintenance.

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

Engineering staff from the City's engineering consultant, Hurst-Rosche Engineers, Inc., East St. Louis, Illinois provides engineering support for the operation, maintenance, rehabilitation, replacement, and improvement of the sanitary sewer system.

The Water and Sewer Department's Administrative Staff also provides support by answering, documenting, and forwarding any phoned in complaints regarding the sanitary sewer system to the appropriate operations staff.

Licenses and certifications of department personnel are as follows:

1 – Class C Operator (Water)
2 – Class C Operator – Currently pending testing (Water)
4 – Class 4 Sanitary Sewer Certification (scheduled)

There is currently one certified Class C Water operator on staff. The goal is to have two additional operators pass the Illinois Class C certification and 4 additional operators pass the Class 4 Wastewater certification by January 31, 2023.

Further information regarding staffing and job duties is included in Appendix L. In addition, the City has consulted with RATES, Inc. to evaluate personnel and other operational conditions in the water and sewer department. RATES, Inc. has stated that a general formulaic evaluation would indicate that the city may be shorthanded in sewer operations personnel by 3 or 4 persons, given current conditions. The City will work to address that shortfall over the next 6 months, while recognizing that the conditions are largely related to the number of lift/pump stations in disrepair and bypass locations that exist today. Those conditions are expected to be rectified over the next three years as funds are utilized for system-wide repair efforts. As such, the manpower shortfall should be considered temporary.

## D.    RECORD KEEPING

There are a myriad of record keeping activities associated with the operation and maintenance of a sanitary sewer utility. Therefore, accurate and complete record keeping is crucial. Equally important are the mechanisms for archiving and retrieving the collected data.

Historically, the system has been set up for manual, hard copy, records. Recently, more and more of this data is kept in digital format. records are kept for a minimum of 7 years in the Utility Billing Software (Caselle – Licensed by Civic Systems). A cloud-based billing software. The actual work orders are printed out, completed by Field employees, and then placed in the customer file . Records are kept by customer address. Records are purged after 10 years.

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

Inspection checklists are completed for each sanitary sewer lift station and are kept in files by the lift station number and address. Employees are supplied with pre-printed blank inspection checklist. The employees complete the inspections according to schedule (visibly check each lift station and by- pass daily, inspect and complete inspection form (every other day) for sanitary lift stations) . These completed forms are turned in to the Assistant Director and are filed in the appropriate file by lift station number and name.

Daily job sheets are completed and turned in at the end of every week. These reports are kept in a binder by date. Log Sheets are kept in the file with the lift stations checklists.

Daily time sheets are completed each day by the Field Supervisor and are kept in a binder by date.

The City of Cahokia Heights also keeps records on many activities, including the following:

1.  Wastewater collection system maps

2.  Sewer system inspections

3.  Manhole inspections

4.  Pump station inspections

5.  Manhole replacement information

6.  Pump station repair information

7.  Sewer replacement information

8.  Sewer point repair information

9.  Sewer televising data

10. Sewer lining information

11. Sanitary sewer overflow data

12. Sanitary sewer system complaint forms

Copies of the wastewater collection system maps, manhole inspection sheets, pump station inspection checklist, and sanitary sewer system complaint forms are included in Appendices D, E, and F, respectively.

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

# E. EMERGENCY RESPONSE PROCEDURES

The City of Cahokia Heights's Emergency Response Plan contains procedures and contingency plans to respond to emergencies throughout the City, including emergencies affecting the City's sanitary sewer system. The Emergency Response Plan takes into consideration vulnerable points in the sewer system, severe natural events, failure of critical system components, and vandalism or third party events. A copy of the plan is included in Appendix J.

Effective emergency management planning requires considerable coordination and forethought. There are various types of emergencies and/or disasters that can have a very negative impact on the operation of the sanitary sewer system.

When a dry weather sanitary sewer back-up occurs, sewer cleaning equipment is used to clean the blocked sewer. If that effort is unsuccessful, internal closed circuit television equipment is used to inspect the line to determine the exact nature of the obstruction. If more aggressive cleaning or root removal won't solve the problem, emergency underground utility locates are requested and the area is excavated to make the necessary repair.

When wet weather sanitary sewer overflows or basement back-ups occur, the Operations Staff check the downstream collector and interceptor sewers to see if they are surcharged. If the downstream collector and interceptor sewers are surcharged, the line with the sanitary sewer overflow or basement back-up will be flagged for further inspection.

The Emergency Response Plan includes an up-to-date list of the names, titles, phone numbers, and responsibilities of emergency response personnel, including Water and Sewer Department staff and Fire Department response teams. Work crews have immediate access to tools and equipment necessary to respond to emergency situations, including containment equipment and supplies (booms, inlet covers, etc.) to protect the storm drainage system.

Water and Sewer Department staff receive awareness training on responding to emergency situations, including notifications to the Illinois Emergency Management Agency, the St. Clair County Health Department, and the local drinking water authorities (the Columbia Water Department, Illinois American Water Company, and/or the City of Cahokia Heights Water Department) as appropriate.

Should any workplace accidents occur, they will be investigated by the Mayor's office. Any findings resulting from accident investigations will be incorporated into the employee training program.

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

The City's Emergency Response Plan is updated on an as needed basis, and was last updated in December 2021. A copy of the Emergency Response Plan is on file at the City of Cahokia Heights Water and Sewer Department, and is provided in Appendix J herein.

## F.  SANITARY SEWER OVERFLOW (SSO) NOTIFICATION

The City of Cahokia Heights is proactive in working to prevent releases of sanitary sewage into the environment. However, it is not possible to prevent all such events, and therefore, the City of Cahokia Heights has adopted a Chain of Communication for Reporting Sanitary Sewer Overflows which outlines the following public notification protocol:

1.  Contact local Illinois Environmental Protection Agency (IEPA) office within 24- hours of the event, and submit a Sanitary Sewer Overflow or Bypass Notification Summary Report within 5 days of the occurrence. The contact number for the local IEPA office is (618) 346-5120

2.  Post sign(s) where appropriate at the site of a release event immediately upon discovery and confirmation of such an event and leave them up for up to one (1) week after the source of the release has been corrected to warn affected parties of potential health hazards associated with the SSO

The "Sanitary Sewer Overflow or Bypass Notification Summary Report" will contain the following information:

1.  Location of the SSO

2.  Receiving water body, if any

3.  Estimate of the volume of the SSO.

4.  A description of the sewer system component from which the release occurred, including, but not limited to, manholes, pipe, and pipe cracks

5.  Estimated date and time when the SSO began and stopped or will be stopped

6.  Cause or suspected cause of the SSO

7.  Steps taken or planned to reduce, eliminate, and prevent reoccurrence of the SSO

CITY OF CAHOKIA
HEIGHTS CMOM
PROGRAM

In addition, a Targeted Dry Weather SSO Plan for three specific areas of known SSO issues has been approved by the USEPA, and elements of that plan will be compared with and incorporated into this CMOM.

A copy of the Sanitary Sewer Overflow or Bypass Notification Summary Report is included in Appendix G.

# V. LEGAL AUTHORITIES

Proper control of the sanitary sewer system includes establishing appropriate ordinances to provide regulatory/legal authority to insure optimal performance and compliance with pertinent regulatory requirements. Applicable ordinances include sewer rate ordinances establishing the cost of service, and sewer use ordinances regulating the use of public and private sewers within the City of Cahokia Heights.

## A. SEWER RATE ORDINANCES

In 2021 the City approved a new Water and Sewer Ordinance No. 21-1404, which amended and adopted previous ordinances establishing rates and other conditions for sewer users. Under the utility structure, all residential dwelling units and churches are charged a flat rate sewer utility fee, and all commercial and industrial customers are charged a graduated sewer utility fee based on their amount of water usage. The sanitary sewer utility charges are calculated to recover the full cost of operating, maintaining, rehabilitating, and improving the sanitary sewer collection system. Copies of Water and Sewer Ordinance No. 21-1404 is included in Appendix A along with other preceding ordinances regarding water and sewer use and fees.

## B. SEWER USE REQUIREMENTS

In 2021 the City approved a new Water and Sewer Ordinance No. 21-1404, which amended and adopted previous ordinances establishing rates and other conditions for sewer users, including regulating the use of public and private sewers and drains, private sewage disposal, the installation and connection of building sewers, the discharge of water and wastes into the public sewer system and providing penalties for violation thereof, and the levying of charges for wastewater services (user charges). A copy of Ordinance No. 21-1404, and the adopted ordinances that preceded it, including applications for sewer permits, is included in Appendix A.

The following sewer use requirements are included in Ordinance No. 21-1404 (and in preceding ordinances):

1. Procedures for inspection standards, pretreatment requirements, and building/sewer approval

2. General prohibitions for fire and explosion hazards, oil, petroleum, corrosive materials, and obstructive materials

3.   Substances prohibited by the sewage treatment plant

4.   Procedures and enforcement actions for fats, oils, and grease

5.   The restriction of storm water connections to the sanitary sewer system

Further information and regulations governing sewer use are contained in the Sewer Use Ordinance #84-2, dated August 8, 1984, by the Commonfields of Cahokia PWD, included in Appendix A, and by other Ordinances approved by the Village of Cahokia, all of which are included in Appendix A. This Ordinance, and all others approved by both the Commonfields of Cahokia PWD and the Village of Cahokia have been approved and adopted by the new City of Cahokia Heights, under the Intergovernmental Agreement dated June 9, 2021, and approved by Resolution #21-1138, included in Appendix A.

In addition, the City of Cahokia Heights utilizes the Standard Specifications for Water and Sewer Construction in Illinois to establish sewer use requirements for the City. Requirements that sewers and connections be properly designed and constructed, and that new or rehabilitated sewers are properly installed, tested, and inspected, are covered under the Standard Specifications for Water and Sewer Construction in Illinois.

A copy of the Standard Specifications for Water and Sewer Construction in Illinois is maintained at the local office of Hurst-Rosche, Inc., #5 Bank Square, East St. Louis, IL 62201, is also available from the Illinois Society of Professional Engineers, 100 East Washington Street, Springfield, Illinois 62701, and can also be found online via the Illinois Pollution Control Board and the Illinois EPA.

## C.   MUNICIPAL SATELLITE COLLECTION SYSTEMS

Municipal Satellite Collection Systems are collection systems that do not treat and discharge their wastewater, but rather convey flows to a treatment facility where the NPDES permittee is a different entity. As such, the City of Cahokia Heights is a municipal satellite collection system upstream and tributary to the American Bottoms Regional Wastewater Treatment Plant, in adjacent Sauget, IL.

## D.   WASTEWATER TREATMENT

All of Cahokia's wastewater is treated at the American Bottoms Wastewater Treatment Plant in Sauget, Illinois. Under the City of Cahokia Heights's agreement with American Bottoms, the City's Sewer Use Ordinance is linked to, and in compliance with, the American Bottoms' POTW Pretreatment Program.

The city does not have an agreement with the American Bottoms facility, but is operating under the adopted current agreement with the former entities, the Village of Cahokia and the Commonfields of Cahokia, as discussed above and per the Ordinances and Resolutions included in Appendix A. This agreement is scheduled to expire in 2023, at which time it will be replaced by a new agreement with Cahokia Heights, and the CMOM will be updated at that time.

# VI. MEASURES AND ACTIVITIES

## A. MAINTENANCE FACILITIES AND EQUIPMENT

Adequate maintenance of the sanitary sewer system relies on the availability of equipment and parts. Maintenance facilities are locations where equipment, materials and personnel are dispatched and where operations records are kept. Industry guidance recognizes that properly planned and supported equipment facilities are essential to collection system operations.

1.    Equipment

The City has the following equipment assigned to the operation and maintenance of the sanitary sewer system:

a.    Two Combination Jet- Vactor Trucks

b.    Three Back Hoes

c.    One Dump Truck

d.    Six Pick-Up Trucks with Tools

e.    One Boom Truck

f.    Three Trash Pumps

CITY OF CAHOKIA
HEIGHTS
CMOM PROGRAM

2.    Maintenance Facilities

The City self-performs its own maintenance of and coordination for replacement of the City's sanitary sewer system maintenance equipment.

The operations and maintenance of the system, including storage of equipment when not in use, is located at the Water and Sewer Department facility, at 2525 Mousette Lane, Cahokia Hts., IL. The following specific functions are performed for the City's sanitary sewer system maintenance vehicles and equipment, per the Maintenance Program detailed and included in Appendix K:

a.    Perform preventive maintenance and repairs at proper intervals

b.    Evaluate, rehabilitate and modify equipment to include minor accident damage

c.    Oversee outside fueling services

d.    Administer a repair record system

e.    Evaluate equipment replacement and administer the bidding process for purchasing new equipment

f.    Train City personnel on the proper operation of new equipment

The original documents and records for maintenance are stored on the department computer. Master copies are kept in the vault located at 2525 Mousette Lane, Cahokia Heights, IL. Each Field Director has been supplied with a copy.


# B.    MAINTENANCE OF WASTEWATER COLLECTION SYSTEM MAPS

One of the most typical problems in collection system management and maintenance is determining the locations of sewer pipes and manholes. Determining such locations is best done by keeping appropriate collection system maps up-to-date. Maps and plans should be kept current by updating them when alterations or system additions occur.

Accurate sewer mapping is a fundamental requirement for any Sewer Utility. This mapping allows staff to do a variety of activities including: 1) answer questions from current and potential customers; 2) visually establish system performance trends; 3) track maintenance and rehabilitation activities; and 4) facilitate the orderly extension of sewer service.

The wastewater collection system maps are carried in the vehicles used by the Operations Division Staff assigned to sewer system maintenance. The maps carried by Operations Division Staff are annotated with corrections as discrepancies are discovered. Corrections are made to the maps by Hurst-Rosche, Inc.

A copy of the Wastewater Collection System Maps for the City of Cahokia Heights and adjoining communities are included in Appendix B. Areas within the City of Cahokia Heights Sewer District are those identified as Sewer Districts C1 through C7, and portions of E5, E6, and E7.

## C.   USE OF TIMELY AND RELEVANT INFORMATION

Timely and relevant information plays a critical role in an effective CMOM program. A dynamic CMOM program focuses on planning, implementing, reviewing, evaluating and taking appropriate actions in response to available information. The key to these approaches is the ability to get information from the field staff.

The Water and Sewer Department maintains the following databases to ensure the use of timely, relevant information. These include:

1.   Wastewater collection system maps

2.   Sewer system inspections

3.   Manhole inspections

4.   Pump station inspections

5.   Manhole replacement information

6.   Pump station repair information

7.   Sewer replacement information

8.   Sewer point repair information

9.   Sewer televising data

10. Sewer lining information

11. Sanitary sewer overflow data

12. Sanitary sewer system complaint forms

These data are updated on an as-needed basis, such as after changes, additions, or repairs to system components. Updates are made via a combination of effort between City staff, contractors, and Hurst-Rosche.

## D. ROUTINE PREVENTATIVE OPERATION AND MAINTENANCE ACTIVITIES

A good preventive maintenance program is one of the best ways to keep a system in good working order and prevent service interruptions and system failures which can result in overflows and/or backups. In addition to preventing service interruptions and system failures, a preventive maintenance program can protect the capital investment in the collection system. The primary goal of this CMOM is to develop a program to help insure optimal operation of the utility.

Cahokia's Sanitary Sewer Utility's Preventive maintenance activities include:

1. Routinely inspect the collection system and address defects or other problems

2. Investigate complaints and promptly correct faulty conditions

3. Provide maintenance records, an adequate workforce, and appropriate equipment in working order

4. Maintain and update a schedule of planned activities

5. Preventive maintenance activities

Sewer system inspections, including detailed manhole and pump station inspections, inspections for infiltration and inflow sources, and cleaning of the City's sewer system, are performed on an as needed basis. Manhole and Pump Station Inspection Sheets are completed for each inspection and copies are retained in the City of Cahokia Heights Water and Sewer Department. Staff responsible for inspections complete the inspection report, and include any recommended or needed repairs via work orders. These work orders are reviewed weekly by supervisors, and prioritized for follow up actions. Manhole inspections are warranted by customer complaints of sewer backup, possible surcharge or SSO's. Manholes are also inspected when a pump station malfunctions and during routine line inspections.

Pump stations are inspected every other day, including weekends, and daily job sheets and work sheets are maintained for all pump stations. Examples of these sheets are included in Appendix E. The pump station pumps are serviced and calibrated on an annual basis through "draw-down" tests or equivalence to verify pumping capacities. A warning light is provided on each pump station control panel to indicate malfunctioning equipment and/or alarm conditions. Some of these lights have become inoperative or missing. Those with operating lights are shown on the list in Appendix C. Those without lights are scheduled for installation or replacement within the next year. Portable electrical generators are available in the event power is disrupted at any of the City's pump stations, and temporary pumps and hoses are available to bypass a pump station if necessary.

Emergency operating procedures are available for each pump station, and any pump station failures and/or overflows are responded to by Water and Sewer Department personnel. Off hour/emergency notifications are provided through the City after hours call center.

The Water and Sewer Department also regularly inspects the route of all force mains to assess force main conditions. There are currently only two locations with air release valves on any of the system force mains, due to the very flat nature of the topography in the city, which does not produce high points in force mains, or the need for release valves. They are located in the Racehorse Business Park and at the Diversion Station on the main trunkline at Jerome Lane. A malfunction in these pump stations or the pump station not pumping to full capacity would require an inspection of the valve

All pump station and/or force main failures are investigated by the Water and Sewer Department, and any necessary actions are implemented to prevent future failures. All manholes and lift stations surrounding SSO's or other signs of failure are inspected and investigated until the surcharge is no longer visible upstream and down stream of the SSO or failure. The customers cleanout is inspected as well.

The City maintains a record of all sanitary sewer system complaints received by the City and the results of their investigation/resolution. This information provides a useful tool in planning future sewer repairs and/or replacements.

The City is currently implementing investigative and preventative measures, including smoke testing, flow monitoring, CCTV, and CIPP lining to address failures, I/I, and other system issues. The City is in the process of procuring equipment for these purposes. Areas of known SSOs will be given the highest priority, followed by other priorities listed in the following section F. Once the equipment is in hand, and production rates for investigative work are determined, the CMOM will be updated with this information. The City has currently employed an outside contractor to do the cleaning of sewer lines on an as-needed basis. The cleaning of the lines will be a requirement on all of the future lift station rehabs and sewer break repairs. In addition, once CCTV equipment is obtained, a schedule of system-wide cleaning will be developed and the CMOM updated.

# E.   CAPACITY OF THE COLLECTION SYSTEM

System capacity has not been analyzed in quote some time. There is no program or schedule of regular analyses for this, and no need, as the number of sewer users has been declining, with little or no new residential or commercial development. In the meantime, the City has developed, in conjunction with review ad approval by EPA District V, approved Dry Weather SSO, and pending Wet Weather SSO plans to investigate and strive to eliminate I&I sources which have contributed to backups, surcharges, and other capacity issues for certain sewer districts. In addition, as part of comprehensive lift station repair and rehab work currently planned for the next three years, certain stations will be replaced and will include flow meters and telemetry to give real-time data on system capacity and flow parameters, As these plans reveal corrective actions to be taken, capacity challenges and impacts are expected to be reduced. Lastly, capacity issues in the northern part of the City related to downstream surcharged or backup conditions in the East St. Louis system will be addressed by construction of the interceptor system at the north end of the City.

# F.   IDENTIFICATION AND PRIORTIZATION OF DEFICIENCIES AND CORRESPONDING REHABILATION ACTIONS

The Water and Sewer Department's pipe televising and manhole inspection efforts and associated sanitary sewer system repairs and rehabilitation activities are prioritized using the following criteria:

1.   Threat to public safety (sinkholes in streets, etc.)

2.   Threat to public health (loss of sewer service, basement back-ups, SSO's, etc.)

3.   The severity of structural defects (manholes, etc.)

# G.   TRAINING

The City of Cahokia Heights has a comprehensive safety program to ensure that the work environment for City employees is a safe and healthy one. Training, including new employee training, is provided in the normal hazards associated with the general construction industry such as backhoe/loader use, basic electrical safety, fall protection, flagger safety, ladder safety, blood borne pathogens, material safety data sheets (MSDS), confined space entry, etc. There are no known hydrogen sulfide hazard conditions within the system, and no need for hazardous waste training for department personnel. The safety program is designed to protect the general public during the normal course of operating and maintaining the system.

CITY OF CAHOKIA HEIGHTS
CMOM PROGRAM

Training of the Water and Sewer Department staff is an ongoing process. Safe work practices are reviewed at the start of each task, taking into consideration the risks associated with each activity, and preventative measures to mitigate those risks.

Water and Sewer Department staff also receive awareness training on responding to emergency situations, including notifications to the Illinois Emergency Management Agency, the St. Clair County Health Department, and the local drinking water authorities (the Columbia Water Department, , Illinois American Water Company, and/or the City of Cahokia Heights Water Department) as appropriate.

As staffing is in progress at the time this plan is being written, additional details on the training and safety program, and documentation of same is still being developed. At this time, documentation of training provided to staff through the Safety Council of Greater St. Louis on Confined Space, Lock-Out/Tag-Out, and Trenching Awareness is included in Appendix I, along with other training information. In addition, the City plans to provide collection system training for at least 4 workers in November 2022.

Should any workplace accidents occur, they will be investigated by the Mayor's office. Any findings resulting from accident investigations will be incorporated into the employee training program.

## H.    EQUIPMENT AND REPLACEMENT PARTS INVENTORIES

The Water and Sewer Department maintains a spare parts inventory for its sewer maintenance equipment and materials required for sanitary sewer repairs at the Department facility. The Water and Sewer Department maintains a spare parts inventory for the Jet-Vactor Trucks, as well as an inventory of sewer pipe, precast concrete manhole parts, adjusting rings, and manhole frames/covers commonly used in sanitary sewer system repairs.


Information about parts suppliers is kept on file. Parts needed are listed on work orders generated by inspections.

## I.    BACKWATER VALVES AND SUMP PUMPS

The City of Cahokia Heights requires that backwater valves be installed in building drain lines when the lowest plumbing drain in the building is lower than the top of the nearest upstream sanitary sewer manhole in order to eliminate, or substantially reduce, sanitary sewer backups. Such backwater valves are required for all new construction or changes in building ownership or title, unless the property owner signs a waiver releasing the City of any liability due to the occurrence of a sanitary sewer backup. Backwater valves must be properly installed and maintained by the property owner. The City does not inspect these valves, nor reimburse customers for their purchase and installation.

CITY OF CAHOKIA
HEIGHTS
CMOM PROGRAM

Sump pumps must also be properly installed and maintained by the property owner, and the sump pump discharge piping may not be connected to the City's sanitary sewer system.

Information regarding backwater valves and sump pumps is included in Appendix H.

## J.  GREASE CONTROL PROGRAM

All commercial and industrial property owners within the City of Cahokia Heights are expected to conduct their operations in such a manner that grease is captured on the user's premises and properly disposed of. Commercial and industrial property owners are required to develop and implement a grease control program for their facilities. Each facility's grease control practices, grease control equipment, and maintenance records are subject to periodic, unannounced inspection by the City of Cahokia Heights. An ordinance has been prepared to be sent to the Mayor for review and approval by the Board of Alderman.  The City will send Grease Trap Inspection Reports and Annual Grease Trap Maintenance Reports to all commercial customers for record keeping purposes, once the Ordinance is approved, and the CMOM will be updated.
See Appendix N for more information .

# VII. DESIGN AND PERFORMANCE PROVISIONS

The City of Cahokia Heights utilizes the Standard Specifications for Water and Sewer Construction in Illinois. These standards establish acceptable materials and practices for the design and construction of additions and improvements to the City of Cahokia Heights's sanitary sewer system. These standards apply to both public and private sanitary sewers and to sanitary sewer laterals. Copies of the standards are available online via the Illinois Pollution Control Board and the Illinois EPA, and are utilized by the City's engineers, Hurst-Rosche, for design of every new or renovation/repair project done by the City.

A plumbing permit and connection fee are required for all new sanitary sewer lateral construction and any repairs or replacements of sanitary sewer laterals. Fees are listed in the Ordinances included in Appendix A. The City Water and Sewer Department inspects all new sanitary sewer laterals, any lateral repairs, and any lateral replacements. Fees and rates are evaluated and re-established or revised every three years. The last rate study was done for the Commonfields PWD in 2020, and forms the basis for the current City fee and rate structure. A new rate study and fees will be done in 2023.

An Illinois Environmental Protection Agency (IEPA) construction permit must be obtained on all new public and private sanitary sewer construction. The City reviews all proposed sanitary sewer plans and specifications to determine compliance with the City's sanitary sewer standards before authorizing its approval on the IEPA permit application.

Additionally, the City engineering consultant inspects and certifies that the new sanitary sewer was built in accordance with the approved plans and specifications. Internal televised pipe inspections and manhole inspections are performed on all new sanitary sewer installations. Any pipe or manhole defects identified must be corrected before the City will assume ownership of the sewer.

# VIII. MONITORING, MEASUREMENT, AND PROGRAM MODIFICATIONS

The City of Cahokia Heights Water and Sewer Department documents the following activities/ items for the sanitary sewer collection system:

1.  Sewer pipe and manhole cleaning efforts

2.  Internal televising and manhole inspection efforts

3.  Root removal efforts

4.  Grease removal efforts

5.  Dry weather reported blockages and basement back-ups

6.  Wet-weather sanitary sewer overflows and basement back-ups

7.  Infiltration and Inflow (I/I) sources and remedies

8.  Cured-in-place sewer lining rehabilitation efforts

9.  Pipe and manhole repair efforts

10. Compliance with the City's backwater valve and sump pump installation requirements

The above preventative maintenance and corrective action programs are in the process of being finalized and implemented. The City has entered into a compliance agreement with the EPA, dated August 16, 2021, which stipulates the development and implementation of plans and efforts to address each of the above sewer infrastructure aspects and issues.

Some of these plans have been submitted and approved, and some are still in the process of review, or compilation/submittal.

Once all the above have been approved and are being implemented, the CMOM will be updated to include the specifics of each plan and program.

.

# Appendix A

# Water and Sewer Ordinances

# Water and Sewer Ordinances

# Descriptions

### Ordinance 21-1404

City of Cahokia Heights adopts previous Village of Cahokia Ordinance 1158 and amends fees and rates established therein for water and sewer services (tap-ins, deposits, meters, cut-offs, repairs, etc.)

### Ordinance 1158

Village of Cahokia amends previous Ordinances 627,721,807,843,and 903 regarding fees and rates established therein for water and sewer services (tap-ins, deposits, meters, cut-offs, repairs, etc.)

### Ordinance 22-1422 & Ordinance 22-1423

City of Cahokia Heights Cross-Connection Control Program, establishing the requirement for back-flow prevention devices and the specifics thereof, for protection of the City public water supply

### Resolution 21-1138

Intergovernmental agreement between City of Cahokia Heights and the Commonfields of Cahokia Public Water District whereby the parties agree for the City to take over the Water District (and its sewer infrastructure) and assume all of its assets and liabilities. (including via Intergovernmental Agreement Exhibit for same)

### Resolution 21-1143

Agreement between City of Cahokia Heights and Village of Sauget for sewage treatment at the America Bottoms WWTP.

### Resolution 471

Agreement between Village of Cahokia and Village of Sauget to issue bonds to cover costs for repairs to the sewer trunkline

### Resolution 474 – deleted - not germane to sewer system CMOM

### Resolution 475 – deleted - not germane to sewer system CMOM

**Resolution 470 – deleted - not germane to sewer system CMOM**

**Village of Cahokia Code of Ordinances**

Title V – Public Works, sewer use ordinance, including information regarding water and sewer conditions, rates, etc.

**Ordinance 84-2 – Commonfields of Cahokia Public Water District**

Sewer use ordinance

**Agreement and Addendum**

Between Commonfields of Cahokia Public Water District and the City of East St. Louis for acceptance and conveyance of sewage

ORDINANCE NO. __21-1404__

**AN ORDINANCE AMENDING AND ADOPTING ORDINANCE NO. 1158 AND AN ORDINANCE AMENDING ORDINANCE NO. 969, ENTITLED AN ORDINANCE AMENDING ORDINANCE NO. 627, 721, 807, 843 AND 903 ENTITLED " AN ORDINANCE REGULATING THE USE OF PUBLIC AND PRIVATE SEWERS AND DRAINS, PRIVATE SEWAGE DISPOSAL, THE INSTALLATION AND CONNECTION OF BUILDING SEWERS, THE DISCHARGE OF WATER AND WASTE INTO THE PUBLIC SEWER SYSTEM AND PROVIDING PENALTIES FOR VIOLATIONS HEREOF; THE LEVYING OF CHARGES FOR WASTEWATER SERVICES (USER CHARGES)", AND FIXING THE METER RATES AND WATER SERVICE CHARGES AND THE SEWER SERVICE CHARGES OF THE CITY OF CAHOKIA HEIGHTS, ILLINOIS**

**WHEREAS,** the City of Cahokia Heights, Illinois operates and maintains a Waterworks System for furnishing of water supplied to water users in the City of Cahokia Heights, Illinois;

**WHEREAS,** the City of Cahokia Heights, Illinois operates and maintains public and private sewers and drains and private sewage disposal, installation and connection of building sewers, discharge of waters and waste into public sewer systems in the City of Cahokia Heights; and

**WHEREAS,** the Village of Cahokia passed Ordinance No. 1158 on February 15, 2011; and

**WHEREAS,** the City of Cahokia Heights, Illinois wishes to amend and adopt Ordinance No. 1158 to include other fees; and

**WHEREAS,** it is in the best interest of the City of Cahokia Heights that Ordinance No. 1158 be amended and adopted.

NOW THEREFORE, BE IT ORDAINED BY THE MAYOR AND THE CITY COUNCIL OF THE CITY OF CAHOKIA HEIGHTS, ST. CLAIR COUNTY, ILLINOIS AS FOLLOWS:

**Section 1.** That Ordinance No. 1158 of the Village of Cahokia is adopted as an ordinance of the City of Cahokia Heights.

**Section 2**.    That Ordinance No. 1158 of the City of Cahokia Heights is hereby amended to include the following service charges and fees as follows:

| | |
|---|---|
| Deposit (Resident) | $ 75.00 |
| Processing fee (Water area) | $ 40.00 |
| Meter Tampering Charge | $100.00 |
| Recheck shut-offs – back on | $100.00 |
| Broken Lock Charge | $ 75.00 |
| Broken Shut-off Valve Charge | $100.00 |
| Fire Hydrant Rental Fee (plus water at metered rates) | $ 50.00 |
| Broken Riser Charge | $100.00 |
| Disconnect water @ main | $400.00 |
| Dig (disconnect) up sewer @ main | $500.00 |
| Initial Connection free; and 2nd Trip (depending on circumstances) | $ 40.00 |
| Meter Testing Charge (Customer request/nothing wrong with meter) | $ 75.00 |
| Second Tampering Charge (in one instance) | $200.00 |
| All Business Deposit Fee | $200.00 |
| Illegal usage is calculated by average gallons used (add sewer if we service both) | |
| Returned Check Charge | $ 50.00 |
| Lien Release Charge | $120.00 |
| Jumper Removal Fee | $100.00 |
| Stolen Meter Charge | $350.00 |
| Crimp off @ main | $400.00 |
| Call-out after house customer problem | $150.00 |
| Water taps over 1" (Time and material) Varies | |
| Sewer Tap Fee | $750.00 |

**Section 2.**    That conflicting ordinances or pertinent portions thereof in effect at the time this ordinance takes effect are hereby repealed.

**Section 3.**    This ordinance shall take effect from and after its passage. approval and publication by pamphlet all as provided by law.

**THIS ORDINANCE PRESENTED to the City Council this __13__ day of __DECEMBER__, A.D. 2021**

|               | **AYE** | **NAY** |
|---------------|---------|---------|
| Pearce        | Y       |         |
| VanMeter      | Y       |         |
| Jethroe - Franklin | R  |         |
| Liddell - Ware | Y      |         |
| McCallum      | E       |         |
| Weeden        | Y       |         |
| Haywood       | Y       |         |
| Townsend      | Y       |         |

**APPROVED** by the Mayor of the City of Cahokia Heights, Illinois this 13 day of DECEMBER , A.D. 2021.

_____ L. McCall
MAYOR

ATTEST:

_Richard Mencas_
CITY CLERK

**STATE OF ILLINOIS** )
**COUNTY OF ST. CLAIR** )

## **CERTIFICATION**

The undersigned City Clerk does herewith certify that the attached is a true and correct

copy of the Ordinance duly adopted by the Mayor and City Council of the City of Cahokia

Heights at a meeting of the City Council held on the _13_ day of _DECEMBER_, 2021.

Richard Duncan
CITY CLERK

## ORDINANCE NO. 1158

**AN ORDINANCE AMENDING ORDINANCE #969, ENTITLED"AN ORDINANCE AMENDING ORDINANCE No. 627, 721, 807, 843 and 903 ENTITLED "AN ORDINANCE REGULATING THE USE OF PUBLIC AND PRIVATE SEWERS AND DRAINS, PRIVATE SEWAGE DISPOSAL, THE INSTALLATION AND CONNECTION OF BUILDING SEWERS, THE DISCHARGE OF WATER AND WASTE INTO THE PUBLIC SEWER SYSTEM AND PROVIDING PENALTIES FOR VIOLATIONS HEREOF; THE LEVYING OF CHARGES FOR WASTEWATER SERVICES (USER CHARGES)", AND FIXING THE METER RATES AND WATER SERVICE CHARGES AND THE SEWER SERVICE CHARGES OF THE VILLAGE OF CAHOKIA, ILLINOIS.**

WHEREAS, the Village of Cahokia, Illinois, operates and maintains a Waterworks System for furnishing of water supplied to water users in the Village of Cahokia, Illinois;

WHEREAS, the Village of Cahokia, Illinois operates and maintains public and private sewers and drains and private sewage disposal, installation and connection of building sewers, discharge of waters and waste into public sewer systems in the Village of Cahokia; and

WHEREAS, it is for the best interest of the Village of Cahokia, Illinois that the sewer service charges shall be amended; and

NOW, THEREFORE BE IT ORDAINED by the Village Board of Trustees of the Village of Cahokia, Illinois as follows:

1.    That the Ordinances pertaining to sewer service charges and section 38-4-30 of the Ordinances are hereby amended to provide as follows:

SECTION 38-4-30.    **Sewer Service Charges.** Pursuant to this Chapter and Article the following rates and charges for the use and services of the sewerage system are hereby established;

Thereafter for a twelve (12) month period:

(A)  Residential and/or each dwelling        Monthly Rate
     Unit and churches                          $15.00

(B)  Commercial and Institutional accounts
     Water usage (gallons per month)
     0 to 7,500                                 $15.00
     7,501 to 15,000                            $17.40
     15,001 to 50,000                           $31.60
     50,001 to 100,000                          $62.10
     100,001 to 200,000                         $93.70
     150,001 to 200,000                        $124.10
     200,001 to 250,000                        $154.70
     250,001 to 300,000                        $184.10
     Over 300,000 gallons water usage per
     Month shall be billed an additional $63.10
     Per month for each 100,000 gallons of usage
     Or fraction thereof. (Ord No. 843; 06-15-93)

Thereafter for a twelve (12) month period:

(A)  Residential and/or each dwelling        Monthly Rate
     Unit and churches                          $16.25

(B)  Commercial and Institutional accounts
     Water usage (gallons per month)
     0 to 7,500                                 $16.25
     7,501 to 15,000                            $18.65
     15,001 to 50,000                           $32.85
     50,001 to 100,000                          $63.35
     100,001 to 200,000                         $94.95
     150,001 to 200,000                        $125.35
     200,001 to 250,000                        $155.95
     250,001 to 300,000                        $185.35
     Over 300,000 gallons water usage per
     Month shall be billed an additional $64.35
     Per month for each 100,000 gallons of usage
     Or fraction thereof. (Ord No. 843; 06-15-93)

From the passage of this ordinance for a succeeding twelve (12) month period:

(A)  Residential and/or each dwelling        Monthly Rate
     Unit and churches                       $17.75

(C)  Commercial and Institutional accounts
     Water usage (gallons per month)
     0 to 7,500                              $17.75
     7,501 to 15,000                         $20.15
     15,001 to 50,000                        $34.35
     50,001 to 100,000                       $64.85
     100,001 to 200,000                      $96.45
     150,001 to 200,000                      $126.85
     200,001 to 250,000                      $157.45
     250,001 to 300,000                      $186.85
     Over 300,000 gallons water usage per
     Month shall be billed an additional $65.85
     Per month for each 100,000 gallons of usage
     Or fraction thereof. (Ord No. 843; 06-15-93)

Such rates and charges shall be made and collected against each lot, parcel of land or premises situated in the Village which may actively discharge sewage or industrial waste, either directly or indirectly into the sewerage system (Ord. No. 807; 06-04-91)

The Village may also, if practical, disconnect the sewerage connections from said premises; and the same shall not be again connected or used until all delinquent accounts, bills, or services are paid in full, including a fee of One Hundred Fifty Dollars ($150.00) for reconnecting said sewer service, and the reasonable cost of reconnecting services, if the same be disconnected. (Ord. No. 558)

## EFFECTIVE DATE OF RATES
SECTION 3.        The rates effective for user charges hereinabove set forth, shall be effective as of June 1, 2011, and shall be included on bills to be rendered for the next succeeding month beginning June 1, 2011 for monthly users and other users.

SECTION 4.        That if any section, paragraph, clause or provision of this

Ordinance shall be held to be invalid or unenforceable for any reason, the invalidity or unenforceability of such section, paragraph, clause or provision shall not affect any of the provisions of this Ordinance are to the effect of such conflict repealed.

All ordinances, resolutions and orders thereof, not in conflict with any provisions of this Ordinance shall remain in full force and effect.

Passed by the Village Board of Trustees, Village of Cahokia this _15_ day of February, 2011

VILLAGE OF CAHOKIA, ILLINOIS

By _____
Village President

ATTEST:

ATTEST:

_____
CITY CLERK

STATE OF ILLINOIS )
COUNTY OF ST. CLAIR )

## CERTIFICATION

The undersigned Village Clerk does herewith certify that the attached is a true and correct copy of the Ordinance duly adopted by the Mayor and Board of Trustees of the Village of Cahokia at a meeting of the Village Board held on the _15_ day of _February_, 2011.

_____
VILLAGE CLERK

## AN ORDINANCE ADOPTING REGULATIONS ON CROSS-CONNECTION CONTROL TO THE CITY OF CAHOKIA HEIGHTS, ILLINOIS

BE IT ORDAINED by the Mayor and the City Council of the City of Cahokia Heights, Illinois that the following regulations are herewith adopted by the City of Cahokia Heights, Illinois:

Section 1. Cross-Connection Control--General Policy

A.  Purpose. The purpose of these Rules and Regulations is:

1.  To protect the public water supply system form contamination or pollution by isolating within the customer's water system contaminants or pollutants which could backflow through the service connection into the public water supply system.

2.  To promote the elimination or control of existing cross-connections, actual or potential, between the public or consumer's potable water, water system and non-potable water systems, plumbing fixtures and sources or systems containing substances of unknown or questionable safety.

3.  To provide for the maintenance of a continuing program of cross-connection control which will prevent the contamination or pollution of the public and consumer's potable water systems.

B.  Application. These Rules and Regulations shall apply to all premises served by the City of Cahokia Heights (the "Water District").

C.  Policy. The owner or official custodian shall be responsible for protection of the public water supply system from contamination due to backflow or back siphonage of contaminants through the customer's water service connection. If, in the judgment of the Water District's Director or its authorized representative, an approved backflow prevention device is necessary for the safety of the public water supply system, the Water District's Director shall give notice to the consumer to install such approved backflow prevention device at each service connection to the premises. The consumer shall immediately install such approved device or devices at his own expense; failure, refusal, or inability on the part of the consumer to install such device or devices immediately shall constitute grounds for discontinuing water service to the premises until such device or devices have been installed. The consumer shall retain records of installation, maintenance, testing, and repair as required in Section 5D(4) below for a period of at least five years. The Water District may require the consumer to submit a cross-connection inspection report to the City of Cahokia Heights Water District Director to assist in whether or not service line protection will be required. All cross-connection inspections shall be conducted by a Cross-Connection Control Device Inspector certified by the Illinois Environmental Protection Agency.

Section 2. Definitions

A.  The following definitions shall apply in the interpretation and enforcement of these regulations:

1. "Fixed Proper Air Gap" means the unobstructed vertical distance through the free atmosphere between the water discharge point and the flood level rim of the receptacle.

2. "Agency" means Illinois Environmental Protection Agency.

3. "Approved" means backflow prevention devices or methods approved by the Research Foundation for Cross-Connection Control of the University of Southern California, Association of State Sanitary Engineers, American Water Works Association, American National Standards Institute or certified by the National Sanitation Foundation.

4. "Auxiliary Water System" means any water source or system on or available to the premises other than the public water supply system and includes the water supplied by the system. These auxiliary waters may include water from another purveyor's public water supply system; or water from a source such as wells, lakes, or streams or process fluids; or used water. These waters may be polluted or contaminated or objectionable or constitute a water source or system over which the water purveyor does not have control.

5. "Backflow" means the flow of water or other liquids, mixtures, or substances into the distribution pipes of a potable water system from any source other than the intended source of the potable water supply.

6. "Backflow prevention device" means any device method, or type of construction to prevent backflow into potable water system. All devices used for backflow prevention in Illinois must meet the standards of the Illinois Plumbing Code and the Illinois Environmental Protection Agency.

7. "Back Pressure" means backflow caused by a pump, elevated tank, boiler, or other means that could create pressure within the system greater than the supply pressure.

8. "Back Siphonage" means a form of backflow due to a negative or sub-atmospheric pressure within a water system.

9. "Consumer" or "Customer" means the owner, official custodian or person in control of any premises supplied by or in any manner connected to a public water system.

10. "Contamination" means an impairment of the quality of the water by entrance of any substance to a degree which could create a health hazard.

11. "Cross-Connection" means any physical connection or arrangement between two otherwise separate piping systems, one of which contains potable water and the other a substance of unknown or questionable safety or quality, whereby there may be a flow from a system into the other.

    Direct cross-connection means a cross-connection formed when a water system is physically joined to a source of unknown or unsafe substance.

Indirect cross-connection means a cross-connection through which an unknown substance can be forced, drawn by vacuum or otherwise introduced into a safe potable water system.

12. "Double check valve assembly" means an assembly composed of single, independently acting check valves approved under ASSE Standard 1015. A double check valve assembly must include tight shutoff valves located at each end of the assembly and suitable connections for testing the water-tight-ness of each check valve.

13. "Hazard, Degree of" means the results of an evaluation of a health system, or plumbing hazard.

14. "Hazard, Plumbing" means a cross-connection in a consumer's potable-water system that may permit back siphonage in the event of a negative pressure in the supply line (Unprotected plumbing-type cross connections are considered to be health hazard. They include but are not to be health hazard. They include, but are not limited to, faulty connections to fixtures such as toilets, sinks, tubs, lavatories, wash trays and domestic washing machines.

15. "Health Hazard" means any condition, device or practice in a water system or its operations resulting from real or potential danger to the health and well-being of consumers. The word "severe" as used to qualify "health hazard" means a hazard to the health of the user that could be expected to result in death or significant reduction in the quality of life.

16. "Industrial Fluids" means any fluid or solution that may chemically, biologically, or physically degrade the approved water supply.

17. "Industrial Line" means a separate water piping system serving water-using devices, with a backflow preventer or air gap separation on this line at the point of takeoff from the potable-water line.

18. "Industrial Piping System, Consumers" means a system used by a consumer for transmission or storage of anything (fluid, solid, or gas) for human consumption of food processing. (Such a system would include all pipes, conduits, tanks, receptacles, fixtures, equipment, and appurtenances used to produce, convey, or store substance that are or may be polluted.)

19. "Inspection" means a plumbing inspection to examine carefully and critically all materials, fixtures, piping and appurtenances, appliances and installations of a plumbing system for compliance with requirements of the Illinois Plumbing Code, 77 IL Adm, Code 890.

20. "Laboratory, Approved Testing" means on that is approved by the appropriate health agency and water laboratory and is properly staffed and equipped with pumps, meters, measuring devices, and other equipment to test and evaluate fully a backflow prevention device for design, material, construction and operation.

21. "Non-potable water" means water not safe for drinking, personal, or culinary use as determined by the requirements of 35 IL Adm. Code 604.

22. "Plumbing" means the actual installation, repair maintenance, alteration or extension of a plumbing system by any person. Plumbing includes all piping, fixtures, appurtenances and appliances for a supply of water for all purposes, including without limitation lawn sprinkler systems, from the source of a private water system supply on the premises or from the main in the street, alley or at the curb to, within and about any building or buildings where a person or persons live, work or assemble. Plumbing includes all piping, fixtures, appurtenances and appliance for a building or buildings where a person or person live, work or assemble from the point of connection of such building drain to the building sewer or private sewage disposal system five feet beyond the foundation walls.

23. "Pollution" means the presence of any foreign substance (organic, inorganic, radiological, or biological) in water that tends to degrade its quality so as to constitute a hazard or impair the usefulness of the water.

24. "Potable water" means water which meets the requirements of 35 IL Adm. Code 604 for drinking, culinary and domestic purposes.

25. "Potential Cross-Connection" means a fixture or appurtenance with threaded hose connection, tapered spout, or other connection which would facilitate extension of the water supply line beyond its legal termination point.

26. "Process fluid(s)" means any fluid or solution which may be chemically, biologically, or otherwise contaminated or polluted in form of concentration such as would constitute a health, pollution, or system hazard if introduced into the public or a consumer's potable water system. This includes but is not limited to:

    a.  polluted or contaminated waters;
    b.  process waters;
    c.  used waters originating from the public water supply system which may have deteriorated in sanitary quality;
    d.  cooling waters;
    e.  questionable or contaminated natural waters taken from wells, lakes, streams, or irrigation systems;
    f.  chemical in solution or suspension;
    g.  oils, gases, acids, alkalis and other liquid and gaseous fluids used in industrial or other processes, or for firefighting purposes.

27. "Public Water Supply" means all main, pipes and structures through which water is obtained and distributed to the public, including wells and well structures, intakes and cribs, pumping stations, treatment plants, reservoirs, storage tanks and appurtenances, collectively or severally, actually used or intended for use for the purpose of furnishing water for drinking or general domestic use and which serve at least 15 service connections or which regularly serve at least 25 persons at least 60 days per year. A public water supply is either a "community water supply" or a "non-community water supply"

28. "Reduced pressure principle backflow prevention device" means a device containing a minimum or two independently acting check valves together with an automatically operated pressure differential relief valve located between the two check valves and approved under ASSE Standard 1013. During normal flow and at the cessation of normal flow, the pressure between these two checks shall be less than the supply pressure. In case of leakage of either check valve, the differential relief valve, by discharging to the atmosphere, shall operate to maintain the pressure between the check valves at less than the supply pressure. The unit must include tightly closing shutoff valves located at each end of the device, and each device shall be fitted with properly located test locks.

29. "Service Connection" means the opening, including all fittings and appurtenances, at the water main through which water is supplied to the user.

30. "Survey" means the collection of information pertaining to a customer's piping system regarding the location of all connections to the public water supply system and must include the location, type and most recent inspection and testing date of all cross-connection control devices and methods located within that customer's piping system. The survey must be in written form and should not be an actual plumbing inspection.

31. "System Hazard" means a condition through which an aesthetically objectionable or degrading material not dangerous to health may enter the public water supply system or a consumer's potable water system.

32. "Used Water" means any water supplied by a public water supply system to a consumer's water system after it has passed through the service connection and is no longer under the control of the water supply official custodian.

33. "Water Purveyor" means the owner of official custodian of a public water system.

34. "Water Supervisor" means the consumer or his deputy charged with the responsibility of maintaining a consumer's water system free from cross-connections and other sanitary defects. (A certified backflow prevention device tester should not act as a water supervisor unless he is full-time employee of the consumer, having the day- to-day responsibility for the installation and use of pipelines and equipment of the premises and for the avoidance of cross-connection.)

35. "Water, Supply, Approved" means any publicly owned domestic water system operated under public-health supervision. Such a system included all sources, facilities, and appurtenances between the source and the point of deliver, such as valves, pumps, pipes, conduits, tanks, receptacles, fixtures, equipment, and appurtenances used to produce, convey, treat, or store a potable water for public consumption or use.

Section 3. Water System

    A.    The water system shall be considered as made up of two parts: The public water supply system and the consumer's water system.

    B.    The public water supply system shall consist of the source facilities and the distribution system and shall include all those facilities of the potable water system under the control of the Water District's Director up to the point where the consumer's water system begins.

    C.    The source shall include all components of the facilities utilize in the production, treatment, storage, and delivery of water to the public water supply distribution system.

    D.    The public water supply distribution system shall include the network of conduits used to deliver water from the source to the consumer's water system.

    E.    The consumer's water system shall include all part of the facilities beyond the service connection used to convey water from the public water supply distribution system to points of use.

Section 4. Cross-Connection Prohibited

    A.    Connection between potable water systems and other systems or equipment containing water or other substance of unknown or questionable quality are prohibited except when and where approved cross-connection control devices or methods are installed, tested and maintained to insure proper operation on a continuing basis.

    B    1.    No physical connection shall be permitted between the potable portion of supply and any other water supply not of equal or better bacteriological and chemical quality as determined by inspection and analysis by the Agency.

            2.    There shall be no arrangement or connection by which an unsafe substance may enter a supply.

Section 5. Survey and Investigations

    A.    The consumer's premises shall be open at all reasonable times to approved cross-connection control device inspector for the inspection of the presence or absence of cross-connections within the consumer's premises, and testing, repair, and maintenance of cross-connection control devices within the consumer's premises.

    B.    On request by the Water District's Director, or his authorized representative, the consumer shall furnish information regarding the piping system or systems or water use within the customer's premises. The consumer's premises shall be open at all reasonable times to the Water District's Director for the verification of information submitted by the inspection consumer to the public water supply custodian regarding cross-connection inspection results.

    C.    It shall be the responsibility of the water consumer to arrange periodic surveys of water use practices on his premises to determine whether there

are actual potential cross-connection to his water system through which contaminants or pollutants could backflow into his or the public potable water system. All cross-connection control or other plumbing inspection must be conducted in accordance with IL Rev. Stat. 1987, Ch. 111, Par.1103(1).

D.  It is the responsibility of the water consumer to prevent backflow in the public water system by ensuring that:

1.  All cross-connections are removed; or approved cross-connection control devices are installed for control of backflow and back-siphonage.

2.  Cross-connection control devices shall be installed in accordance with the manufacturer's instructions.

3.  Cross-connection control devices shall be inspected at the time of installation and at least annually by a person approved by the Agency as a cross- connection control device inspector (CCCDI). The inspection of mechanical devices shall include physical testing in accordance with the manufacturer's instruction.

4.  Testing and Records

    a.  Each device shall be tested at the time of installation and at least annually or more frequently if recommended by the manufacturer.

    b.  Records submitted to the community public water supply shall be available for inspection by Agency personnel in accordance with IL Rev. Stat. 1987, Ch. 111 1/2, Par. 1004 (e).

    c.  Each device shall have a tag attached listing the date of most recent test, name of CCDDI, and type and date of repairs.

    d.  A maintenance log shall be maintained and include:

        (1)  date of each test;

        (2)  name and approval number of person performing the test;

        (3)  test results;

        (4)  repairs or servicing required;

        (5)  repairs and date completed; and

        (6)  serving performed and dated completed;

Section 6. Where Protection is Required

A.   An approved backflow device shall be installed on all connections to the public water supply as described in the Plumbing Code, 77 IL Adm. Code 890 and the Agency's regulations 35 IL Adm. Code 680. In addition, an approved backflow prevention device shall be installed on each service line to a consumer's water system serving premises, where in the judgment of the Water District's Director, actual or potential hazards to the public water supply system exist.

B.   An approved backflow prevention device shall be installed on each service line to a consumer's water serving premises where the following conditions exist:

   1.   Premises having an auxiliary water supply, unless such auxiliary supply is accepted as an additional source by the Water District's Director and the source is approved by the Illinois Environmental Protection Agency.

   2.   Premises on which any substance is handled which can create an actual or potential hazard to the public water supply system. This shall include premises having sources or systems containing process fluids or waters originating from the public water supply which are no longer under the sanitary control of the Water District's Director.

   3.   Premises having internal cross-connections that, in the judgment of the Water District's Director and/or the Cross-Connection Control Device Inspector, are not correctable or intricate plumbing arrangements which make it impractical to determine whether or not cross-connections exist.

   4.   Premises where, because of security requirements or other prohibitions or restrictions, it is impossible or impractical to make a complete cross-connection survey.

   5.   Premises having a repeated history of cross- connections being established or re-established.

C.   An approved backflow device shall be installed on all connections to the public water supply as described in the Plumbing Code, 77 IL Adm. Cod 890 and the Agency's regulations 35 IL Adm. code 653. In addition, an approved backflow prevention device shall be installed on each service line to a consumer's water system serving, but not necessarily limited to, the following types of facilities unless the Water District's Director determines that no actual or potential hazard to the public water supply system exists:

   1.   Hospitals, mortuaries, clinic, nursing homes;
   2.   Laboratories;
   3.   Storage tanks, cooling towers &  circulating systems;
   4.   Sewage treatment plants, sewage pumping stations or storm water pumping stations;
   5.   Food or beverage processing plants;

6. Chemical plants;
7. Metal plating industries;
8. Petroleum processing or storage plants;
9. Radioactive material processing plants or nuclear reactors;
10. Car washes;
11. Pesticide, or herbicide or extermination plants and trucks;
12. Farm service and fertilizer plants and trucks;
13. Laundry and dyeing facilities;
14. Paper processing plants;
15. Auxiliary water systems;
16. Cooling systems;
17. Farming operations;
18. Fire protection systems;
19. Sprinkler systems filled with anti-freeze solution;
20. Film processing equipment:
21. Irrigation systems;
22. Steam generating systems;
23. Water treatment plants.

Section 7. Type or Protection Required

A. The type of protection required under Sections 6.1 and 6.3 of the regulations shall depend on the degree of hazard which exists as follows:

1. An approved fixed proper air gap separation shall be installed where the public water supply system may be contaminated with substances that could cause a severe health hazard.

2. An approved fixed proper air gap separation or an approved reduced pressure principle backflow prevention assembly shall be installed where the public water supply system may be contaminated with a substance that could cause a system or health hazard.

B. The type of protection required under Section 6.4 and 6.5 of these regulations shall be an approved fixed proper air gap separation or an approved reduced pressure principle backflow prevention device.

C. Where a public water supply or an auxiliary water supply is used for a fire protection system, reduced pressure principle backflow preventers shall be installed on fire safety systems connected to the public water supply when:

1. The fire safety system contains anti-freeze, fire retardant or other chemicals;

2. Water is pumped into the systems from another source;

3. Water flows by gravity from a nonpotable source;

4. Water can be pumped into the fire safety system from any other source;

5.   There is a connection whereby another source can be introduced into the fire safety system.

D.   All other fire safety systems connected to the potable water supply shall be protected by a double check valve assembly on metered service lines and a double detector check valve assembly on unmetered service lines.

Section 8. Backflow Prevention Devices

A.   All backflow prevention devices or methods required by these rules and regulations shall be approved by the Research Foundation for Cross-Connection Control of the University of Southern California, American Water Works Association, American Society of Sanitary Engineering, or American National Standards Institute or certified by the National Sanitation Foundation to be in compliance with applicable industry specification.

B.   Installation of approved devices shall be made in accordance with the manufacturer's instructions. Maintenance as recommended by the manufacturer to the device shall be performed. Manufacturer's maintenance manual shall be available on-site.

Section 9. Inspection and Maintenance

A. It shall be the duty of the consumer at any premises on which backflow prevention devices required by these regulations are installed to have inspection, tests, maintenance, and repair made *in* accordance with the following schedule or more often where inspections indicate a need or are specified in manufacturer's instructions:

1.   Fixed proper air gap separations shall be inspected to document that a proper vertical distance is maintained between the discharge point of the service line and the flood level rim of the receptacle at the time of installation and at least annually thereafter. Corrections to improper or by-passed air gaps shall be made within 24 hours.

2.   Double check valve assemblies shall be inspected and tested at time of installation and at least annually thereafter, and required service performed within five (5) days.

3.   Reduced pressure principle backflow prevention assemblies shall be tested at the time of installation and at least annually or more frequently if recommended by the manufacturer, and required service performed within five (5) days.

B.   Testing shall be performed by a person who has been approved by the Agency as competent to service the device. Proof of approval shall be in writing.

C.   Each device shall have a tag attached listing the date of most recent test or visual inspection, name of tester, and type and date of repairs.

D. A maintenance log shall be maintained and include:

    1. Date of each test or visual inspection;

    2. Name and approval number of person performing the test or visual inspection;

    3. Test results:

    4. Repairs or servicing required;

    5. Repairs and date completed; and

    6. Servicing performed and date completed.

E. Whenever backflow prevention devices required by these regulations are found to be defective, they shall be repaired or replaced at the expense of the consumer without delay as required by Section S.

F. Backflow prevention devices shall not be by-passed, made inoperative, removed, or otherwise made ineffective without specific authorization by the Water District's Director

## Section 10. Booster Pumps

A. Where a booster pump has been installed on the servicing line to or within any premises, such pump shall be equipped with a low pressure cut-off device designed to shut-off the booster pump when the pressure in the service line on the suction side of the pump drops to 20 psi or less.

B. It shall be the duty of the water consumer to maintain the low pressure cut-off device in proper working order and to certify to the Water District's Director, at least once a year, that the device is operable.

## Section 11. Violations

A. The Water District's Director shall deny or discontinue after reasonable notice to the occupants thereof, the water service to any premises wherein any backflow prevention device required by these regulations is not installed, tested, maintained and repaired in a manner acceptable to the Water District's Director, or if it is found that the backflow preventions device has been removed or by passed, or if an unprotected cross-connection exists on the premises, or if a low pressure cut-off required by these regulations is not installed and maintained in working order.

B. Water service to such premises shall not be restored until the consumer has corrected or eliminated such conditions or defects, in conformance with these regulations and to the satisfaction of the Water District's Director, and the required reconnection fee is paid.

C. Water service to such premises shall not be restored until the consumer has corrected or eliminated such conditions or defects in conformance with these regulations and the satisfaction of the Water District's Director.

D.   Neither the Water District's Director, or its agents or assigns shall be liable to any customers of the City of Cahokia Heights for any injury, damages or lost revenues which may result from termination of said customer's water supply in accordance with the terms of this Ordinance, whether or not said termination of the water supply was with or without notice.

E.   The consumer responsible for back-siphoned material or contamination through backflow, if contamination of the potable water supply system occurs through an illegal cross-connection or an improperly installed, maintained, or repaired device, or a device which has been by-passed, must bear the cost of clean-up of the potable water supply system.

F.   Any person found to be violating any provision of this Ordinance shall be served with written notice stating the notice of the violation and providing a reasonable time limit for the satisfactory correction thereof. The offender shall, within the period of time stated in such notice, permanently cease all violation.

G.   Any person violating any of the provisions of this Ordinance in addition to the fine provided, shall become liable to the Water District for any expense, loss or damage occasioned by the Water District by reason of such violation, whether the same was caused before or after notice.

Section 12.   Effective Date

This Ordinance shall be in full force and effect from and after upon its passage and publication in accordance with Section 1-2-4 of the Illinois Municipal Code.

**THIS ORDINANCE IS PRESENTED to the Mayor and the City Council** th 11 ay of MAY , **A.D. 2022**

|               | AYE | NAY |
|---------------|-----|-----|
| Pearce        | Y   |     |
| VanMeter      | Y   |     |
| Liddel - Ware | Y   |     |
| McCallum      | E   |     |
| Weeden        | Y   |     |
| Haywood       | Y   |     |
| Townsend      | Y   |     |
| Lovett        | Y   |     |

**APPROVED** by the Mayor of the City of Cahokia Heights, Illinois this 11 day of MAY A.D. 2022.

_____
MAYOR

ATTEST:
_____
CITY CLERK

## CERTIFICATION

The undersigned City Clerk does herewith certify that the attached is a true and correct copy of

the Ordinance duly adopted by the Mayor and City Council of the City of Cahokia Heights at a meeting of

the City Council held on the 11 _____ day of MAY _____, 2022.

CITY CLERK

-3-

ORDINANCE NO. 22- 1423

## AN ORDINANCE TO ESTABLISH CROSS-CONNECTION CONTROL TO THE CITY OF CAHOKIA HEIGHTS, ILLINOIS AND PROVIDE AN EFFECTIVE MEANS FOR PROTECTING THE PUBLIC WATER SUPPLY SYSTEM FROM CONTAMINATION DUE TO BACKFLOW OF CONTAMINANTS THROUGH THE CUSTOMER WATER SERVICE CONNECTION IN THE PUBLIC WATER SYSTEM

WHEREAS, Rule 890.1510 of the Illinois Plumbing Code, 77 IL Adm. Code 890.1510, requires

protection of all potable water systems for contamination due to backflow of contaminants through

plumbing connections, fixtures or appurtenances; and

WHEREAS, the Illinois Pollution Control Board Regulations, 35 IL Adm. Code 601.101, et seq.

requires an active program of cross- connection control which will prevent the contamination of all

public water supply systems due to backflow of contaminants or pollutants through the potable water

service connections; and

WHEREAS, in order to accomplish these goals it is necessary to introduce restrictions that describe in

detail specific procedures and requirements for cross-connection control;

NOW, THEREFORE, BE IT ORDAINED by the Mayor and the City Council of the City of Cahokia

Heights, Illinois as follows:

SECTION 1. That all plumbing installed within the City of Cahokia Heights, Illinois, shall be installed in accordance with the Illinois Plumbing Code, 77 IL Adm. code 890. That, if in accordance with the Illinois Plumbing Code or in the judgment of the Director of the Water and Sewer Water District of the City of Cahokia Heights, Illinois ("Water District's Director"), an approved backflow prevention device is necessary for the safety of the public water supply system, the Director will give notice to the water customer to install such an approved device immediately. The water customer shall, at his own expense, install such an approved device at a location and in a manner in accordance with the Illinois Plumbing Code, Illinois Environmental Protection Agency, and all applicable local regulations, and shall have inspections and tests made of such approved devices upon installation and as required by the Illinois Plumbing Code, Illinois Environmental Protection Agency and local regulations.

SECTION 2. That no person, firm or corporation shall establish or permit to be maintained any connection whereby a private, auxiliary or emergency water supply other than the regular public water supply of the City of Cahokia Heights, Cahokia, Illinois, may enter the supply or distribution system and the method of connection and use of such supply shall have been approved by the and the Illinois Environmental Protection Agency.

SECTION 3. That it shall be the duty of the Water District's Director to cause surveys and investigations to be made of commercial industrial and other properties served by the public water supply to determine whether actual or potential hazards to the public water supply may exist. Such surveys and investigations shall be made a matter of public record and shall be repeated at least every two years, or as often as the Water District's Director shall deem necessary. Records of such surveys shall be maintained and available for review for a period of at least five years.

SECTION 4. That the approved cross-connection control device inspector shall have the right to enter at any reasonable time any property served by a connection to the public water supply or distribution system for the purpose of verifying the presence or absence of cross-connections, and that the Water District's Director or his authorized agent shall have the right to enter at any reasonable time any property served by a connection to the public water supply or distribution system of the City of Cahokia Heights, Illinois for the purpose of verifying information submitted by the customer regarding the required cross-connection control inspection. On demand the owner, lessees or occupants of any property so served shall furnish to the Water District's Director any information which he may request regarding the piping system or systems or water use on such property. The refusal of such information, when demanded, shall, within the discretion of the Water District's Director, be deemed evidence of the presence of improper connections as provided in this Ordinance.

SECTION 5. That the Water District's Director is hereby authorized and directed to discontinue, after reasonable notice to the occupant thereof. the water service to any property wherein any connection in violation of the provisions of this Ordinance is known to exist, and to take such other precautionary measures as he may deem necessary to eliminate any danger of contamination of the public water supply distribution mains. water service to such property shall not be restored until such conditions have been eliminated or corrected in compliance with the provisions of this Ordinance and until a reconnection fee of $250.00 is paid to the City of Cahokia Heights, Illinois. Immediate disconnection with verbal notice can be effected when the Water District's Director is assured that imminent danger of harmful contamination of the public water supply system exist. Such action shall be followed by written notification of the cause of disconnection. Immediate disconnection without notice to any party can be effected to prevent actual or anticipated contamination or pollution of the public water supply, provided that, in the reasonable opinion of the Water District's Director, or its agents or assigns shall be liable to any customer for any injury. damages or lost revenues which may result from termination of said customer's water supply in accordance with the terms of this Ordinance, whether or not said termination was with or without notice.

SECTION 6. That the consumer responsible for back-siphoned or back pressured material or contamination through backflow, if contamination of the potable water supply system occurs through an illegal cross-connection or an improperly installed, maintained, or repaired device, or a device which has been bypassed, must bear the cost of clean-up of the potable water supply system.

SECTION 7. This Ordinance shall be in full force and effect from and after upon its passage and publication in accordance with Section 1-2-4 of the Illinois Municipal Code.

**THIS ORDINANCE PRESENTED to the City Council this _11_ ay of MAY A.D. 2022**

|  | AYE | NAY |
|---|---|---|
| Pearce | Y | |
| VanMeter | Y | |
| Liddel - Ware | Y | |
| McCallum | E | |

| | | |
|---|---|---|
| Weeden | Y | |
| Haywood | Y | |
| Townsend | Y | |
| Lovett | Y | |

**APPROVED** by the Mayor of the City of Cahokia Heights, Illinois this  11  day of A.D. 2022. MAY

_____
MAYOR

ATTEST:

_____
CITY CLERK

## CERTIFICATION

The undersigned City Clerk does herewith certify that the attached is a true and correct copy of the duly adopted by the Mayor and Board of Alderman of the City of Cahokia at the Board meeting of the City Of Cahokia Heights Board held on the 11 day of MAY 2022

CITY CLERK

RESOLUTION NO 21-1138

## A RESOLUTION AUTHORIZING THE EXECUTION OF AN INTERGOVERNMENTAL AGREEMENT WITH THE COMMONFIELDS OF CAHOKIA PUBLIC WATER DISTRICT

**WHEREAS,** the Commonfields of Cahokia Public Water District is organized and existing under the laws of the State of Illinois; and

**WHEREAS,** the Commonfields of Cahokia Public Water District was dissolved pursuant to a referendum held on April 6, 2021; and

**WHEREAS,** the City of Cahokia Heights is willing to take over the operation of Commonfields of Cahokia Public Water District to provide water service to residents; and

**WHEREAS,** the Commonfields of Cahokia Public Water District and the City of Cahokia Heights have reduced their agreement to writing.

**NOW THEREFORE, BE IT RESOLVED BY THE MAYOR AND THE CITY COUNCIL OF THE CITY OF CAHOKIA HEIGHTS, ST. CLAIR COUNTY, ILLINOIS,**

Section 1. That the Mayor is hereby authorized to execute the Intergovernmental Agreement attached hereto marked Exhibit "A" and made a part hereof.

**THIS RESOLUTION PRESENTED to the City Council this** 9 **day of** JUNE , **A.D. 2021.**

|                  | AYE | NAY |
| ---------------- | --- | --- |
| Haywood          | Y   |     |
| VanMeter         | Y   |     |
| Jethroe-Franklin | Y   |     |
| Liddell-Ware     | Y   |     |
| McCallum         | Y   |     |
| Weeden           | Y   |     |
| Pearce           | Y   |     |
| Townsend         | Y   |     |

**APPROVED** by the Mayor of the City of Cahokia Heights, Illinois this 9 day of JUNE , A.D. 2021.

Curt L. McLah
MAYOR

INTERGOVERNMENTAL AGREEMENT

This Intergovernmental Agreement made this __9__ day of __JUNE__ ,
2021 by and between City of Cahokia Heights, Illinois hereinafter known as "City" and the
Commonfields of Cahokia Public Water District and hereinafter known as "Commonfields".

WHEREAS, Article 7 Paragraph 10 of the Illinois Constitution authorizes units of local
government to enter into Intergovernmental cooperation agreements; and

WHEREAS, Commonfields of Cahokia Public Water District was dissolved pursuant to a
referendum held on April 6, 2021; and,

WHEREAS, the City of Cahokia Heights, Illinois is willing to take over the operation of
Commonfields of Cahokia Public Water District to provide water services to residents; and,

WHEREAS, Commonfields of Cahokia Public Water District wishes that the City of
Cahokia Heights, Illinois take over their water district business.

THEREFORE, in consideration of mutual promises and conditions contained in this
Contract the parties agree as follows:

1. Commonfields hereby agrees to transfer all of its assets described in the attached
schedule together with Commonfields water business as a growing concern.

2. The City of Cahokia Heights agrees to continue operating Commonfields water
business and to continue serving customers being served by Commonfields.

3. Except for any collective bargaining agreement entered into by Commonfields,
City shall assume all debts and liabilities and obligations of Commonfields.

4. At the closing, Commonfields shall deliver to City all deeds, bills of sale,
endorsements, assignments, and other instruments of conveyance and transfer in a form
satisfactory to City's counsel, containing full warranties of title as necessary to vest in the City

1

absolute and marketable title to the properties, assets, and business being transferred by Commonfields, free and clear of all liens, charges, encumbrances, and any other restrictions. Commonfields shall deliver to the City all contracts, dealer franchises, and agreements, commitments, and rights pertaining to Commonfields business and other data relating to its assets, business, and operation, except its books of account and supporting records, corporate minute books. Commonfields shall take all steps that may be required to put City in actual possession, operation, and control of the properties, assets, and business to be transferred under this contract. All applicable taxes and fees that may be due or payable as a result of the conveyance, assignment, transfer, or delivery of the property, assets, or business to be conveyed and transferred as provided by this contract, whether levied on Commonfields or City shall be paid by Commonfields.

5. After the closing and at the request of the City, Commonfields shall execute and deliver to the City other instrument of conveyance and transfer and take other action as the City may reasonably require more effectively to transfer to and vest in the City, and to put the City in possession of, any of the properties or assets to be transferred under this contract.

6. Commonfields represents and warrants that it is a public water district organized under the laws of the State of Illinois and has all requisite corporate power and authority to carryon its business as it is currently being conducted, to enter into this contract, and to carry out and perform the terms and provisions of this contract.

7. Commonfields has delivered to the City an audited balance sheet as of

_____. A copy is attached hereto marked Exhibit "A". Commonfields represents to warrants that to the best of Commonfields knowledge and belief, the balance sheet was prepared in accordance with generally accepted accounting principles, applied on a basis

2

consistent with prior periods, fairly presents the financial condition of Commonfields at the date

of the balance sheet, and discloses all of the debts, liabilities, and obligations of Commonfields

arising out of transactions occurring, or any state of facts existing, on or prior to the date of the

balance sheet. Commonfields represents and warrants that between _____

(date of balance sheet), and the date of this contract, Commonfields has not: (a) incurred any

obligations or liabilities except current liabilities incurred in the ordinary course of business; (b)

mortgaged, pledged, subjected to lien, charge, or encumbrance, or granted a security interest in

any of its assets, tangible or intangible; (c) canceled any debt or claim or sold or transferred any

of its assets or properties except by sales out of in the ordinary course of business; (d) suffered

any damage, destruction, or loss (whether or not covered by insurance) affecting its properties,

business, or prospects; or (e) waived any rights of substantial value.

     8.     Commonfields represents and warrants that to the best of Commonfields'

knowledge there are no lawsuits or administrative proceedings pending or threatened against

Commonfields or affecting any of its property or rights.

     9     Commonfields represents and warrants that Commonfields is not in violation of

any term or provision of any charter, bylaw, mortgage, indenture, contract, agreement,

instrument, judgment, decree, order, statute, rule, or regulations; and Commonfields execution,

delivery and performance of this contract will not result in any violation or in the creation of any

mortgage, lien, encumbrance, or charge on any of the properties or assets of Commonfields.

     10.     Commonfields warrants that Commonfields has good, and absolute, and

marketable title to all of its properties and assets being transferred to the City pursuant to this

contract, and that Commonfields holds those properties and assets subject to no lease, mortgage,

pledge, lien, charge, security interest, encumbrance, or restriction.

11. Commonfields represents that the furniture, fixtures, equipment, and other tangible assets of Commonfields being transferred under this contract are in good condition and repair, reasonable wear and tear excepted.

12. The obligation of the City to consummate this contract is subject to and conditioned on the satisfaction, at or prior to the closing, of all of the terms and conditions of this contract to be complied with and performed by Commonfields at or prior to the closing, and subject to the following conditions:

a. The validity or legality of all actions, proceedings, instruments, and documents required to carry out this contract or incidental to this contract, and all other related legal matters, shall be approved by the City's counsel, and Commonfields shall furnish to the City's counsel all corporate and other records of Commonfields that have been requested for that purpose.

b. The representations and warranties of Commonfields in this contract shall be deemed to have been made again on the closing date and then be true and correct, subject to any changes contemplated by this contract.

13. Rights under this contract shall not be assigned by either party without the consent of the other. Nothing in this contract, expressed or implied that is intended to confer on any other person, other than the parties or their successors, any rights or remedies under or by reason of this contract.

14. This contract may be amended or modified at any time and in all respects, and any provision may be waived, by an instrument in writing executed by the City and Commonfields or by either of them in the case of a waiver.

15. It is the intention of the parties that the laws of the State of Illinois should govern the validity of this contract, the construction of its terms, and the interpretation of the rights and duties of the parties.

16. All the terms and provisions of this contract shall be binding on and inure to the benefit of, and be enforceable by, Commonfields and the City and their successors and assigns.

17. This contract constitutes the entire agreement between the parties, and there are no agreements, understandings, restrictions, warranties, or representations between the parties other than those set forth as provided in this contract.

COMMONFIELDS OF CAHOKIA
PUBLIC WATER DISTRICT,

BY _____ L. McCall

CITY OF CAHOKIA HEIGHTS,

BY: _____ L. McCall

## CERTIFICATION

The undersigned Village Clerk does herewith certify that the attached is a true and correct copy of the duly adopted by the Mayor and Board of Trustees of the village of Cahokia at a meeting of the Village Board held on the _9_ day of _JUNE_ 2021

CITY CLERK

AMENDING NO.470,471,474,475-AMERICAN BOTTOMS
RESOLUTION NO.21-1143

## AGREEMENT BY AND BETWEEN THE VILLAGE OF SAUGET, ILLINOIS ("SAUGET") AND THE CITY OF CAHOKIA HEIGHTS, ILLINOIS ("CAHOKIA HEIGHTS")

WHEREAS, in 1977 and as amended in 1982, a Regional Agreement was entered into by and between the Village of Sauget, Illinois("Sauget"), the Village of Cahokia, Illinois ("Cahokia") the Commonfields of Cahokia Public Water District ("Commonfields") and the City of East St. Louis, Illinois by which the parties agreed that the residents receiving sewer and /or water services from the respective parties would, at the commencement of operations of the Sauget owned American Bottoms Regional Wastewater Treatment Facility ("American Bottoms"), receive and be liable for wastewater treatment services provided by American Bottoms; and,

WHEREAS, Cahokia Heights, Illinois is a municipality created from the merger of Alcentra, Illinois and Cahokia as approved by the residents of those communities in a referendum conducted in April of 2021 called to consider whether a merger should take place; and,

WHEREAS, residents within the corporate boundaries of Commonfields, which included residents of Alcentra, Illinois and the former Cahokia, Illinois, passed a referendum in April of 2021 in favor of dissolution of the Commonfields of Cahokia Water District; and,

WHEREAS, the Board of Directors of Commonfields passed a resolution on June 7, 2021 (attached hereto as "Exhibit A") whereby Cahokia Heights and Commonfields agreed that Cahokia Heights assumes "except for any collective bargaining agreement entered into by Commonfields all debts and liabilities and obligations of Commonfields.":

NOW THEREFORE BE IT AGREED AS FOLLOWS:

1. The parties adopt the recital clauses as findings of fact.

2. Cahokia Heights agrees to be bound by and enjoy and assume the respective promises to and obligations of the former municipality of Cahokia and Commonfields as set out in the Regional Agreement of 1977 as amended in 1982.

City of Cahokia Heights, Illinois

By: _L. McCall_

Curtis McCall, Sr. , Mayor

Date: 9 - 22 - 21

Village of Sauget, Illinois

By: _____

Richard A. Sauget, Jr., Mayor

Date: 10 - 12 · 21

RESOLUTION NO. 471 ᵃ

WHEREAS, on January 25, 1982 the Village of Sauget, Illinois
offered to issue $268,000 of additional Regional Wastewater Treat-
ment Revenue Bonds to assist the Village of Cahokia in paying the
"local" share of its costs of repairing the "Cahokia Trunk Line"; and

WHEREAS, the Village of Cahokia, under the provisions of
Resolution No. 451, adopted and approved on January 26, 1982, accepted
said offer; and

WHEREAS, subsequently the Village of Cahokia requested that
said additional bonds be increased from $268,000 to $450,000; and

WHEREAS, the Village of Sauget, Illinois agreed to accept said
request to issue $450,000 of additional Regional Wastewater Treat-
ment Revenue Bonds to assist the Village of Cahokia in paying the
"local" share of its costs of repairing the "Cahokia Trunk Line"; and

WHEREAS, it is to the best interest of the Village of Cahokia,
Illinois that said additional bonds increasing said $268,000 to
$450,000, as hereinabove set forth.

NOW, THEREFORE, BE IT RESOLVED by the President and Board of
Trustees of the Village of Cahokia, Illinois that the request to the
Village of Sauget, Illinois for issuance of $450,000 of Regional Waste-
water Treatment Revenue Bonds to assist the Village of Cahokia in
paying the "local" share of its cost of repairing the "Cahokia Trunk
Line" be affirmed, and that the increase from $268,000 to $450,000
Regional Wastewater Treatment Revenue Bonds to assist the Village of
Cahokia, Illinois in paying the "local" share of its cost of repairing
the "Cahokia Trunk Line" aforesaid be and the same is hereby approved
and affirmed, and shall be effective as of December 7, 1982.

THIS RESOLUTION PRESENTED the 7th day of December, A.D. 1982.

APPROVED the 7th day of December, A.D. 1982.

PASSED the 7th day of December, A.D. 1982.

VILLAGE OF CAHOKIA, ILLINOIS

ATTEST:

By _____
                    Village President

_____
Village Clerk

(SEAL)

## CLERK'S CERTIFICATE

I, Jessie Brown, Village Clerk, do hereby certify that I am
the duly qualified and acting Village Clerk of the Village of
Cahokia, Illinois, and as such I am the keeper of the records and
files of the Board of Trustees of said Village.

I further certify that the foregoing is a full, true and
complete copy of Resolution No. $47/^a$ approving the increase
from $263,000 to $450,000 Village of Sauget Regional Wastewater
Treatment Revenue Bonds to assist the Village of Cahokia in paying
the "local" share of its cost of repairing the "Cahokia Trunk Line",
adopted the 7th day of December, A.D. 1982, the original of which is
now on file in my said office.

DATED this 7th day of December, A.D. 1982.

Jessie Brown
Village Clerk

(SEAL)

# VILLAGE OF CAHOKIA, ILLINOIS

# CODE OF ORDINANCES

2005 S-7 Supplement contains:
Local legislation current through Ord. 05-1091, passed 9-6-05
State legislation current through 2005 Legislative Service Pamphlet No. 5

AMERICAN LEGAL PUBLISHING CORPORATION

432 Walnut Street   Cincinnati, Ohio  45202-3909   (800) 445-5588

COPYRIGHT © 2005

AMERICAN LEGAL PUBLISHING CORPORATION

# CAHOKIA, ILLINOIS
## TABLE OF CONTENTS

Chapter

### TITLE I: GENERAL PROVISIONS

10.   General Provisions

### TITLE III: ADMINISTRATION

30.   Board of Trustees
     Appendix: Map of Districts
31.   Village Officers and Employees
32.   Finance and Taxation
33.   Code Enforcement
34.   Public Records
     Appendix: Exhibits
35.   Village Policy
36.   Ethics Ordinance

### TITLE V: PUBLIC WORKS

50.   Solid Waste
51.   Sewers
     Appendix: Applications for Sewer Permit
52.   Water and Sewer Rates; Water Supply

### TITLE VII: TRAFFIC CODE

70.   General Provisions
71.   Snow Routes
     Appendix: Maps of Snow Zones
72.   Traffic Rules
73.   Parking Regulations
74.   Traffic Schedules
75.   Parking Schedules

### TITLE IX: GENERAL REGULATIONS

90.   Animals
91.   Fire Prevention
92.   Nuisances
93.   Parks
94.   Preservation of Artifacts

## TITLE XI: BUSINESS REGULATIONS

110.   Permits and Licenses
111.   Amusements
112.   Temporary Businesses and Sales
113.   Liquor Control
114.   Pawnbrokers
115.   Bed and Breakfast Establishments
116.   Taxicabs
117.   Solicitors
118.   Tattoo or Body-Piercing Establishments

## TITLE XIII: GENERAL OFFENSES

130.   General Provisions
131.   Offenses Pertaining to Property
132.   Offenses Against Public Order
133.   Offenses Against Public Justice and Administration
134.   Offenses Against Public Morals
135.   Gambling Offenses
136.   Offenses Against Public Health and Safety
137.   Weapons
138.   Drug Offenses

## TITLE XV: LAND USAGE

150.   General Provisions
151.   Building Regulations
152.   Historic Preservation
153.   Development in Flood Hazard Areas
154.   Sign Control
       Appendix: Interstate Interchange Sign Control Zone Map
155.   Land Subdivision and Development
       Appendix A: Street Design Specifications
       Appendix B: Minimum Requirements for Structural Composition of
                   Pavements
       Appendix C: Street Diagrams
156.   Zoning
       Appendix A: Area and Bulk Regulations; Parking Requirements

## TABLE OF SPECIAL ORDINANCES

Table

| | |
|---|---|
| I. | Acceptances |
| II. | Agreements |
| III. | Annexations and Disannexations |
| IV. | Collective Bargaining Agreements |
| V. | Contracts |
| VI. | Easements |
| VII. | Economic Development |
| VIII. | Franchises |
| IX. | Real Estate Transactions |
| X. | Street Name Changes |
| XI. | Vacations |
| XII. | Variances |
| XIII. | Zoning Map Changes |

## PARALLEL REFERENCES

References to Illinois Compiled Statutes
References to Prior Code
References to Ordinances

## INDEX

# TITLE V:  PUBLIC WORKS

Chapter

**50.   SOLID WASTE**

**51.   SEWERS**
       **APPENDIX: APPLICATIONS FOR SEWER PERMIT**

**52.   WATER AND SEWER RATES**

1

# CHAPTER 51: SEWERS

Section

## *General Provisions*

51.01   Definitions
51.02   Use of public sewers required
51.03   Private sewage disposal
51.04   Protection of sewage works from damage

## *Building Sewers and Connections*

51.15   Unauthorized use prohibited
51.16   Classification of permits
51.17   Installation expense
51.18   Separate connections required
51.19   Conformance of construction
51.20   Construction requirements
51.21   Connection to be in conformance with certain standards
51.22   Inspection
51.23   Prevention of public hazard

## *Use of Public Sewers*

51.35   Unpolluted drainage
51.36   Discharge prohibitions
51.37   Industrial cost recovery
51.38   Actions of Village Board
51.39   Grease, oil, and sand interceptors
51.40   Maintenance of treatment facilities
51.41   Control manhole required
51.42   Laboratory tests and analyses
51.43   Special agreements

*Wastewater Service Charges*

51.55    Basis for charges
51.56    Measurement of flow

*Billing Procedures*

51.70    Bills and payment
51.71    Delinquency; disconnection
51.72    Disconnection for late payment
51.73    Foreclosure of lien
51.74    Revenues
51.75    System of accounts; access
51.76    Public access to rates

*Powers and Authority of Inspectors; Violations*

51.85    Access granted to inspectors
51.86    Non-liability of facility
51.87    Violations
Appendix:   Applications for sewer permits

## GENERAL PROVISIONS

§ 51.01  DEFINITIONS.

For the purpose of this chapter, the following definitions shall apply unless the context clearly indicates or requires a different meaning.

*ADMINISTRATOR.* The Administrator of the U. S. Environmental Protection Agency.

*APPROVING AUTHORITY.* The Village Board of Trustees, or its duly approved representative.

*BASIC USER CHARGE.* The basic assessment levied on all users of the public sewer system.

*BOD* or *BIOCHEMICAL OXYGEN DEMAND.* The quantity of oxygen utilized in the biochemical oxidation of organic matter under standard laboratory procedure in five days at 20°C, expressed in milligrams per liter.

*BUILDING DRAIN.* That part of the lowest piping of a drainage system which receives the discharge from soil, waste, and other drainage pipes inside the walls of the building and conveys it to the building sewer or other approved point of discharge, beginning five feet (1.5 meters) outside the inner face of the building wall.

*CONTROL MANHOLE.* A structure located on a site from which industrial wastes are discharged. Where feasible, the manhole shall have an interior drop. The purpose of a *CONTROL MANHOLE* is to provide access for the village representative to sample and/or measure discharges.

*DEBT SERVICE CHARGE.* The amount to be paid each billing period for payment of interest, principal and coverage of loan, bond, and the like outstanding, and shall be computed by dividing the annual debt service by the number of users connected to the wastewater facilities.

*DIRECTOR.* The Director of the Illinois Environmental Protection Agency.

*EASEMENT.* An acquired legal right for the specific use of land owned by others.

*EFFLUENT CRITERIA* are defined in any applicable NPDES permit.

*FEDERAL ACT.* The Federal Water Pollution Control Act (33 USC 1251 *et seq.*) as amended by the Federal Water Pollution Control Act of Amendments of 1972 (Pub. L. 92-500 and Pub. L. 93-243).

*FEDERAL GRANT.* The U.S. government participation in the financing of the construction of treatment works as provided for by Title II, *Grants for Construction of Treatment Works of the Act* and implementing regulations.

*FLOATABLE OIL.* Oil, fat, or grease in a physical state such that it will separate by gravity from wastewater by treatment in an approved pretreatment facility. A wastewater shall be considered free of floatable fat if it is properly pretreated and the wastewater does not interfere with the collection system.

*GARBAGE.* Solid wastes from the domestic and commercial preparation, cooking, and dispensing of food, and from the handling, storage, and sale of produce.

*GARBAGE, PROPERLY SHREDDED.* The wastes from the preparation, cooking, and dispensing of food that have been shredded to such a degree that all particles will be carried freely under the flow conditions normally prevailing in public sewers, with no particle greater than ½-inch (1.27 centimeters) in any dimension.

*INDUSTRIAL WASTE.* Any solid, liquid, or gaseous substance discharged, permitted to flow, or escaping from any industrial, manufacturing, commercial, or business establishment or process or from the development, recovery, or processing of any natural resource as distinct from sanitary sewage.

*MAJOR CONTRIBUTING INDUSTRY.* An industrial user of the publicly-owned treatment works characterized by any of the following:

    (1) A flow of 50,000 gallons or more per average work day;

    (2) A flow greater than 10% of the flow carried by the municipal system receiving the waste;

    (3) A user who has, in its waste, a toxic pollutant in toxic amounts as defined in standards issued under section 307(a) of the Federal Act (33 USC 1317(a)); or

    (4) A user who is found by the permit issuance authority, in connection with the issuance of the NPDES permit to the publicly-owned treatment works receiving the waste, to have significant impact, either singly or in combination with other contributing industries, on that treatment works or upon the quality of effluent from that treatment works.

*MAY* is discretionary.

*MILLIGRAMS PER LITER.* A unit of the concentration of water or wastewater constituent. It is 0.001 g of the constituent in 1,000 ml of water. It has replaced the unit formerly used commonly, parts per million, to which it is approximately equivalent, in reporting the results of water and wastewater analysis.

*NATURAL OUTLET.* Any outlet into a watercourse, pond, ditch, lake, or other body of surface or groundwater.

*NPDES PERMIT.* Any permit or equivalent document or requirements issued by the Administrator, or, where appropriate by the Director, after enactment of the Federal Water Pollution Control Amendments of 1972, to regulate the discharge of pollutants pursuant to section 402 of the Federal Act (33 USC 1342).

*PERSON.* Any and all persons, natural or artificial, including any individual, firm, company, municipal, or private corporation, association, society, institution, enterprise, governmental agency, or other entity.

*pH.* The logarithm (base 10) of the reciprocal of the hydrogen-ion concentration expressed by one of the procedures outlined in *Standard Methods*.

*POPULATION EQUIVALENT.* A term used to evaluate the impact of industrial or other waste on a treatment works or stream. One *POPULATION EQUIVALENT* is 100 gallons of sewage per day, containing 0.22 pounds of BOD and 0.25 pounds of suspended solids.

*ppm.* Parts per million by weight.

*PRETREATMENT.* The treatment of wastewaters from sources before introduction into the wastewater treatment works.

*REPLACEMENT.* Expenditures for obtaining and installing equipment, accessories, or appurtenances which are necessary during the service life of the treatment works to maintain the capacity and performance for which the works were designed and constructed. The term "operation and maintenance" includes *REPLACEMENT.*

*SEWAGE* is used interchangeably with wastewater.

*SEWER.* A pipe or conduit for conveying sewage or any other waste liquids, including storm, surface, and groundwater drainage.

(1) *BUILDING SEWER.* The extension from the building drain to the public sewer or other place of disposal.

(2) *COMBINED SEWER.* A sewer which is designed and intended to receive wastewater, storm, surface, and groundwater drainage.

(3) *PUBLIC SEWER.* A sewer provided by or subject to the jurisdiction of the village. It shall also include sewers within or outside the village boundaries that serve one or more persons and ultimately discharge into the village sanitary (or combined sewer system), even though those sewers may not have been constructed with village funds.

(4) *SANITARY SEWER.* A sewer that conveys sewage or industrial wastes or a combination of both, and into which storm, surface, and groundwaters or unpolluted industrial wastes are not intentionally admitted.

(5) *STORM SEWER.* A sewer that carries storm, surface, and groundwater drainage but excludes sewage and industrial wastes other than unpolluted cooling water.

*SEWERAGE.* The system of sewers and appurtenances for the collection, transportation, and pumping of sewage.

*SEWERAGE FUND.* The principal accounting designation for all revenues received in the operation of the sewerage system.

*SHALL* is mandatory.

*SLUG.* Any discharge of water, sewage, or industrial waste which in concentration of any given constituent or in quantity of flow exceeds for any period of duration longer than 15 minutes, more than five times the average 24-hour concentration of flows during normal operation.

*STANDARD METHODS.* The examination and analytical procedures set forth in the most recent edition of *Standard Methods for the Examination of Water and Wastewater* published jointly by the American Public Health Association, the American Water Works Association, and the Water Pollution Control Federation.

*STATE ACT.* The Illinois Anti-Pollution Bond Act of 1970, ILCS Ch. 225, Act 225, §§ 1 *et seq.*

*STATE GRANT.* The State of Illinois participation in the financing of the construction of treatment works as provided for by the Illinois Anti-Pollution Bond Act and for making such grants as filed with the Secretary of State of the State of Illinois.

*STORMWATER RUNOFF.* That portion of the precipitation that is drained into the sewers.

*SURCHARGE.* The assessment in addition to the basic user charge and debt service charge which is levied on those persons whose wastes are greater in strength than the concentration values established in § 51.36.

*SUSPENDED SOLIDS.* Solids that either float on the surface of, or are in suspension in water, sewage, or industrial waste, and which are removable by a laboratory filtration device. Quantitative determination of suspended solids shall be made in accordance with procedures set forth in *Standard Methods.*

*UNPOLLUTED WATER.* Water of quality equal to or better than the effluent criteria in effect or water that would not cause violation of receiving water quality standards and would not be benefitted by discharge to the sanitary sewers and wastewater treatment facilities provided.

*USEFUL LIFE.* The estimated period during which the collection system and/or treatment works will be operated and shall be 20 years from the date of start-up of any wastewater facilities constructed with a state grant.

*USER CHARGE.* A charge levied on users of treatment works for the cost of operation and maintenance.

*USER CLASS.* The type of user either "residential or commercial" (non-industrial) or "industrial" as defined herein.

(1) *RESIDENTIAL OR COMMERCIAL* or *NON-INDUSTRIAL USER.* Any user of the treatment works not classified as an industrial user or excluded as an industrial user as provided for in this section.

(2) *INDUSTRIAL USER.* Any non-governmental user of publicly-owned treatment works identified in the *Standard Industrial Classification Manual*, 1972, Office of Management and Budget, as amended and supplemented, under the following divisions. A user in the divisions listed may be excluded if it is determined by the Board of Trustees that it will introduce primarily segregated domestic wastes or wastes from sanitary conveniences:

     (a) Division A--Agriculture, Forestry, and Fishing;

     (b) Division B--Mining;

     (c) Division I--Services;

     (d) Division E--Transportation, Communications, Electric, Gas and Sanitary Services; and

     (e) Division D--Manufacturing.

*VILLAGE.* The Village of Cahokia.

*WASTEWATER.* The spent water of a community. From this standpoint of course, it may be a combination of the liquid and water-carried wastes from residences, commercial buildings, industrial plants, and institutions, together with any groundwater, surface water, and stormwater that may be present.

*WASTEWATER FACILITIES.* The structures, equipment, and processes required to collect, carry away, and treat domestic and industrial wastes and transport effluent to a watercourse.

*WASTEWATER SERVICE CHARGE.* The charge per quarter or month levied on all users of the wastewater facilities. The service charge shall be computer as outlined in § 52.20.

*WASTEWATER TREATMENT WORKS.* An arrangement of devices and structures for treating wastewater, industrial wastes, and sludge. Sometimes synonymous with "waste treatment plant," "wastewater treatment plant," or "pollution control plant."

*WATER QUALITY STANDARDS* are defined in the Water Pollution Regulations of Illinois.

*WATERCOURSE.* A channel in which a flow of water occurs, either continuously or intermittently.
(Ord. 769, passed 6-6-89)

§ 51.02  USE OF PUBLIC SEWERS REQUIRED.

(A) It shall be unlawful for any person to place, deposit, or permit to be deposited in any unsanitary manner on public or private property within the village or in any area under the jurisdiction of the village, any human or animal excrement, garbage, or other objectionable waste.

(B) It shall be unlawful to discharge to any natural outlet within the village, or in any area under the jurisdiction of the village, any sewage or other polluted waters, except where suitable treatment has been provided in accordance with subsequent provisions of this chapter.

(C) Except as hereinafter provided, it shall be unlawful to construct or maintain any privy, privy vault, septic tank, cesspool, or other facility intended or used for the disposal of sewage.

(D) The owner of all houses, buildings, or properties used for human occupancy, employment, recreation, or other purposes situated within the village and abutting on any street, alley, or right-of-way in which there is now located or may in the future be located any public sanitary (or combined) sewer of the village, is hereby required at his expense to install suitable toilet facilities therein, and to connect the facilities directly with the proper public sewer in accordance with the provisions of this chapter within 90 days after date of official notice to do so, provided that the public sewer is within 250 feet (76.2 meters) of the property line.
(Ord. 769, passed 6-6-89)  Penalty, see § 10.99

§ 51.03  PRIVATE SEWAGE DISPOSAL.

(A) Where a public sanitary (or combined) sewer is not available under the provisions of § 51.02(D), the building sewer shall be connected to a private sewage disposal system complying with the provisions of this section.

(B) Before commencement of construction of a private sewage disposal system, the owner shall first obtain a written permit signed by the Village Board. The application for such permit shall be made on a form furnished by the village, (see Appendix) which the applicant shall supplement by any plans, specifications, and other information as are deemed necessary by the Village Board. A permit and inspection fee *(missing material)* shall be paid to the village at the time the application is filed.

(C) A permit for a private sewage disposal system shall not become effective until the installation is completed to the satisfaction of the Village Board. The Board shall be allowed to inspect the work at any stage of construction and, in any event, the applicant for the permit shall notify the Village Board when the work is ready for final inspection, and before any underground portions are covered. The inspection shall be made within 48 hours of the receipt of written notice by the Village Board.

(D) The type, capacities, location, and layout of a private sewage disposal system shall comply with all recommendations of the State of Illinois Private Sewage Disposal Licensing Act and Code and with the State of Illinois Environmental Protection Agency. No permit shall be issued for any private sewage disposal system employing subsurface soil absorption facilities where the area of the lot is less than 15,000 square feet (1393 square meters). No septic tank or cesspool shall be permitted to discharge to any natural outlet.

(E) At such time as a public sewer becomes available to a property served by a private sewage disposal system, as provided in § 51.02(D), a direct connection shall be made to the public sewer in compliance with this chapter, and any septic tanks, cesspools, and similar private sewage disposal facilities shall be abandoned and filled with suitable material.

(F) The owner shall operate and maintain the private sewage disposal facilities in a sanitary manner at all times, and at no expense to the village.

(G) No statement contained in this section shall be construed to interfere with any additional requirements that may be imposed by the Department of Public Health.

(H) When a public sewer becomes available, the building sewer shall be connected to the sewer within 60 days and the private sewage disposal system shall be cleaned of sludge and filled with clean bank-run gravel or dirt.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99
*Cross-reference:*
   *Private sewage code, see § 151.099*
   *Sewer/catch basin, see § 110.75*


## § 51.04 PROTECTION OF SEWAGE WORKS FROM DAMAGE.

No unauthorized person shall maliciously, willfully, or negligently break, damage, destroy, or tamper with any structure, appurtenance, or equipment which is a part of the sewage works. Any person violating this provision shall be subject to immediate arrest under charge of disorderly conduct.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## BUILDING SEWERS AND CONNECTIONS

### § 51.15  UNAUTHORIZED USE PROHIBITED.

(A) No unauthorized person shall uncover, make any connections with, or opening into, use, alter, or disturb any public sewer or appurtenance thereof without first obtaining a written permit from the Village Board.

(B) All disposal by any person into the sewer system is unlawful except those discharges in compliance with Federal Standards promulgated pursuant to the Federal Act and more stringent state and local standards.
(Ord. 769, passed 6-6-89)  Penalty, see § 10.99

### § 51.16  CLASSIFICATION OF PERMITS.

(A) There shall be two classes of building sewer permits: for residential and commercial service, and for service to establishments producing industrial wastes. In either case, the owner or his agent shall make application on a special form furnished by the village (see Appendix ). The permit application shall be supplemented by any plans, specifications, or other information considered pertinent in the judgment of the Village Board. A permit and connection fee of $250 for a residential or commercial building sewer permit shall be paid to the village at the time the application is filed. The industry, as a condition of permit authorization, must provide information describing its wastewater constituents, characteristics, and type of activity.

(B) A building sewer permit will only be issued and a sewer connection shall only be allowed if it can be demonstrated that the downstream sewerage facilities, including sewers, pump stations, and wastewater treatment facilities, have sufficient reserve capacity to adequately and efficiently handle the additional anticipated waste load.
(Ord. 769, passed 6-6-89)

### § 51.17  INSTALLATION EXPENSE.

All costs and expense incident to the installation and connection of the building sewer shall be borne by the owner. The owner shall indemnify the village from any loss or damage that may directly or indirectly be occasioned by the installation of the building sewer.
(Ord. 769, passed 6-6-89)  Penalty, see § 10.99

## § 51.18  SEPARATE CONNECTIONS REQUIRED.

(A) A separate and independent building sewer shall be provided for every building, except that where one building stands at the rear of another on an interior lot, and no private sewer is available or can be constructed to the rear building through an adjoining alley, court, yard, or driveway, the building sewer from the front building may be extended to the rear building, and the whole considered as one building sewer.

(B) Old building sewers may be used in connection with new buildings only when they are found, on examination and test by the Village Board, to meet all requirements of this chapter.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.19  CONFORMANCE OF CONSTRUCTION.

The size, slope, alignment, materials of construction of a building sewer, and the methods to be used in excavating, placing of the pipe, jointing, testing, and backfilling the trench, shall all conform to the requirements of the building and plumbing code, or other applicable rules and regulations of the village. In the absence of code provisions or in amplification thereof, the materials and procedures set forth in appropriate specifications of the *American Society of Testing Materials, Water Pollution Control Federation Manual of Practice No. 9*, and *Standard Specifications for Water and Sewer Main Construction in Illinois* shall apply.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.20  CONSTRUCTION REQUIREMENTS.

(A) The following materials and construction methods, and none other, shall be used in the building of sewers and connections to the public sanitary sewer system:

(1) All pipe shall be one of the following: Cast iron soil pipe conforming to the ASTM standard specification A-74-62; asbestos-cement building sewer pipe conforming to the specifications of Johns-Manville TRANSITE asbestos-cement building sewer pipe and the UPC MC 1-58 WPOA; or vitrified glazed clay sewer pipe conforming to ASTM standard specifications C-13 or C-261, with compression-type coupling designated as ASTM C-425-60T as PVC (Polyvinyl Chloride) joint coupling; or virgin unplasticized PVC (Polyvinyl Chloride) pipe. PVC pipe sizes 4 inches to 12 inches shall meet or exceed all of the requirements of ASTM specifications D-3034-72 and shall have the following minimum inside diameters:

(a) 4 inches - 3.965 inches;

(b)  6 inches - 5.915 inches;

(c)  8 inches - 8.00 inches;

(d)  10 inches - 10.00 inches; and

(e)  12 inches - 11.90 inches;

(2)  Fifteen-inch PVC shall have a minimum inside diameter of 14.55 inches and a wall thickness of 0.375 inches;

(3)  Standard lengths of PVC pipe shall be 12.5 feet and 20 feet;

(4)  Jointing of PVC pipe shall be accomplished by using an integral bell containing a rubber ring;

(5)  Fittings for PVC pipe shall be as furnished by the pipe supplier and shall be of the same material as the pipe; and

(6)  The size of all pipes shall not be less than four inches in diameter for single dwelling, and not less than six inches in diameter for a commercial building or a multiple dwelling. No single length of pipe shall exceed 20 feet in length at any time.

(B)  Whenever possible, the building sewer shall be brought to the building at an elevation below the basement floor. In all buildings in which any building drain is too low to permit gravity flow to the public sewer, sanitary sewage carried by the building drain shall be lifted by a means which is approved in accordance with § 51.15(B), and discharges to the building sewer.

(C)  No person shall make connection of roof downspouts, exterior foundation drains, areaway drains, or other sources of surface runoff or groundwater to a building sewer or building drain which in turn is connected directly or indirectly to a public sewer.
(Ord. 769, passed 6-6-89)  Penalty, see § 10.99

## § 51.21  CONNECTION TO BE IN CONFORMANCE WITH CERTAIN STANDARDS.

The connection of the building sewer into the public sewer shall conform to the requirements of the building and plumbing code, or other applicable rules and regulations of the village, or the procedures set forth in appropriate specifications of the *American Society of Testing Materials, Water Pollution Control Federation Manual of Practice No. 9*, and *Standard Specifications for Water and Sewer Main*

*Construction in Illinois.* All such connections shall be made gastight and watertight. Any deviation from the prescribed procedures and materials must be approved by the Village Board before installation.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.22 INSPECTION.

The applicant for the building sewer permit shall notify the Village Board when the building sewer is ready for inspection and connection to the public sewer. The connection shall be made under the supervision of the Village Board or his representative.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.23 PREVENTION OF PUBLIC HAZARD.

All excavations for building sewer installation shall be adequately guarded with barricades and lights so as to protect the public from hazard. Streets, sidewalks, parkways, and other public property disturbed in the course of the work shall be restored in a manner satisfactory to the village.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## *USE OF PUBLIC SEWERS*

## § 51.35 UNPOLLUTED DRAINAGE.

(A) No person shall discharge, or cause to be discharged, any stormwater, surface water, groundwater, roof runoff, subsurface drainage, uncontaminated cooling water, or unpolluted industrial process waters to any sanitary sewer.

(B) Stormwater and all other unpolluted drainage shall be discharged to such sewers as are specifically designated as combined sewers or storm sewers, or to a natural outlet approved by the Village Board. Industrial cooling water or unpolluted process waters may be discharged, on approval of the Village Board, to a storm sewer, combined sewer, or natural outlet.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.36 DISCHARGE PROHIBITIONS.

(A) No person shall discharge or cause to be discharged any of the following described waters or wastes to any public sewers:

(1) Any gasoline, benzene, naphtha, fuel oil, or other flammable or explosive liquid, solid, or gas;

(2) Any waters or wastes containing toxic or poisonous solids, liquids, or gases in sufficient quantity, either singly or by interaction with other wastes, to injure or interfere with any sewage treatment process, constitute a hazard to humans or animals, create a public nuisance, or create any hazard in the receiving waters of the sewage treatment plant;

(3) Any waters or wastes having a pH lower than 5.5 or having any other corrosive property capable of causing damage or hazard to structures, equipment, and personnel of the sewage works; or

(4) Solid or viscous substances in quantities or of such size capable of causing obstruction to the flow in sewers, or other interference with the proper operation of the sewage works such as, but not limited to, ashes, cinders, sand, mud, straw, shavings, metal, glass, rags, feathers, tar, plastics, wood, unground garbage, whole blood, paunch manure, hair and fleshings, entrails and paper dishes, cups, milk containers, and the like, either whole or ground by garbage grinders.

(B) No person shall discharge or cause to be discharged the following described substances, materials, waters, or wastes if it appears likely in the opinion of the Village Board that such wastes can harm either the sewers, sewage treatment process or equipment; have an adverse effect on the receiving stream; or can otherwise endanger life, limb, public property, or constitute a nuisance. In forming an opinion as to the acceptability of these wastes, the Village Board will give consideration to such factors as the quantities of subject wastes in relation to flows and velocities in the sewers, materials of construction of the sewers, nature of the sewage treatment process, capacity of the sewage treatment plant, degree of treatability of wastes in the sewage treatment plant, and maximum limits established by regulatory agencies. The substances prohibited are as follows:

(1) Any liquid or vapor having a temperature higher than 150°F (65°C);

(2) Any waters or wastes containing toxic or poisonous material; oils, whether emulsified or not, in excess of 100 mg/l or containing substances which may solidify or become viscous at temperatures between 32°F and 150°F (0°C and 65°C);

(3) Any garbage that has not been properly shredded. The installation and operation of any garbage grinder equipped with a motor of ¾ horsepower (0.76 hp metric) or greater shall be subject to the review and approval of the Village Board;

(4) Any waters or wastes containing strong acid, iron pickling wastes, or concentrated plating solutions whether neutralized or not;

(5) Any waters or wastes containing iron, chromium, copper, zinc, or similar objectionable or toxic substances; wastes exerting an excessive chlorine requirement, to such degree that any such material received in the composite sewage at the sewage treatment works exceeds the limits established by the Village Board for such materials;

(6) Any waters or wastes containing phenols or other taste or odor-producing substances, in concentrations exceeding limits which may be established by the Village Board as necessary after treatment of the composite sewage, to meet the requirements of the state, federal, or other public agencies of jurisdiction for such discharge to the receiving waters;

(7) Any radioactive wastes or isotopes of such half-life or concentration as may exceed limits established by the Village Board in compliance with applicable state or federal regulations;

(8) Any waters or wastes having a pH in excess of 9.5;

(9) Any mercury or any of its compounds in excess of 0.0005 mg/l as Hg at any time except as permitted by the Village Board in compliance with applicable state and federal regulations;

(10) Any cyanide in excess of 0.025 mg/l at any time except as permitted by the Village Board in compliance with applicable state and federal regulations;

(11) Materials which exert or cause the following:

(a) Unusual concentrations of inert suspended solids (such as, but not limited to fullers earth, lime slurries, and lime residues) or of dissolved solids (such as, but not limited to, sodium chloride and sodium sulfate);

(b) Excessive discoloration (such as, but not limited to, dye wastes and vegetable tanning solutions);

(c) Unusual BOD, chemical oxygen demand, or chlorine requirements in such quantities as to constitute a significant load on the sewage treatment works; or

(d) Unusual volume of flow or concentrations of wastes constituting "slugs" as defined herein;

(12) Waters or wastes containing substances which are not amenable to treatment or reduction by the sewage treatment processes employed, or are amenable to treatment only to such degree that the sewage treatment plant effluent cannot meet the requirements of agencies having jurisdiction over discharge to the receiving waters.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.37 INDUSTRIAL COST RECOVERY.

No industrial user may discharge sewage into any public sewer until the village has adopted an industrial cost recovery system which does the following:

(A) Meets the requirements of Section 204 (b) (1) (B) of the Federal Water Pollution Control Act Amendments of 1972 (33 USC 1284(b)(1)(B)) and applicable federal regulations; and

(B) Has been approved by the Agency in accordance with the conditions of any grant made to the village by the United States Environmental Protection Agency or by the State of Illinois for the construction of any part of the sewer system or sewage treatment works of the village.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.38 ACTIONS OF VILLAGE BOARD.

(A) If any waters or wastes are discharged, or are proposed to be discharged to the public sewers, which waters contain the substances or possess the characteristics enumerated in § 51.36(B), and/or which are in violation of the standards for pretreatment provided in Chapter 1, EPA Rules and Regulations, subchapter D, Water Programs Part 128 - Pretreatment, Standards, Federal Register Volume 38, No. 215, Thursday, November 8, 1973 and any amendments thereto, and which in the judgment of the Village Board may have a deleterious effect upon the sewage works, processes, equipment, or receiving waters, or which otherwise create a hazard to life or constitute a public nuisance, the Village Board may do the following:

(1) Reject the wastes;

(2) Require pretreatment to an acceptable condition for discharge to the public sewers;

(3) Require control over the quantities and rates of discharge; and

(4) Require payment to cover the added costs of handling and treating the wastes not covered by existing taxes or sewer charges, under the provisions of § 51.42(B).

(B) If the Village Board permits the pretreatment or equalization of waste flows, the design and installation of the plants and equipment shall be subject to the review and approval of the Village Board, and subject to the requirements of all applicable codes, ordinances, and laws.
(Ord. 769, passed 6-6-89)

## § 51.39 GREASE, OIL, AND SAND INTERCEPTORS.

Grease, oil, and sand interceptors shall be provided when, in the opinion of the Village Board, they are necessary for the proper handling of liquid wastes containing grease in excessive amounts, or any flammable wastes, sand, or other harmful ingredients; except that the interceptors shall not be required for private living quarters or dwelling units. All interceptors shall be of a type and capacity approved by the Village Board, and shall be located as to be readily and easily accessible for cleaning and inspection.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.40 MAINTENANCE OF TREATMENT FACILITIES.

Where preliminary treatment or flow-equalizing facilities are provided, they shall be maintained continuously in satisfactory and effective operation by the owner at his expense.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.41 CONTROL MANHOLE REQUIRED.

Each industry shall be required to install a control manhole and, when required by the Village Board, the owner of any property serviced by a building sewer carrying industrial wastes shall install a suitable control manhole together with necessary meters and other appurtenances in the building sewer to facilitate observation, sampling, and measurement of the wastes. The manhole, when required, shall be accessibly and safely located, and shall be constructed in accordance with plans approved by the Village Board. The manhole shall be installed by the owner at his expense, and shall be maintained by him so as to be safe and accessible at all times.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.42 LABORATORY TESTS AND ANALYSES.

(A) The owner of any property serviced by a building sewer carrying industrial wastes shall provide laboratory measurements, tests, and analyses of waters and wastes to illustrate compliance with this chapter and any special conditions for discharge established by the village or regulatory agencies having jurisdiction over the discharge.

(B) The number, type, and frequency of laboratory analyses to be performed by the owner shall be as stipulated by the village, but no less than once per year the industry must supply a complete analysis of the constituents of the wastewater discharge to assure that compliance with the federal, state, and local standards are being met. The owner shall report the results of measurements and laboratory

analyses to the village at such times and in such manner as prescribed by the village. The owner shall bear the expense of all measurements, analyses, and reporting required by the village. At such times as deemed necessary, the village reserves the right to take measurements and samples for analysis by an outside laboratory service.

(C) All measurements, test, and analyses of the characteristics of waters and wastes to which reference is made in this chapter shall be determined in accordance with the latest edition of *Standard Methods for the Examination of Water and Wastewater*, published by the American Public Health Association, and shall be determined at the control manhole provided, or upon suitable samples taken at the control manhole. In the event that no special manhole has been required, the control manhole shall be considered to be the nearest downstream manhole in the public sewer to the point at which the building sewer is connected. Sampling shall be carried out by customarily accepted methods to reflect the effect of constituents upon the sewage works and to determine the existence of hazards to life, limb, and property. [The particular analyses involved will determine whether a 24-hour composite of all outfalls of a premise is appropriate or whether a grab sample or samples should be taken. Normally, but not always, BOD and suspended solids analyses are obtained from 24-hour composites of all outfalls, whereas pH's are determined from periodic grab samples.]
(Ord. 769, passed 6-6-89)  Penalty, see § 10.99

## § 51.43  SPECIAL AGREEMENTS.

No statement contained in this subchapter shall be construed as preventing any special agreement or arrangement between the village and any industrial concern whereby an industrial waste of unusual strength or character may be accepted by the village for treatment, subject to payment therefore, in accordance with §§ 51.55 through 51.56 hereof, by the industrial concern, provided payments are in accordance with federal and state guidelines for user charge system and industrial cost recovery system. (Ord. 769, passed 6-6-89)

### *WASTEWATER SERVICE CHARGES*

## § 51.55  BASIS FOR CHARGES.

(A) *Basis for wastewater service charges.*

(1) The wastewater service charge for the use of and for service supplied by the wastewater facilities of the village shall consist of a basic user charge for operation and maintenance plus replacement, a debt service charge, and a surcharge, if applicable.

(2) The debt service charge shall be computed by dividing the annual debt service of all outstanding bonds by the number of users. Through further divisions, the monthly and quarterly debt service charges can be computed.

(3) The basic user charge shall be based on water usage as recorded by water meters and/or sewage meters for wastes having the following normal concentrations.

(a) A five day, 20°C biochemical oxygen demand (BOD) of 260 mg/l.

(b) A suspended solids (SS) content of 300 mg/l.

(4) The basic user charge shall consist of operation and maintenance costs plus replacement and shall be computed as follows:

(a) Estimate the projected annual revenue required to operate and maintain the wastewater facilities including a replacement fund for the year, for all works categories;

(b) Proportion the estimated costs to wastewater facility categories by volume, suspended solids, and BOD, if possible;

(c) Estimate wastewater volume, pounds of SS, and pounds of BOD to be treated;

(d) Proportion the estimated costs to non-industrial and industrial users by volume, suspended solids, and BOD, if applicable;

(e) Compute costs per 1000 gallons for normal sewage strength; and

(f) Compute surcharge costs per 1000 gallons per mg/l in excess of normal sewage strength for BOD and SS, if applicable.

(5) A surcharge may be levied to all users whose waters exceed the normal concentrations for BOD (260 mg/l) and SS (300 mg/l). The surcharge will be based on water usage as recorded by water meters and/or sewage meters for all wastes which exceed the 260 mg/l and 300 mg/l concentration for BOD and SS respectively.

(6) The adequacy of the wastewater service charge shall be reviewed annually by certified public accountants for the village in their annual audit report. The wastewater service charge shall be revised periodically to reflect a change in debt service or a change in operation and maintenance costs including replacement costs.

(B) *Debt service charge.* A debt service charge of $2.75 per user per month is hereby established. The debt service charge is included in the user rate shown in § 52.20.
(Ord. 769, passed 6-6-89)

## § 51.56 MEASUREMENT OF FLOW.

The volume of flow used for computing basic user charges and surcharges shall be the metered water consumption read to the lowest even increments of 1000/Y gallons.

(A) If the person discharging wastes into the public sewers procures any part, or all, of his water from sources other than the public waterworks system, all or a part of which is discharged into the public sewers, the person shall install and maintain, at his expense, water meters of a type approved by the Village Board for the purpose of determining the volume of water obtained from these other sources.

(B) Devices for measuring the volume of waste discharged may be required by the Village Board if these volumes cannot otherwise be determined from the metered water consumption records.

(C) Metering devices for determining the volume of waste shall be installed, owned, and maintained by the person. Following approval and installation, such meters may not be removed, unless service is canceled, without the consent of the Village Board.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

### *BILLING PROCEDURES*

## § 51.70 BILLS AND PAYMENT.

(A) The rates or charges for service shall be payable monthly depending on the classification of service for which bills are rendered. The owner of the premises, the occupant thereof, and the user of the service shall be jointly and severally liable to pay for the service to the premises and the service is furnished to the premised by the village only upon the condition that the owner of the premises, occupant, and user of the services are jointly and severally liable therefor to the village.

(B) Rates and charges shall be made and collected against each lot parcel of land or premises situated in the village which may actively discharge sewage or industrial waste, either directly or indirectly into the sewerage system.

(C) Bills for the rates and charges herein established for water and sewer charges shall be made out by the village and shall be sent out monthly and/or bimonthly. The bills shall be payable following the rendition of the bills by the due date. All bills shall be payable at the appropriate office in the Village Hall.
(Ord. 769, passed 6-6-89)

## § 51.71 DELINQUENCY; DISCONNECTION.

(A) If any charge for the services of the water or sewerage system shall not be paid by the due date on which it shall become due and payable, a delayed payment charge of 10% shall be added and collected. If the rates and charges for the use and services of the water or sewerage system are not paid within 30 days after the rendition of the bill therefor, the rates and charges shall be deemed and are hereby declared to be delinquent and shall thereafter constitute a lien upon the real estate for which water or sewerage services are furnished. The Village Treasurer shall promptly, after the expiration of 30 days, file a notice of the lien in the office of the Recorder of Deeds of St. Clair County. This notice shall consists of a sworn statement of the Treasurer setting out the following provisions:

(1) A description of the real estate sufficient for the identification thereof;

(2) The amount of money due for the use and services of the water or sewerage system; and

(3) The date when the amount became delinquent.

(B) The village may also, if practical, disconnect the water or sewerage connections from the premises pursuant to the provisions of § 51.72; and the same shall not be again connected or used until all delinquent accounts, bills, or services are paid in full, including all fees as provided in § 51.72.
(Ord. 769, passed 6-6-89)

## § 51.72 DISCONNECTION FOR LATE PAYMENT.

(A) It is the policy of the village to discontinue utility service to customers by reason of nonpayment of bills only after notice and a meaningful opportunity to be heard on disputed bills. The village's form for application for utility service and all bills shall contain, in addition to the title, address, room number, and telephone number of the official in charge of billing, clearly visible and easily readable provisions to the effect:

(1) That all bills are due and payable on or before the date set forth on the bill; and

(2) That if any bill is not paid by or before that date, a second bill will be mailed containing a cutoff notice that if the bill is not paid within ten days of the mailing of the second bill, service will be discontinued for nonpayment; and

(3) That any customer disputing the correctness of his bill shall have a right to a hearing at which time he may be represented in person and by counsel or any other person of his choosing and may present orally or in writing his complaint and contentions to the village official in charge of utility billing. This official shall be authorized to order that the customer's service not be discontinued and shall have the authority to make a final determination of the customer's complaint.

(B) Requests for delays or waiver of payment will not be entertained; only questions of proper and correct billing will be considered. In the absence of payment of the bill rendered or resort to the hearing procedure provided herein, service will be discontinued at the time specified, but in no event until the charges have been due and unpaid for at least 30 days.

(C) When it becomes necessary for the village to discontinue utility service to a customer for nonpayment of bills, service will be reinstated only after all bills for service then due have been paid, along with a turn-on charge in the sum of $20.

## § 51.73 FORECLOSURE OF LIEN.

Property subject to a lien for unpaid charges shall be sold for non-payment of the same, and the proceeds of the sale shall be applied to pay the charges, after deducting costs, as is the case in the foreclosure of statutory liens. Foreclosure shall be by bill-in-equity in the name of the village. The Village Attorney is hereby authorized and directed to institute proceedings in the name of the village in any court having jurisdiction over the matters against any property for which the bill has remained unpaid 45 days in the case of a monthly bill.
(Ord. 769, passed 6-6-89)

## § 51.74 REVENUES.

All revenues and moneys derived from the operation of the sewerage system shall be deposited in the sewerage account of the sewerage fund. All revenues and monies shall be held by the Village Treasurer separate and apart from his private funds and separate and apart from all other funds of the village and all of that sum, without any deductions whatever, shall be delivered to the Village Treasurer not more than ten days after receipt of the same, or at more frequent intervals as may from time to time be directed by the President and Board of Trustees. The Village Treasurer shall receive all revenues

from the sewerage system and all other funds and moneys incident to the operation of the system as the same may be delivered to him and deposit the same in the account of the fund designated as the "Sewerage Fund of the village." The Treasurer shall administer the fund in every respect in the manner provided by statute of the Illinois Municipal Code, ILCS Ch. 65, Act 5.
(Ord. 769, passed 6-6-89)

## § 51.75  SYSTEM OF ACCOUNTS; ACCESS.

(A) *Accounts.*

(1) The Village Treasurer shall establish a proper system of accounts and shall keep proper books, records, and accounts in which complete and correct entries shall be made of all transactions relative to the sewerage system, and at regular annual intervals he shall cause to be made an audit of the books by an independent auditing concern to show the receipts and disbursements of the sewerage system.

(2) It is the duty of the Village Treasurer to prepare or cause to be prepared a complete and accurate list of all premises and properties receiving water service, sewerage service or both water and sewerage services that are served by the water and sewerage system, showing the name and address of the occupant, and the owner of the same. The list shall be kept up to date and shall be corrected from time to time to allow changes in the occupancy or ownership of any property or premises.

(3) In addition to the customary operating statements, the annual audit report shall also reflect the revenues and operating expenses of the wastewater facilities, including a replacement cost. In this regard, the financial information to be shown in the audit report shall include the following information:

(a) Flow data showing total gallons received at the wastewater plant for the current fiscal year;

(b) Billing data to show total number of gallons billed;

(c) Debt service for the next succeeding fiscal year;

(d) Number of users connected to the system; and

(e) Number of non-metered users.

(B) *Access to records.* The Illinois Environmental Protection Agency or its authorized representative shall have access to any books, documents, papers and records of the village which are applicable to the village system of user charges for the purpose of making audit, examination, excerpts, and transcriptions thereof to insure compliance with the terms of the special and general conditions to any state grant.
(Ord. 769, passed 6-6-89)

## § 51.76  PUBLIC ACCESS TO RATES.

A copy of this subchapter, properly certified by the Village Treasurer, shall be filed in the office of the Recorder of Deeds of St. Clair County and shall be deemed notice to all owners of real estate of the charges of the sewerage system of the village on their properties.
(Ord. 769, passed 6-6-89)

## *POWERS AND AUTHORITY OF INSPECTORS; VIOLATIONS*

## § 51.85  ACCESS GRANTED TO INSPECTORS.

(A) The Village Board and other duly authorized employees of the village, the Illinois Environmental Protection Agency, and the U.S. Environmental Protection Agency, bearing proper credentials and identification, shall be permitted to enter all properties for the purposes of inspection, observation, measurement, sampling, and testing in accordance with the provisions of this chapter. The Village Board or its representative shall have no authority to inquire into any processes, including metallurgical, chemical, oil refining, ceramic, paper, or other industries beyond that point having a direct bearing on the kind and source of discharge to the sewers or waterway or facilities for waste treatment.

(B) The Village Board and other duly authorized employees of the village bearing proper credentials and identification shall be permitted to enter all private properties through which the village holds a duly negotiated easement for the purposes of, but not limited to, inspection, observation, measurement, sampling, repair, and maintenance of any portion of the sewage works lying within the easement. All entry and subsequent work, if any, on the easement, shall be done in full accordance with the terms of the duly negotiated easement pertaining to the private property involved.
(Ord. 769, passed 6-6-89) Penalty, see § 10.99

## § 51.86 NON-LIABILITY OF FACILITY.

While performing the necessary work on private properties referred to in § 51.85, the Village Board or duly authorized employees of the village, the Illinois Environmental Protection Agency, and the U.S. Environmental Protection Agency shall observe all safety rules applicable to the premises established by the company and the company shall be held harmless for injury or death to the village employees, and the village shall indemnify the company against loss or damage to its property by village employees and against liability claims and demands for personal injury or property damage asserted against the company and growing out of the gauging and sampling operation, except as may be caused by negligence or failure of the company to maintain safe conditions as required in § 51.41.
(Ord. 769, passed 6-6-89)

## § 51.87 VIOLATIONS.

(A) Any person found to be violating any provision of this chapter except § 51.04 shall be served by the village with written notice stating the nature of the violation and providing a reasonable time limit for the satisfactory correction thereof. The offender shall, within the period of time stated in the notice, permanently cease all violations. The village may revoke any permit for sewage disposal as a result of any violation of any provision of this chapter.

(B) Any person violating any of the provisions of this chapter shall become liable to the village by reason of the violation.
(Ord. 769, passed 6-6-89)

## APPENDIX: APPLICATIONS FOR SEWER PERMITS

### RESIDENTIAL OR COMMERCIAL BUILDING SEWER APPLICATION

To the Village of Cahokia:

(A) THE UNDERSIGNED, being the _____ of the property located at
                                             (Owner, Owner's Agent)
_____DOES HEREBY REQUEST a permit to install and connect a building sewer
   Number      Street
to serve the_____at said location.
                   (Residence, Commercial Building)

1.   The following indicated fixtures will be connected to the proposed building sewer:

| Number | Fixtures | Number | Fixtures |
|---|---|---|---|
| _____ | Kitchen Sinks | _____ | Water Closets |
| _____ | Lavatories | _____ | Bath Tubs |
| _____ | Laundry Tubs | _____ | Showers |
| _____ | Urinals | _____ | Garbage Grinders |

Specify other fixtures_____

2.   The maximum number of persons who will use the above fixtures is_____

3.   The name and address of the person or firm who will perform the proposed work
    is_____

4.   Plans and specifications for the proposed building sewer are attached hereunto as Exhibit "A".

(B) In consideration of the granting of this permit, THE UNDERSIGNED AGREES:

1.   To accept and abide by all provisions of the Village Code of the Village of Cahokia and of all other pertinent ordinances or regulations that may be adopted in the future.

2.   To maintain the building sewer at no expense to the Village.

3.  To notify the _____ when the building sewer is ready for inspection
                    (Approving Authority)
    and connection to the public sewer, but before any portion of the work is covered.


DATE:_____          _____
                                                    (Applicant)


                                     _____
                                                (Address of Applicant)



_____
(Certification by Village Treasurer)

$_____ connection fee paid.

$_____ inspection fee paid.

Application approved and permit issued:

DATE:_____          _____
                                                    (Approving Authority)

4.  To notify the_____ immediately in event of any accident,
                    (Approving Authority)
    negligence, or other occurrence that occasions discharge to the public sewers of any wastes or
    process waters not covered by this permit.

DATE:_____          _____
                                                    (Applicant)


                                     _____
                                                (Address of Applicant)



_____
(Certification of Village Treasurer)

$_____ connection fee paid.

$_____ inspection fee paid.

Application approved and permit granted:

DATE:_____     _____
                                      (Approving Authority)

(Ord. 769, passed 6-6-89)

## CHAPTER 52: WATER AND SEWER RATES; WATER SUPPLY

Section

### *Water Service Rates*

52.01    Water rates
52.02    Deposit required
52.03    Meter required
52.04    Automatic sprinkler systems
52.05    New connections; charges
52.06    Fire hydrants
52.07    No free service
52.08    Contracts with high-volume users
52.09    Delinquency
52.10    Tampering with meters

### *Sewer Service Rates*

52.20    Sewer rates
52.21    Deposit required

### *Billing and Administration*

52.35    Billing periods; responsibility
52.36    Delinquency
52.37    Disconnection for late payment
52.38    Village records
52.39    Revenues; accounts
52.40    Connection charges
52.41    Declaration of nuisance

52.99    Penalty

## WATER SERVICE RATES

### § 52.01 WATER RATES.

Rates are fixed for water supplied by the waterworks system as follows. All water sold to all users must be metered and the charge for water supplied through meters shall be fixed as follows:

(A) All customers using less than 100,000 gallons of water per month:

| | |
|---|---|
| 0 to 2,000 gallons, minimum charges | $11.660 |
| Next 3,000 gallons, per 100 gallons | $11.340 |
| Next 5,000 gallons, per 100 gallons | $11.326 |
| Next 10,000 gallons, per 100 gallons | $11.310 |
| Next 20,000 gallons, per 100 gallons | $11.277 |
| Next 60,000 gallons, per 100 gallons | $11.240 |

(B) All customers using 100,000 gallons or more per month:

(1) First 100,000 gallons, minimum charge    $268.40; and

(2) Over 100,000 gallons, per 1,000 gallons    $2.20.
(Ord. 558, passed 11-20-79; Am. Ord. 903, passed 6-18-96; Am. Ord. 936, passed 4-7-98; Am. Ord. 961, passed 5-18-99)

### § 52.02 DEPOSIT REQUIRED.

(A) A deposit of $25 shall be collected from each residential consumer before water service is rendered. Deposits of property owners will be refunded after three years, provided that the property owners shall have established a prompt payment record for three years.

(B) For all business customers, a deposit of $25 shall be collected before service is rendered.

(C) Special classifications (contractors and the like) may require an additional deposit based on estimated consumption. It will be the responsibility of the manager to set the deposit as may be necessary.

(D) All deposits (except property owners) will be refunded upon termination of services and payment in full of all charges.
(Ord. 558, passed 11-20-79) Penalty, see § 52.99

## § 52.03 METER REQUIRED.

All water service shall be furnished upon a metered basis, except automatic sprinkler systems, which shall be upon a flat rate or rental basis as is provided in § 52.04, and that a separate meter shall be installed for each dwelling, business establishment, or property served with water.
(Ord. 558, passed 11-20-79)

## § 52.04 AUTOMATIC SPRINKLER SYSTEMS.

The charge for service rendered by the water system to each automatic sprinkler system (including the water consumed in the proper use of the system, without additional charge therefor), shall be at the rate of $5.35 per month, for up to 100 sprinkler heads, plus an additional monthly charge of $0.15 for each head in excess of 100. The charge or rental shall be due and payable at the end of each month during which automatic sprinkler service has been available or has been rendered.
(Ord. 558, passed 11-20-79)

## § 52.05 NEW CONNECTIONS; CHARGES.

(A) Any person, persons, or corporations desiring water service in any area within the village where lines are not constructed will make application for service and shall submit with the application plans showing proposed extension, and the proposed extension, when approved by the Village Board, shall be constructed in accordance with specifications on file in the office of the village. All costs of construction shall be paid in full by the applicant, and title thereto shall be vested in the village, and the village shall operate and maintain the services and extensions.

(B) The following charges shall be made for each new service connection constructed by the village on established mains. The charges shall be paid with application for services and is not refundable.

| TAP FEES: | |
|---|---|
| Water Tap 4" (same side street) | $475.00 |
| Water Tap 6" (same side street) | $475.00 |
| Water Tap 4" (opposite side street) | $475.00 |
| Water Tap 6" (opposite side street) | $475.00 |

(Ord. 558, passed 11-20-79; Am. Ord. 1060, passed 5-4-04)

### § 52.06  FIRE HYDRANTS.

A charge of $30 per year shall be made for each active fire hydrant in the village.
(Ord. 558, passed 11-20-79)


### § 52.07  NO FREE SERVICE.

No water service shall be furnished or rendered free of charge to any person firm, corporation, or to the village.
(Ord. 558, passed 11-20-79)


### § 52.08  CONTRACTS WITH HIGH-VOLUME USERS.

The Board of Trustees is authorized to enter into individual contracts with any customer normally using in excess of 100,00 gallons of water per month for the furnishing of the services and facilities of the system at rates and with minimum bills and terms as may be mutually agreed upon, provided, however, that in no event shall the rate per 1,000 gallons, or fraction thereof be less than $0.90 and that no preferential rates shall be given users of the same class.
(Ord. 558, passed 11-20-79)


### § 52.09  DELINQUENCY.

(A) If any bill for water service shall be and remain due and unpaid on or after the due date of the month following the month in which service was rendered, an additional charge of 10% thereof shall be added thereto.

(B) If any bill for water service shall be and remain unpaid after the due date of the second month following the month in which services were rendered, services to the customer shall be discontinued and shall not be reconnected until all past due bills are paid in full, together with a reconnection charge as specified in § 52.37.
(Ord. 558, passed 11-20-79)


### § 52.10  TAMPERING WITH METERS.

It shall be a misdemeanor for any person or persons to tamper with or damage any water main or water service or change any water meter, or to make any connection to the waterworks system without written permission from the village, or to reconnect service when it has been disconnected for nonpayment of a bill for service, until the bill has been paid in full, including the reconnection fee and the following fees:

| Recheck shut-offs tampering | $50.00 |
|---|---|
| Broken lock | $25.00 |
| Removal of jumper | $50.00 |
| Broken shut-off | $50.00 |
| Stolen meter | $50.00 |

(Ord. 558, passed 11-20-79; Am. Ord. 1060, passed 5-4-04) Penalty, see § 52.99

## *SEWER SERVICE RATES*

### § 52.20 SEWER RATES.

The following rates and charges for the use and services of the sewerage system are as follows. These rates and charges shall be made and collected against each lot parcel of land or premises situated in the village which may actively discharge sewage or industrial waste, either directly or indirectly into the sewerage system.

(A) Thereafter for a 12-month period.

**Monthly Rate**

(1) Residential and/or each dwelling unit and churches.     $12.00

(2) Commercial and institutional accounts.

    (a) Water usage (gallons per month)

| | |
|---|---|
| 0 to 7,500 | $12.00 |
| 7,501 to 15,000 | $16.40 |
| 15,001 to 50,000 | $31.60 |
| 50,001 to 100,000 | $62.10 |
| 100,001 to 150,000 | $92.70 |
| 150,001 to 200,000 | $123.10 |
| 200,001 to 250,000 | $153.70 |
| 250,001 to 300,000 | $183.10 |

    (b) Over 300,000 gallons water usage per month shall be billed an additional $61 per month for each 100,000 gallons of usage or fraction thereof.

(B) Thereafter for a 12-month period.

                                                              Monthly Rate

(1) Residential and/or each dwelling unit and churches.        $13.00

(2) Commercial and institutional accounts.

    (a) Water usage (gallons per month)

| | |
|---|---|
| 0 to 7,500 | $13.00 |
| 7,501 to 15,000 | $17.40 |
| 15,001 to 50,000 | $32.60 |
| 50,001 to 100,000 | $63.10 |
| 100,001 to 150,000 | $93.70 |
| 150,001 to 200,000 | $124.10 |
| 200,001 to 250,000 | $154.70 |
| 250,001 to 300,000 | $184.10 |

    (b) Over 300,000 gallons water usage per month shall be billed an additional $61 per month for each 100,000 gallons of usage or fraction thereof.

(C) Thereafter for a 12-month period.

                                                              Monthly Rate

(1) Residential and/or each dwelling unit and churches.        $14.00

(2) Commercial and institutional accounts.

    (a) Water usage (gallons per month)

| | |
|---|---|
| 0 to 7,500 | $14.00 |
| 7,501 to 15,000 | $18.40 |
| 15,001 to 50,000 | $33.60 |
| 50,001 to 100,000 | $64.10 |
| 100,001 to 150,000 | $94.70 |
| 150,001 to 200,000 | $125.10 |
| 200,001 to 250,000 | $155.70 |
| 250,001 to 300,000 | $185.10 |

    (b) Over 300,000 gallons water usage per month shall be billed an additional $61 per month for each 100,000 gallons of usage or fraction thereof.
(Ord. 558, passed 11-20-79; Am. Ord. 807, passed 6-4-91; Am. Ord. 843, passed 6-15-93; Am. Ord. 969, passed 9-21-99)

## § 52.21 DEPOSIT REQUIRED.

All sewer users shall pay a $50 deposit which shall be refunded upon discontinuance of sewer use. (Ord. 558, passed 11-20-79; Am. Ord. 923, passed 4-7-98) Penalty, see § 52.99

## BILLING AND ADMINISTRATION

## § 52.35 BILLING PERIODS; RESPONSIBILITY.

(A) Bills for the rates and charges herein established for water and sewer charges shall be made out by the village and shall be sent out monthly and or bi-monthly. The bills shall be payable following the rendition of the bills by the due date. All bills shall be payable at the appropriate office in the Village Hall.

(B) The owner of any lot, parcel of land or premises receiving the services of the sewerage extensions, the occupant of the premises and the user of the services shall be jointly and severally liable for the payment of services to the lot, parcel of land or premises. All services are rendered to the premises by the village only on the condition that the owner, occupant and user shall jointly and severally liable therefor to the village.
(Ord. 558, passed 11-20-79)

## § 52.36 DELINQUENCY.

(A) If any charge for the services of the water or sewerage system shall not be paid by the due date on which it shall become due and payable, a delayed payment charge of 10% shall be added and collected. If the rates and charges for the use and services of the water or sewerage system are not paid within 30 days after the rendition of the bill therefor, the rates and charges shall be declared to be delinquent and shall thereafter constitute a lien upon the real estate for which water or sewerage services are furnished. The Village Treasurer shall promptly, after the expiration of 30 days, file a notice of the lien in the Office of the Recorder of Deeds of St. Clair County. This notice shall consist of a sworn statement of the Treasurer setting out the following information:

(1) A description of the real estate sufficient for the identification thereof;

(2) The amount due for the use and services of the water or sewerage system; and

(3) The date when the amount became delinquent.

(B) The village may also, if practical, disconnect the water or sewerage connections from the premises pursuant to the provisions of § 52.37; and the same shall not be again connected or used until all delinquent accounts, bills or services are paid in full, including all fees as provided in § 52.37.

(C) A fee of $30 shall be added for bad checks written as payment for water and/or sewage connection service, deposit and/or payments.
(Ord. 558, passed 11-20-79; Am. Ord. 1060, passed 5-4-04)

## § 52.37 DISCONNECTION FOR LATE PAYMENT.

(A) It is the policy of the village to discontinue utility service to customers by reason of nonpayment of bills only after notice and a meaningful opportunity to be heard on disputed bills. The village's form for application for utility service and all bills shall contain, in addition to the title, address, room number, and telephone number of the official in charge of billing, clearly visible and easily readable provisions to the effect:

(1) That all bills are due and payable on or before the date set forth on the bill; and

(2) That if any bill is not paid by or before that date, a second bill will be mailed containing a cutoff notice that if the bill is not paid within ten days of the mailing of the second bill, service will be discontinued for nonpayment; and

(3) That any customer disputing the correctness of his bill shall have a right to a hearing at which time he may be represented in person and by counsel or any other person of his choosing and may present orally or in writing his complaint and contentions to the village official in charge of utility billing. This official shall be authorized to order that the customer's service not be discontinued and shall have the authority to make a final determination of the customer's complaint.

(B) Requests for delays or waiver of payment will not be entertained; only questions of proper and correct billing will be considered. In the absence of payment of the bill rendered or resort to the hearing procedure provided herein, service will be discontinued at the time specified, but in no event until the charges have been due and unpaid for at least 30 days.

(C) When it becomes necessary for the village to discontinue utility service to a customer for nonpayment of bills, service will be reinstated only after all bills for service then due have been paid, along with a turn-on charge of $20 for water area reconnection and $40 for sewer area reconnection.
(Am. Ord. 1060, passed 5-4-04)

## § 52.38 VILLAGE RECORDS.

It is the duty of the Village Treasurer to prepare or cause to be prepared a complete and accurate list of all premises and properties receiving water service, sewerage service or both water and sewerage

services that are served by the water and sewerage system, showing the name and address of the occupant, and the owner of the same. The list shall be kept up to date and shall be corrected from time to time to allow changes in the occupancy or ownership of any property or premises.
(Ord. 558, passed 11-20-79) Penalty, see § 52.99

§ 52.39 REVENUES; ACCOUNTS.

(A) All revenues derived from the operation of the water and sewerage system shall be set aside as collected and shall be remitted to the Village Treasurer. All revenues shall, by the Village Treasurer, be set aside as collected and deposited in a special fund as provided by the ordinances of the village, relating to the issuance of revenue bonds, and shall be held, handled and disbursed in accordance with the terms of those ordinances.

(B) The Village Treasurer shall install and maintain a proper system of accounts and records, separate and apart from all other accounts and records, showing the amount of revenues received from the water and sewerage system and the application for all such revenues and all financial transactions in connection therewith. The accounts shall be kept and an annual audit thereof shall be made in accordance with the provisions of all ordinances relating to the issuance of the revenue bonds of the village heretofore passed.
(Ord. 558, passed 11-20-79)

§ 52.40 CONNECTION CHARGES.

A connection charge for the privilege of using the sewer system shall be made for each sewer connection serving an individual residence, and this connection charge is hereby set at $250 for all users that have access to the sewers as outlined in the plans and specifications approved by the State of Illinois Water Sanitary Board; provided that in multiple units, the connection fee shall be $250. All future users of the sewerage system and who presently do not have access to the sewerage system as outlined in the plans and specifications approved by the State of Illinois Sanitary Water Board shall pay for all extensions made to the sewerage system.
(Ord. 558, passed 11-20-79; Am. Ord. 627, passed 5-17-83) Penalty, see § 52.99

§ 52.41 DECLARATION OF NUISANCE.

(A) The use of any premises of the village in such a manner as to create sewerage thereon not discharged into the sewerage system of the village is hereby declared to be a nuisance. Every water closet or privy connected and used in any building in the area not connected with the sewerage system of the village is hereby declared to be a nuisance, provided that this section shall be inapplicable to premises where connection with the sewerage system is not feasible. Connection with the sewerage system is hereby declared to be feasible as to any premises abutting any street, alley, or other public way or sewer right-of-way in which any lines of the sewerage system of the village exists.

(B) The owner of any premises so used as to create sewerage or on which there exists any water closet or privy, or any tenant or other person occupying any such premises is hereby required to cause proper connection to be made with the sewerage system of the village when the connection with the sewerage system of the village shall become feasible.

(Ord. 558, passed 11-20-79) Penalty, see § 52.99

§ 52.99  PENALTY.

Any person violating the provisions of this chapter for which no specific penalty is provided shall be subject to the terms of § 10.99.

(Am. Ord. 1047, passed 9-2-03)

84-2

# I N D E X

| | | Page |
|---|---|---|
| **CHAPTER O** | **SEWER USE** | |
| ARTICLE I | Use of Public Sewers Required | 3 |
| II | Building Sewers and Connection | 3 |
| III | Use of Public Sewers | 7 |
| IV | Protection of Sewage Works | 12 |
| V | Powers and Authority of Inspectors | 12 |
| VI | Penalties | 13 |
| | | |
| CHAPTER 00 | WASTEWATER SERVICE CHARGES AND USER REGULATIONS | |
| ARTICLE I | Wastewater Service Charges | 14 |
| II | General Provisions: | |
| | Owner and Tenant Liability; Free Service; Billing Period; Late Charges; Deposits; and Tap Fees | 18 |
| III | Effective Date of Rates | 20 |
| IV | Validity | 20 |
| V | Ordinance in Force | 21 |
| APPENDIX NO. 1. | Definitions | 23 |
| APPENDIX No. 2. | Sewer Permit Applicaitons | 30 |

84-2

AN ORDINANCE REGULATING: THE USE OF PUBLIC AND
PRIVATE SEWERS AND DRAINS, THE INSTALLATION AND CONNECTION OF
BUILDING SEWERS, THE DISCHARGE OF WATERS AND WASTES INTO THE
PUBLIC SEWER SYSTEM, AND PROVIDING PENALTIES FOR VIOLATIONS
THEREOF; THE LEVYING OF CHARGES FOR WASTEWATER SERVICES (USER
CHARGES).

IN THE   Commonfields of Cahokia Public Water District          ,

COUNTY OF    St. Clair     ,   STATE OF ILLINOIS.

BE IT ORDAINED AND ENACTED BY THE  Board of Trustees OF THE

Commonfields of Cahokia Public Water District, STATE OF

ILLINOIS, AS FOLLOWS:

## ARTICLE I

### Use of Public Sewers Required

Sec. 1. That the use of any premises in the District in such manner as to create sewage thereon not discharged into the sewerage system of said District is hereby declared to be a nuisance; every water closet or privy connected and used in any building in said area not connected with the sewerage system of said District is hereby declared to be a nuisance, provided that this section shall be inapplicable to premises where connection with said sewerage system is not feasible. Such connection with the sewerage system is hereby declared to be feasible as to any premises abutting any street, alley or other public way or sewer right of way in which any line of the sewerage system of the District exists.

Sec. 2. Where a public sanitary sewer is not available, the building sewer shall be connected to a private sewage disposal system complying with the provisions of the governing entity (City, Village, Township, or County) and the Illinois Environmental Protection Agency.

Sec. 3. When a public sewer becomes available, the building sewer shall be connected to said sewer within sixty (60) days and the private sewage disposal system shall be cleaned of sludge and filled with clean bank-run gravel or dirt.

## ARTICLE II

### Building Sewers and Connections

Sec. 1. No unauthorized person shall uncover, make any connections with or opening into, use, alter, or disturb any public sewer or appurtenance thereof without first obtaining a written permit from the District.

Sec. 2. All disposal by any person into the sewer system is unlawful except those discharges in compliance with Federal Standards promulgated pursuant to the Federal Act and more stringent state and local standards.

Sec. 3 There shall be two (2) classes of building sewer permits: (a.) for residential and commercial service; and (b.) for service to establishments producing industrial wastes. In either case, the owner or his agent shall make application on a special form furnished by the District, (reference Appendix #2). The permit application shall be supplemented by any plans, specifications, or other information considered pertinent in the judgment of the District.

3

Sec. 4. A building sewer permit will only be issued and a sewer connection shall only be allowed if it can be demonstrated that the downstream sewerage facilities, including sewers, pump stations and wastewater treatment facilities, have sufficient reserve capacity to adequately and efficiently handle the additional anticipated waste load.

Sec. 5. All costs and expense incident to the installation and connection of the building sewer shall be borne by the owner. The owner shall indemnify the District from any loss or damage that may directly or indirectly be occasioned by the installation of the building sewer.

Sec. 6. A separate and independent building sewer shall be provided for every building, except that where one building stands at the rear of another on an interior lot and no private sewer is available or can be constructed to the rear building through an adjoining alley, court, yard, or driveway, the building sewer from the front building may be extended to the rear building and the whole considered as one building sewer. In such cases, the District may require installation of a 6" sewer line.

Sec. 7. Old building sewers may be used in connection with new buildings only when they are found, on examination and test by the District, to meet all requirements of this Ordinance.

Sec. 8. The size, slope, alignment, materials of construction of a building sewer, and the methods to be used in excavating, placing of the pipe, jointing, testing and backfilling the trench, shall all conform to the requirements of the building and plumbing code or other APPLICABLE rules and regulations of the District. In the absence of code provisions or in amplification thereof, the materials and procedures set forth in appropriate specifications of the American Society of Testing Materials, Water Pollution Control Federation Manual of Practice No. 9, and Standard Specifications for Water and Sewer Main Construction in Illinois shall apply.

Sec. 9. All future users, (contractors, developers, etc.) of the sewerage system who presently do not have access to the existing sewer system and the extensions of the District sewers subsequently made, may obtain access to said sewerage by paying for all extensions made to the sewerage system providing that conditions set forth in Section 4, Article II will be met.

A tap-in charge will not be required to those users having paid for extensions. If the extension work is installed by persons other than District employees, then plans, specifications, and construction must be approved by the District Engineer, prior to acceptance by the District.

No connection shall be made by any individual to the sanitary sewer system of the District but that all tapping shall be made by District employees, and the District shall extend the riser to the property line of the property to be served by the sewer connection. The property owner or person, firm, or corporation obtaining the sewer connection shall extend the connection lateral from the premises to the owner's property line at a point where the District has made and installed said riser.

4

Sec. 9.  Should a riser already exist, District employees using existing records shall locate said riser for the sewer applicant.

Sec. 10.  Construction Requirements.  The following materials and construction methods, and none other, shall be used in the building of sewers and connections to the public sanitary sewer system:

Materials - All pipe shall be one of the following:  cast iron soil pipe conforming to the ASTM standard specification A-74-62; asbestos-cement building sewer pipe conforming to the specifications of Johns-Manville TRANSITE asbestos-cement building sewer pipe and the UPC MC 1-E8 WPOA; or vitrified glazed clay sewer pipe conforming to ASTM standard specifications C-13 or C-261, with compression-type coupling designated as ASTM C-425-60T as PVC (Polyvinyl Chloride) joint coupling; or virgin unplasticized PVC (Polyvinyl Chloride) pipe.  PVC pipe sizes four (4) inches to twelve (12) inches shall meet or exceed all of the requirements of ASTM specifications D-3034-72 and shall have the following minimum inside diameters:

| 4 inches | - | 3.965 inches |
| 6 inches | - | 5.915 inches |
| 8 inches | - | 8.00 inches |
| 10 inches | - | 10.00 inches |
| 12 inches | - | 11.90 inches |

Fifteen (15) inch PVC shall have a minimum I. D. of 14.55 inches and a wall thickness of 0.375 inches.

Standard lengths of PVC shall be 12.5 feet and 20 feet.

Jointing of PVC pipe shall be accomplished by using an integral bell containing a rubber ring.

Fittings for PVC shall be furnished by the pipe supplier and shall be of the same material as the pipe.

The size of all pipes shall not be less than four (4) inches in diameter for single dwelling, and not less than six (6) inches in diamter for a commercial building or a multiple dwelling.  No single length of pipe shall exceed twenty (20) feet in length at any time.

Sec. 11.  No connection to the District's sewerage system is permitted which would allow gravity drainage for basement floor drains or other fixtures or any other structure below ground level, where the basement floor elevation is below the top elevation of the nearest sanitary sewer manholes.  It being declared a matter of public safety that due to high water table levels and lift station malfunctions that it is possible for backup of sewage into basements, resulting in exposure to property damage and danger to public health.  That if such connections are made by any property owner for basement or subsurface structures, without the approval of the District, that the same shall be made at the complete risk of the property owner, who shall be liable for any losses resulting therefrom.

Sec. 11.   In buildings described previously, gravity drainage of upper floors is permissible, where upper floor elevations are higher than the top elevation of manholes. Basements for these buildings may be drained by an approved means of lifting sewage in accordance with Article III, Section 2.

Sec. 12.   No person(s) shall make connection of roof downspouts, exterior foundation drains, areaway drains, or other sources of surface runoff or groundwater to a building sewer or building drain which in turn is connected directly or indirectly to a public sanitary sewer.

Sec. 13.   The connection of the building sewer into the public sewer shall conform to the requirements of the building and plumbing code, or other applicable rules and regulations of the District, or the procedures set forth in appropriate specifications of the American Society of Testing Materials, Water Pollution Control Federation Manual of Practice No. 9, and Standard Specifications for Water and Sewer Main Con-Struction in Illinois. All such connections shall be made gastight and watertight. Any deviation from the prescribed procedures and materials must be approved by the District before installation.

Sec. 14.   The applicant for the building sewer permit shall notify the District when the building sewer is ready for inspection and connection to the public sewer. The connection shall be made under the supervision of the District inspector.

Sec. 15.   All excavations for building sewer installation shall be adequately guarded with barricades and lights so as to protect the public from hazard. Streets, sidewalks, parkways, and other public property disturbed in the course of the work shall be restored in a manner satisfactory to the District.

## ARTICLE III
### Use of the Public Sewers

Sec. 1 No person shall discharge, or cause to be discharged, any stormwater, surface water, groundwater roof runoff, subsurface drainage, uncontaminated cooling water, or unpolluted industrial process waters to any sanitary sewer.

Sec. 2 Stormwater and all other unpolluted drainage shall be discharged to such sewers as are specifically designated as combined sewers or storm sewers, or to a natural outlet approved by the _____District_____. Indus-
(Approving Authority)
trial cooling water or unpolluted process waters may be discharged. on approval of the ____District____, to a storm sewer. combined sewer,
(Approving Authority)
or natural outlet.

Sec. 3 No person shall discharge or cause to be discharged any of the following described waters or wastes to any public sewers:

(a) Any gasoline, benzene, naphtha, fuel oil, or other flammable or explosive liquid, solid, or gas.

(b) Any waters or wastes containing toxic or poisonous solids, liquids, or gases in sufficient quantity, either singly or by interaction with other wastes, to injure or interfere with any sewage treatment process, constitute a hazard to humans or animals, create a public nuisance, or create any hazard in the receiving waters of the sewage treatment plant.

(c) Any waters or wastes having a pH lower than 5.5 or having any other corrosive property capable of causing damage or hazard to structures, equipment, and personnel of the sewage works.

(d) Solid or viscous substances in quantities or of such size capable of causing obstruction to the flow in sewers, or other interference with the proper operation of the sewage works such as, but not limited to, ashes, cinders, sand, mud, straw, shavings, metal, glass, rags, feathers, tar, plastics, wood, unground garbage, whole blood, paunch manure, hair and fleshings, entrails and paper dishes, cups, mild containers, etc., either whole or ground by garbage grinders.

Sec. 4 No industrial user may discharge sewage into any public sewer until the _____District_____ has adopted an industrial cost recovery system
(Unit of Government)
which:

(a) meets the requirements of Section 204(b)(1)(B) of the Federal Water Pollution Control Act Amendments of 1972 /citation/ and applicable federal regulations; and

(b) has been approved by the Agency in accordance with the conditions of any grant made to the ____District____ by the United States
(Unit of Government)

7

Environmental Protection Agency or by the State of Illinois for the construction of any part of the sewer system or sewage treatment works of the _____ District _____.

(Unit of Government)


Sec. 5 No person shall discharge or cause to be discharged the following described substances, materials, waters, or wastes if it appears likely in the opinion of the _____ District _____ that such wastes can harm

(Approving Authority)

either the sewers sewage treatment process or equipment; have an adverse effect on the receiving stream; or can otherwise endanger life, limb, public property, or constitute a nuisance. In forming his opinion as to the acceptability of these wastes, the _____ District _____ will give

(Approving Authority)

consideration to such factors as the quantities of subject wastes in relation to flows and velocities in the sewers, materials of construction of the sewers, nature of the sewage treatment process, capacity of the sewage treatment plant, degree of treatability of wastes in the sewage treatment plant, and maximum limits established by regulatory agencies. The substances prohibited are:

(a) Any liquid or vapor having a temperature higher than one hundred fifty degrees Fahrenheit ($150^\circ$ F), ($65^\circ$ C).

(b) Any waters or wastes containing toxic or poisonous materials; or oils, whether emulsified or not, in excess of one hundred (100) mg/l or containing substances which may solidify or become viscous at temperatures between thirty-two (32) and one hundred fifty degrees Fahrenheit ($150^\circ$ F), (0 and $65^\circ$ C).

(c) Any garbage that has not been properly shredded. The installation and operation of any garbage grinder equipped with a motor of three-fourths (3/4) horsepower (0.76 hp metric) or greater shall be subject to the review and approval of the _____ District _____.

(Approving Authority)

(d) Any waters or wastes containing strong acid, iron pickling wastes, or concentrated plating solutions whether neutralized or not.

(e) Any waters or wastes containing iron, chromium, copper, zinc, or similar objectionable or toxic substances; or wastes exerting an excessive chlorine requirement, to such degree that any such material received in the composite sewage at the sewage treatment works exceeds the limits established by the _____ District _____ for

(Approving Authority)

such materials.

(f) Any waters or wastes containing phenols or other taste or odor-producing substances, in such concentrations exceeding limits which may be established by the _____ District _____ as necessary after

(Approving Authority)

8

treatment of the composite sewage, to meet the requirements of the State, Federal. or other public agencies of jurisdiction for such discharge to the receiving waters.

(g) Any radioactive wastes or isotopes of such half-life or concentration as may exceed limits established by the _____ District _____
    (Approving Authority)
    in compliance with applicable State or Federal regulations.

(h) Any waters or wastes having a pH in excess of 9.5.

(i) Any mercury or any of its compounds in excess of 0.0005 mg/l as Hg at any time except as permitted by the _____ District _____ in
    (Approving Authority)
    compliance with applicable State and Federal regulations.

(j) Any cyanide in excess of 0.025 mg/l at any time except as permitted by the _____ District · _____ in compliance with applicable State
    (Approving Authority)
    and Federal regulations.

(k) Materials which exert or cause:

    (1) unusual concentrations of inert suspended solids (such as, but not limited to, Fullers earth, lime slurries, and lime residues) or of dissolved solids (such as, but not limited to, sodium chloride and sodium sulfate);

    (2) excessive discoloration (such as, but not limited to, dye wastes and vegetable tanning solutions);

    (3) unusual BOD, chemical oxygen demand, or chlorine requirements in such quantities as to constitute a significant load on the sewage treatment works;

    (4) unusual volume of flow or concentrations of wastes constituting "slugs" as defined herein.

(1) Waters or wastes containing substances which are not amenable to treatment or reduction by the sewage treatment processes employed, or are amenable to treatment only to such degree that the sewage treatment plant effluent cannot meet the requirements of agencies having jurisdiction over discharge to the receiving waters.

Sec. 6  If any waters or wastes are discharged or are proposed to be discharged to the public sewers, which waters contain the substances or possess the characteristics enumerated in Section 5 of this Article, and/or which are in violation of the standards for pretreatment provided in Chapter 1, EPA Rules and Regulations, subchapter D, Water Programs Part 128 - Pretreatment Standards, Federal Register Volume 38, No. 215, Thursday, November 8, 1973 and any amendments thereto, and which in the judgment of the _____
        District _____ may have a deleterious effect upon the sewage works,
    (Approving Authority)

9

processes, equipment, or receiving waters, or which otherwise create a
hazard to life or constitute a public nuisance, the ____District____

(Approving Authority)

may: -

(a) reject the wastes;

(b) require pretreatment to an acceptable condition for discharge to
the public sewers;

(c) require control over the quantities and rates of discharge; and/or

(d) require payment to cover the added costs of handling and treating
the wastes not covered by existing taxes or sewer charges, under
the provisions of Section 11 of this Article.

If the ____District____ permits the pretreatment or equalization
(Approving Authority)
of waste flows, the design and installation of the plants and equipment
shall be subject to the review and approval of the ____District____,

(Approving Authority)
and subject to the requirements of all applicable codes, ordinances, and
laws.

Sec.  7    Grease, oil, and sand interceptors shall be provided when, in the opinion
of the ____District____ they are necessary for the proper handling
(Approving Authority)
of liquid wastes containing grease in excessive amounts, or any flammable
wastes, sand, or other harmful ingredients; except that such interceptors
shall not be required for private living quarters or dwelling units. All
interceptors shall be of a type and capacity approved by the _____

(Approving
District , and shall be located as to be readily and easily accessible
Authority)
for cleaning and inspection.

Sec.  8    Where preliminary treatment or flow-equalizing facilities are provided,
they shall be maintained continuously in satisfactory and effective oper-
ation by the owner at his expense.

Sec.  9    Each industry shall be required to install a control manhole and, when
required by the ____District____, the owner of any property serv-
(Approving Authority)
iced by a building sewer carrying industrial wastes shall install a
suitable control manhole together with such necessary meters and other
appurtenances in the building sewer to facilitate observation, sampling,
and measurement of the wastes. Such manhole, when required, shall be
accessibly and safely located, and shall be constructed in accordance
with plans approved by the ____District____. The manhole shall be

(Approving Authority)
installed by the owner at his expense, and shall be maintained by him so
as to be safe and accessible at all times.

Sec. 10   The owner of any property serviced by a building sewer carrying indus-
          trial wastes shall provide laboratory measurements, tests, and analyses
          of waters and wastes to illustrate compliance with this ordinance and
          any special conditions for discharge established by the ___District___
                                                                  (Unit of Govern-

          _____ or regulatory agencies having jurisdiction over the discharge.
          ment)

          The number, type, and frequency of laboratory analyses to be performed
          by the owner shall be as stipulated by the __District_____, but
                                                      (Unit of Government)
          no less than once per year the industry must supply a complete analysis
          of the constituents of the wastewater discharge to assure that compli-
          ance with the Federal, State, and local standards are being met. The
          owner shall report the results of measurements and laboratory analyses
          to the ___District_____ at such times and in such manner as pre-
                 (Unit of Government)
          scribed by the ___District_____. The owner shall bear the expense
                          (Unit of Government)
          of all measurements, analyses, and reporting required by the _District_
                                                                        (Unit
          _____. At such times as deemed necessary, the __District___
          of Government)                                             (Unit of Govern-
          _____ reserves the right to take measurements and samples for analysis
          ment)
          by an outside laboratory service.

Sec. 11   All measurements, tests, and analyses of the characteristics of waters
          and wastes to which reference is made in this ordinance shall be deter-
          mined in accordance with the latest edition of "Standard Methods for the
          Examination of Water and Wastewater", published by the American Public
          Health Association, and shall be determined at the control manhole pro-
          vided, or upon suitable samples taken at said control manhole. In the
          event that no special manhole has been required, the control manhole
          shall be considered to be the nearest downstream manhole in the public
          sewer to the point at which the building sewer is connected. Sampling
          shall be carried out by customarily accepted methods to reflect the
          effect of constituents upon the sewage works and to determine the exis-
          tence of hazards to life, limb, and property. /The particular analyses
          involved will determine whether a twenty-four (24) hour composite of all
          outfalls of a premise is appropriate or whether a grab sample or samples
          should be taken. Normally, but not always, BOD and suspended solids
          analyses are obtained from 24-hour composites of all outfalls, whereas
          pH's are determined from periodic grab samples./

Sec. 12   No statement contained in this Article shall be construed as preventing
          any special agreement or arrangement between the ___District_____
                                                           (Unit of Government)
          and any industrial concern whereby an industrial waste of unusual strength
          or character may be accepted by the ___District_____ for treatment,
                                               (Unit of Government)
          subject to payment therefore, in accordance with Chapter 00, Article I,
          hereof, by the industrial concern, provided such payments are in accord-
          ance with Federal and State guidelines for User Charge System and Indus-
          trial Cost Recovery System.

                                        11

## ARTICLE IV
### Protection of Sewage Works from Damage

Sec. 1    No unauthorized person shall maliciously, willfully, or negligently break, damage, destroy, or tamper with any structure, appurtenance, or equipment which is a part of the sewage works. Any person violating this provision shall be subject to immediate arrest under charge of disorderly conduct.

## ARTICLE V
### Powers and Authority of Inspectors

Sec. 1    The _____Manager_____ and other duly authorized employees of the
          (Approving Authority)
          _____District_____, the Illinois Environmental Protection Agency, and
          (Unit of Government)
          the U. S. Environmental Protection Agency, bearing proper credentials and identification, shall be permitted to enter all properties for the purposes of inspection, observation, measurement, sampling, and testing in accordance with the provisions of this ordinance. The _____Manager_____
                                                         (Approving Authority)
          or his representative shall have no authority to inquire into any processes, including metallurgical, chemical, oil refining, ceramic, paper, or other industries beyond that point having a direct bearing on the kind and source of discharge to the sewers or waterway or facilities for waste treatment.

Sec. 2    While performing the necessary work on private properties referred to in Article VI, Section 1 above, the _____Manager_____ or duly autho-
                                                    (Approving Authority)
          rized employees of the _____District_____, the Illinois Environmental
                                 (Unit of Government)
          Protection Agency, and the U. S. Environmental Protection Agency shall observe all safety rules applicable to the premises established by the company and the company shall be held harmless for injury or death to the
          _____District_____ employees and the _____District_____ shall
          (Unit of Government)                 (Unit of Government)
          indemnify the company against loss or damage to its property by _____
                                                                         (Unit
          _____District_____ employees and against liability claims and demands for
          of Government)
          personal injury or property damage asserted against the company and growing out of the gauging and sampling operation, except as such may be caused by negligence or failure of the company to maintain safe conditions as required in Article IV, Section 9.

Sec. 3    The _____Manager_____ and other duly authorized employees of the
              (Approving Authority)
          _____District_____ bearing proper credentials and identification
          (Unit of Government)
          shall be permitted to enter all private properties through which the
          _____District_____ holds a duly negotiated easement for the purposes
          (Unit of Government)

12

of, but not limited to, inspection, observation, measurement, sampling, repair, and maintenance of any portion of the sewage works lying within said easement. All entry and subsequent work, if any, on said easement, shall be done in full accordance with the terms of the duly negotiated easement pertaining to the private property involved.

## ARTICLE VI
### Penalties

Sec. 1    Any person found to be violating any provision of this ordinance except Article V shall be served by the District with written notice stating the nature of the violation and providing a reasonable time limit for the satisfactory correction thereof. The offender shall, within the period of time stated in such notice, permanently cease all violations. The District may revoke any permit for sewage disposal as a result of any violation of any provision of this ordinance.

Sec. 2    Any person who shall continue any violation beyond the time limit provided for in Article VII, Section 1, shall be guilty of a misdemeanor, and on conviction thereof shall be fined in the amount not less than Ten Dollars ($10.00) nor more than Two Hundred Dollars ($200.00) for each violation. Each day in which any such violation shall continue shall be deemed a separate offense. All premises to be constructed in the future must be connected to the sewerage system and failure to do so will be treated as a misdemeanor and shall be subject to the fines and penalties as herein set forth for existing premises.

Sec. 3    Any person violating any of the provisions of this ordinance shall become liable to the District by reason of such violation.

13

## ARTICLE I
### Wastewater Service Charges

Sec.  1  Basis for wastewater service charges:  The wastewater
service charge for the use of and for service supplied
by the wastewater facilities of the ___District___
(City, Village, etc.)
shall consist of a basic user charge for operation and
maintenance plus replacement, a debt service charge and
a surcharge, if applicable.

The debt service charge shall be computed by dividing
the annual debt service of all outstanding ___Bonds___
(Loans,
_____ by the number of users.  Through further
bonds, etc.)
divisions, the monthly and quarterly debt service charges
can be computed.

The basic user charge shall be based on water usage as
recorded by water meters and/or sewage meters for wastes
having the following normal concentrations:

a)  A five day, 20 degree centigrade ($20^\circ$ C) bio-
chemical oxygen demand (BOD) of _260_ mg/l.

b)  A suspended solids (SS) content of _300_ mg/l.

It shall consist of operation and maintenance costs plus
replacement and shall be computed as follows:

a)  Estimate the projected annual revenue required to
operate and maintain the wastewater facilities
including a replacement fund for the year, for
all works categories.

b)  Proportion the estimated costs to wastewater
facility categories by Volume, Suspended Solids and
BOD, if possible.

c)  Estimate wastewater volume, pounds of SS and pounds
of BOD to be treated.

d)  Proportion the estimated costs to non-industrial
and industrial users by volume, suspended solids
and BOD.

e)  Compute costs per 1000 gal. for normal sewage
strength.

f)  Compute surcharge costs per 1000 gal. per mg/l
in excess of normal sewage strength for BOD and SS.

14

A surcharge may be levied to all users whose waters exceed the normal concentrations for BOD ( 260 mg/l) and SS (300 mg/l). The surcharge will be based on water usage as recorded by water meters and/or sewage meters for all wastes which exceed the 260 mg/l and 300 mg/l concentration for BOD and SS respectively.

The adequacy of the wastewater service charge shall be reviewed annually by Certified Public Accountants for the _____ District _____ in their annual
(City, Village, etc.)
audit report. The wastewater service charge shall be revised periodically to reflect a change in debt service or a change in operation and maintenance costs including replacement costs.

Sec. 2 Measurement of flow: The volume of flow used for computing basic user charges and surcharges shall be the metered water consumption read to the lowest even increments of 1000 gallons.
(Y)

a) If the person dishcarging wastes into the public sewers procures any part, or all, of his water from sources other than the Public Waterworks System, all or a part of which is discharged into the public sewers, the person shall install and maintain, at his expense, water meters of a type approved by the _____ District _____ for the
(Approving Authority)
purpose of determining the volume of water obtained from these other sources.

b) Devices for measuring the volume of waste discharged may be required by the _____ District _____ if
(Approving Authority)
these volumes cannot otherwise be determined from the metered water consumption records.

c) Metering devices for determining the volume of waste shall be installed, owned, and maintained by the person. Following approval and installation, such meters may not be removed, unless service is cancelled, without the consent of the _____ District _____.
(Approving Authority)

15

Sec.    3    Debt Service Charge; A debt service charge in accordance with
             the following schedule of wastewater discharge is hereby es-
             tablished. The debt service charge is included in the User
             Rate shown in Section 4.

             Residential and/or Each Dwelling Unit
             and Churches:

                 Monthly Rate              -    $4.71

             Commercial and Institutional Accounts:

                 Monthly Rate:

                     0 - 9,000 Gallons     -    $3.78 (Required minimum for
                                                       all accounts)

                     All over 9,000 Gallons -   $0.42 (per 1,000 Gallons)

16

Sec. 4. Basic User Rate: There shall be and there is hereby established a minimum charge and a basic user rate for the use of and for service supplied by the Wastewater Facilities of the District.

Residential and/or each Dwelling Unit and Churches.

        Monthly Rate -          $10.00

Commercial and Institutional Accounts:

        Monthly Rate

        C - 10,000 Gallons $12.00   (Required minimum for all accounts)

        ALL OVER 10,000 Gallons - $1.25   (Per 1,000 Gallons)

All residential users of wastewater facilities shall pay a flat rate charge per month adequate to cover the costs of the minimum debt service charge, the minimum service charge and the basic user rate which amounts to $8.10 per month. Based on an average residential water consumption of 5,000 Gallons, $0.25 of the aforementioned charge, is allocated for trunk line O. M. & R.

For commercial and institutional, Trunk Line O. M. & R. is charged at a rate of $0.05 per 1,000 gallons of water consumed.

Sec. 5. Computation of Wastewater Service Charge: The wastewater service charge shall be computed by the following formula as applicable to above rate schedule.

$$CS = CD + CM + (Vu-X)CU$$

Where  $CU$ = Amount of wastewater service charge ($) per billing period

      $CD$ = Debt Service Charge (Section 3.)

      $CM$ = Minimum Charge for Operation, Maintenance and Replacement (Section 4.)

      $Vu$ = Wastewater Volume for the billing period.

      $X$ = Allowable consumption in gallons for the minimum charge (Section 4.)

      $CU$ = Basic User Rate for Operation, Maintenance and Replacement (Section 4.)

## ARTICLE II

### General Provisions

Sec. 1. <u>Owner and Tenant Liability</u>: The owner of the premises, the occupant thereof and the user of the service shall be jointly and severally liable to pay for the service to such premises and the service is furnished to the premises by the District only upon the conditions that the owner of the premises, occupant and user of the services are jointly and severally liable thereof to the District.

Sec. 2. <u>Free Service</u>: That no service shall be furnished or rendered free of charge to any person, firm, corporation or the Commonfields of Cahokia Public Water District.

Rates and charges shall be made against each lot, parcel of Land or premise which may actively discharge sewage or industrial waste, either directly or indirectly into the sewerage system.

Sec. 3. <u>Billing Period</u>: Bills for sewer service shall be made out by the District and forwarded to the customer monthly. The bills shall be payable following the rendition of the bills by the due date. All bills are payable at the District Office.

Sec. 4. <u>Late Charges</u>: If any bill for sewer service shall remain unpaid after the due date indicated on the billing card, an additional charge of ten percent (10%) shall be added thereto. Late charges shall be added only once for each month in arrears.

If any bills for sewer service shall remain unpaid after the due date of two (2) second consecutive months, water service shall be discontinued to such customer and shall not be recontinued until all past due bills are paid in full, together with a reconnect charge of $5.00.

Should the sewer user not be a water customer, the District may cause the sewer to be disconnected and not used again until all past due bills are paid in full together with a reconnect fee of $50.00 plus expenses.

In addition, the District may by resolution of the Board of Trustees, place a lien upon the premises for the amount of past due sewer charges plus any other expenses incurred.

Sec. 5. <u>Deposits</u>: A deposit will not be required for sewer service alone, except as provided below. Since it is the desire of the District to encourage the use of the sewer system, and because a required deposit may inhibit some customers from identifying themselves as occupants of a premise, it is deemed to be in the best interest of the District to forego a sewer service deposit. However, if any customer becomes a collection problem and/or if sewer service has been disconnected for nonpayment of charges, then the District shall, at its discretion, require a deposit as outlined below.

18

Sec. 5. Deposits: (Cont'd.)

RESIDENTIAL - $25.00

COMMERCIAL - 50% of the average of two (2) months'
highest billings during the current
calendar year.

The above statement in no way waives the requirement for water service deposit as provided for in a separate ordinance. Deposits will be refunded upon termination of service and payment in full of all charges. Final payments may be deducted from deposits.

Sec. 6. Tap Fees: A permit and inspection fee of Two Hundred Fifty Dollars ($250) for a residential or commercial building sewer permit shall be paid to the District at the time the application is filed. In the event that a riser exists at the site of the proposed sewer connection, then a permit and connection fee of $150.00 shall be made. Tap fees or charges are not refundable.

Industry, as a condition of permit authorization, must provide information describing its wastewater constituents, characteristics, and type of activity.

Sec. 7. Revenues: All revenues and monies derived from the operation of the sewerage system shall be deposited in the sewerage account of the sewerage fund. All such revenues and monies shall be held by the District, separate and apart, from all other funds. The District shall receive all such revenues from the sewerage system and all other funds and monies incident to the operation of such system as the same may be delivered and deposit the same in the account of the fund designated as the "Sewerage Fund of the District", in compliance procedurally with District Bond Ordinances #76-2 and #76-3.

Sec. 8. Accounts: The District shall establish a proper system of accounts and shall keep proper books, records, and accounts in which complete and correct entries shall be made of all transactions relative to the sewerage system, and at regular annual intervals shall cause to be made an audit by an independent auditing concern of the books to show the receipts and disbursements of he sewerage system.

The District shall prepare or cause to be prepared a complete and accurate list of all premises and properties receiving water service, sewerage service or both water and sewerage services that are served by the water and sewerage system, showing the name and address of the occupant, and the owner of the same. The list shall be kept up to date and shall be corrected from time to time to allow changes in the occupancy or ownership of any such property or premises.

In addition to the customary operating statements, the annual audit report shall also reflect the revenues and operating expenses of the wastewater facilities, including a replacement cost. In this regard, the financial information to be shown in the audit report shall include the following:

1. Flow data showing total gallons received at the wastewater plant for the current fiscal year.

2. Billing data to show total number of gallons billed.

3. Debt service for the next succeeding fiscal year.

4. Number of users connected to the system.

5. Number of non-metered users.

Sec. 9. **Notice of Rates**: A copy of this article properly certified by the District Treasurer, shall be filed in the office of the Recorder of Deeds of St. Clair County and shall be deemed notice to all owners of real estate of the charges of the sewerage system of said Village on their properties.

Sec. 10. **Penalty**: Any person, firm or corporation violating any provisions of this article shall be fined not less than Twenty ($20.00) dollars nor more than Two Hundred ($200.00) dollars for each offense.

Sec. 11. **Access to Records**: The Illinois Environmental Protection Agency or its authorized representative shall have access to any books, documents, papers and records of the District which are applicable to the Village system of user charges for the purpose of making audit, examination, excerpts and transcriptions thereof to insure compliance with the terms of the Special and General Conditions to any State Grant.

ARTICLE III
Effective Date of Rates

The rates and service charges established for user charges in Article I, Section 3 through Section 7 shall be effective as of the next fiscal year beginning _____ and on bills to be rendered for the next succeeding month being _____ for monthly users.

ARTICLE IV
Validity

That if any section, paragraph, clause or provision of this Ordinance shall be held to be invalid or unenforceable for any reason, the invalidity or unenforceability of such section, paragraph, clause or provision shall not affect any of the remaining provisions of this Ordinance. All ordinances, resolutions or orders, or parts thereof, in conflict with any of the provisions of this Ordinance are to the effect of such conflict repealed.

## ARTICLE V
### Ordinance in Force

This Ordinance shall be in full force and effect from and after its passage and approval and publication as provided by law.

Passed by the _Board of Trustees_ of the Commonfields of Cahokia Public Waster District, on the _8th_ day of _August_ A. D. 19 _84_ .

(Signed) _Robert Bergman_

ATTEST:
(Signed) _Peggy Diesel_
_Secretary_

(MUNICIPAL SEAL)

21

STATE OF ILLINOIS    )
                     )    SS.
COUNTY OF ST. CLAIR  )

### SECRETARY'S CERTIFICATE

I, _____, do hereby certify
that I am the duly qualified and acting Secretary of the Commonfields
of Cahokia Public Water District in St. Clair County, Illinois, and as
such official I further certify that I have the care and custody of
the official records of the said District.

I do further certify that the foregoing ORDINANCE NO. 84-2
entitled, "AN ORDINANCE REGULATING: THE USE OF PUBLIC AND PRIVATE
SEWERS AND DRAINS, THE INSTALLATION AND CONNECTION OF BUILDING SEWERS,
THE DISCHARGE OF WATERS AND WASTES INTO THE PUBLIC SEWER SYSTEM, AND
PROVIDING PENALTIES FOR VIOLATIONS THEREOF; THE LEVYING OF CHARGES FOR
WASTEWATER SERVICES (USER CHARGES).

IN THE _____Commonfields of Cahokia Public Water District_____;
COUNTY OF ___St. Clair_____, STATE OF ILLINOIS" was adopted
and passed by the Board of Trustees on the 8th day of August, A.D., 1984,
and I do further certify that the foregoing is a full, true and complete
and compared copy of the Ordinance No. 84-2.

IN WITNESS WHEREOF, I have hereunto affixed my hand and the
seal of the Commonfields of Cahokia Public Water District in St. Clair
County, Illinois, this      day of        A.D. 1987.


                              _____
                              Peggy Diesel, Secretary

(SEAL)

APPENDIX #1


DEFINITIONS

MJH:RPD:kmm
9/25/75

## DEFINITIONS

Unless the context specifically indicates otherwise, the meaning of terms used in this Ordinance shall be as follows:

Sec. 1. Federal Government

"Federal Act" means the Federal Water Pollution Control Act (33 U.S.C. 1251 et seq) as amended by the Federal Water Pollution Control Act of Amendments of 1972 (Pub. L. 92 - 500) and (Pub. L. 93-243).

"Administrator" means the Administrator of the U. S. Environmental Protection Agency.

"Federal Grant" shall mean the U. S. government participation in the financing of the construction of treatment works as provided for by Title II-Grants for Construction of Treatment Works of the Act and implementing regulations.

Sec. 2. State Government

"State Act" means the Illinois Anit-Pollution Bond Act of 1970.

"Director" means the Director of the Illinois Environmental Protection Agency.

"State Grant" shall mean the State of Illinois participation in the financing of the construction of treatment works as provided for by the Illinois Anti-Pollution Bond Act and for making such grants as filed with the Secretary of State of the State of Illinois.

Sec. 3. Local Government

"Ordinance" means this ordinance.

"District" means the Commonfields of Cahokia Public Water District Board of Trustees and their Authorized Representatives.

Sec. 4. "Person" shall mean any and all persons, natural or artificial including any individual, firm, company, municipal, or private corporation, association, society, institution, enterprise, governmental agency or other entity.

Sec. 5. "NPDES Permit" means any permit or equivalent document or requirements issued by the Administrator, or, where appropriated by the Director, after enactment of the Federal Water Pollution Control Amendments of 1972, to regulate the discharge of pollutants pursuant to section 402 of the Federal Act.

23

Sec.    6    Clarification of word usage:  "Shall" is mandatory;
             "may" is permissible.

Sec.    7    Wastewater and its characteristics:

             "Wastewater" shall mean the spent water of a community.
             From this standpoint of course, it may be a combination
             of the liquid and water-carried wastes from residences,
             commercial buildings, industrial plants, and institutions,
             together with any groundwater, surface water, and storm-
             water that may be present.

             "Sewage" is used interchangeably with "wastewater".

             "Effluent Criteria" are defined in any applicable
             "NPDES Permit".

             "Water Quality Standards" are defined in the Water
             Pollution Regulations of Illinois.

             "Unpolluted Water" is water of quality equal to or
             better than the effluent criteria in effect or water that
             would not cause violation of receiving water quality stan-
             dards and would not be benefited by discharge to the
             sanitary sewers and wastewater treatment facilities
             provided.

             "ppm" shall mean parts per million by weight.

             "Milligrams per Liter" shall mean a unit of the concen-
             tration of water or wastewater constituent.  It is
             0.001 g of the constituent in 1,000 ml of water.  It
             has replaced the unit formerly used commonly, parts
             per million, to which it is approximately equivalent,
             in reporting the results of water and wastewater analysis.

             "Suspended Solids" shall mean solids that either float on
             the surface of, or are in suspension in water, sewage, or
             industrial waste, and which are removable by a laboratory
             filtration device.  Quantitative determination of suspended
             solids shall be made in accordance with procedures set
             forth in "Standard Methods".

             "BOD" (denoting Biochemical Oxygen Demand) shall mean
             the quantity of oxygen utilized in the biochemical
             exidation of organic matter under standards laboratory
             procedure in five (5) days at $20^{\circ}$ C, expressed in
             milligrams per liter.

             "pH" shall mean the logarithm (base 10) of the reciprocal
             of the hydrogen-ion concentration expressed by one of the
             procedures outlined in "Standard Methods".

"Standard Methods" shall mean the examination and analytical procedures set forth in the most recent edition of "Standard Methods for the Examination of Water and Wastewater" published jointly by the American Public Health Association, the American Water Works Association and the Water Pollution Control Federation.

"Garbage" shall mean solid wastes from the domestic and commercial preparation, cooking, and despensing of food, and from the handling, storage and sale of produce.

"Properly Shredded Garbage" shall mean the wastes from the preparation, cooking, and dispensing of food that have been shredded to such a degree that all particles will be carried freely under the flow conditions normally prevailing in public sewers, with no particle greater than one-half (1/2) inch (1.27 centimeters) in any dimension.

"Floatable Oil" is oil, fat, or grease in a physical state such that it will separate by gravity from wastewater by treatment in an approved pretreatment facility. A wastewater shall be considered free of floatable fat if it is properly pretreated and the wastewater does not interfere with the collection system.

"Population Equivalent" is a term used to evaluate the impact of industrial or other waste on a treatment works or stream. One population equivalent is 100 gallons of sewage per day, containing 0.22 pounds of BOD and 0.25 pounds of suspended solids.

"Slug" shall mean any discharge of water, sewage or industrial waste which in concentration of any given constituent or in quantity of flow exceeds for any period of duration longer than fifteen (15) minutes more than five (5) times the average twenty-four (24) hour concentration or flows during normal operation.

"Industrial Waste" shall mean any solid, liquid or gaseous substance discharged, permitted to flow or escaping from any industrial, manufacturing, commercial or business establishment or process or from the development, recovery or processing of any natural resource as distinct from sanitary sewage.

"Major Contributing Industry" shall mean an industrial user of the publicly owned treatment works that: (a) Has a flow of 50,000 gallons or more per average work day; or (b) has a flow greater than ten percent of the flow carried by the municipal system receiving the waste; or (c) has in its waste, a toxic pollutant in toxic

amounts as defined in standards issued under section 307(a) of the Federal Act; or (d) is found by the permit issuance authority, in connection with the issuance of the NPDES permit to the publicly owned treatment works receiving the waste, to have significant impact, either singly or in combination with other contributing industries, on that treatment works or upon the quality of effluent from that treatment works.

Sec. 8 Sewer types, and appurtenances:

"Sewer" shall mean a pipe or conduit for conveying sewage or any other waste liquids, including storm, surface and groundwater drainage.

"Public Sewer" shall mean a sewer provided by or subject to the jurisdiction of the ___District___.
                                     (City, Village, etc.)
It shall also include sewers within or outside the
___District___ boundaries that serve one or
   (City, Village, etc.)
more persons and ultimately discharge into the
___District___ sanitary (or combined sewer
   (City, Village, etc.)
system), even though those sewers may not have been
constructed with ___District___ funds.
                    (City, Village, etc.)

"Sanitary Sewer" shall mean a sewer that conveys sewage or industrial wastes or a combination of both, and into which storm, surface, and groundwaters or unpolluted industrial wastes are not intentionally admitted.

"Storm Sewer" shall mean a sewer that carries storm, surface and groundwater drainage but excludes sewage and industrial wastes other than unpolluted cooling water.

"Combined Sewer" shall mean a sewer which is designed and intended to receive wastewater, storm, surface and groundwater drainage.

"Building Sewer" shall mean the extension from the building drain to the public sewer or other place of disposal.

"Building Drain" shall mean that part of the lowest piping of a drainage system which receives the discharge from soil, waste, and other drainage pipes inside the walls of the building and conveys it to the building sewer or other approved point of discharge, beginning five (5) feet (1.5 meter: outside the inner face of the building wall.

"Stormwater Runoff" shall mean that portion of the precipitation that is drained into the sewers.

"Sewerage" shall mean the system of sewers and appurtenances for the collection, transportation and pumping of sewage.

"Easement" shall mean an acquired legal right for the specific use of land owned by others.

Sec. 9 Treatment:

"Pretreatment" shall mean the treatment of wastewaters from sources before introduction into the wastewater treatment works.

"Wastewater Treatment Works" shall mean an arrangement of devices and structures for treating wastewater, industrial wastes, and sludge. Sometimes used as synonymous with "waste treatment plant" or "wastewater treatment plant" or "pollution control plant".

Sec. 10 "Wastewater Facilities" shall mean the structures, equipment, and processes required to collect, carry away, and treat domestic and industrial wastes and transport effluent to a watercourse.

Sec. 11 Watercourse and connections:

"Watercourse" shall mean a channel in which a flow of water occurs, either continuously or intermittently.

"Natural Outlet" shall mean any outlet into a watercourse, pond, ditch, lake, or other body of surface or groundwater.

Sec. 12 User types:

"User Class" shall mean the type of user either "residential or commercial" (non-industrial) or "industrial" as defined herein.

"Residential or Commercial" or "Non-industrial" user, shall mean any user of the treatment works not classified as an industrial user or excluded as an indusdrial user as provided for in this section.

"Industrial User" shall mean any nongovernmental user of publicly owned treatment works identified in the Standard Industrial Classification Manual, 1972, Office of Management and Budget, as amended and supplemented, under the following divisions:

(a) Division A--Agriculture, Forestry, and Fishing.
(b) Division B--Mining.
(c) Division D--Manufacturing.
(d) Division E--Transportation, Communications, Electric, Gas and Sanitary Services.
(e) Division I--Services.

A user in the Divisions listed may be excluded if it is determined by the ___Board of Trustees___ that it
(Approving Authority)
will introduce primarily segregated domestic wastes or wastes from sanitary conveniences.

"Control Manhole" shall mean a structure located on a site from which industrial wastes are discharged. Where feasible, the manhole shall have an interior drop. The purpose of a "control manhole" is to provide access for the ___·___ District
(City, Village, etc.)
representative to sample and/or measure discharges.

Sec. 13 Types of charges:

"Wastewater Service Charge" shall be the charge per quarter or month levied on all users of the Wastewater Facilities. The service charge shall be computed as outlined in Chapter 00, Article II and shall consist of the total or the Basic User Charge, the Debt Service Charge and a Surcharge, if applicable.

"User Charge" shall mean a charge levied on users of treatment works for the cost of operation and maintenance.

"Basic User Charge" shall mean the basic assessment levied on all users of the public sewer system.

"Debt Service Charge" shall be the amount to be paid each billing period for payment of interest, principal and coverage of (loan, bond, etc.) outstanding and shall be computed by dividing the annual debt service by the number of users connected to the Wastewater Facilities.

"Surcharge" shall mean the assessment in addition to the basic user charge and debt service charge which is levied on those persons whose wastes are greater in strength than the concentration values established in Chapter 00, Article III.

"Replacement" shall mean expenditures for obtaining and installing equipment, accessories, or appurtenances which are necessary during the service life of the treatment works to maintain the capacity and performance for which such works were designed and constructed. The term "operation and maintenance" includes replacement.

"Useful Life" shall mean the estimated period during which the collection system and/or treatment works will be operated and shall be ___ years from the date of start-up of any wastewater facilities constructed with a State grant.

"Sewerage Fund" is the principal accounting designation for all revenues received in the operation of the sewerage system





*Commonfields of Cahokia Public Water District*

2525 MOUSETTE LANE
CAHOKIA, ILLINOIS 62206

AMERICAN WATER WORKS ASSOCIATION
MEMBER

April 20, 1987

Mr. Michael Preston
Mayor's Office
301 E. Broadway
East St. Louis, Illinois 62201

Dear Mike:

Enclosed are three signed copies of an amendment to the
agreement executed in 1976 between the City and the
District.

This amendment incorporates changes we agreed on several
weeks ago.

When approved please return one (1) signed copy to me.

Cordially,

Joseph S. LiVigni
Manager

JSL:al
Enclosures

COPY

## A D D E N D U M

This Addendum entered into this _8th_ day of _April_, 1987, by and between the City of E. St. Louis, hereinafter referred to as the "City" and the Commonfields of Cahokia Public Water District, hereinafter referred to as the "District".

WHEREAS, the City and the District entered into an agreement dated June 4, 1976, with respect to treatment and transportation of sewage and the charges therefore; and

WHEREAS, there has been a substantial change of circumstances in that the City of E. St. Louis no longer operates a sewage treatment facility; and

WHEREAS, the City of E. St. Louis still maintains the sewage treatment facility for the transportation of sewage and that of the District;

WHEREAS, it is incumbent on the parties to vary the rate structure from the 1976 agreement in view of the circumstances existing at this time; and

WHEREAS, it is in the best iterest of the parties hereto that this agreement be approved.

NOW THEREFORE, for and in consideration of the mutual covenants contained herein it is hereby agreed by and between the parties hereto as follows:

1. The City agrees to continue to transport the sanitary sewage and industrial wastes from the district.

2. The service charges for said transportation shall be $1.00 per month per user. The District covenants and agrees to

collect and promptly pay to the City the charges set forth above, or as revised.

3. The rates herein stated may be changed by the City in a pro rata amount equal to an increase made by the City to its residential users.

4. All the other provisions of the agreement dated June 4, 1976 shall remain in full force and effect.

5. This Addendum shall apply retroactively as of August 1, 1986.

IN WITNESS WHEREOF, the City of E.St. Louis, Illinois and the Commonfields of Cahokia Public Water District, have caused this instrument to be executed, seals affixed hereunto and attested or witnessed where necessary, all as of this day and year first written above.

The City of E.St. Louis, Illinois
a Municipal Corporation

ATTEST:

_____   BY:_____
CITY CLERK                        MAYOR

Commonfields of Cahokia Public Water District

ATTEST:
Peggy Diehl         BY: Robert Bergman
SECRETARY

AGREEMENT

By and Between

The City of East St. Louis, Illinois

AND

The Commonfields of Cahokia Public Water District,
St. Clair County, Illinois

THIS AGREEMENT, made and entered into this __4__ day of
___June___, A.D. 1976, by and between the City of
East St. Louis, Illinois, hereinafter called the City, and the
Commonfields of Cahokia Public Water District, a municipal corpora-
tion in St. Clair County, Illinois, hereinafter called the District:

WITNESSETH:

WHEREAS, the City of East St. Louis, Illinois, a municipal
corporation, is operating a municipal sanitary sewer system and
has constructed treatment facilities to comply with the Illinois
Sanitary Water Board Directive to discontinue the discharge of
untreated domestic sewerage, industrial and other wastes into the
Mississippi River, pursuant to Federal and State Program for abating
the pollution of the Mississippi River; and

WHEREAS, the City of East St. Louis, Illinois, a municipal
corporation, did construct and acquire a sewerage treatment system
and did extend and improve the existing system as hereinafter described,
and does maintain and operate same said sewerage system to serve the
City of East St. Louis and adjacent territory thereto; and

WHEREAS, the boundaries of the locality served by said facilities
of the City of East St. Louis, Illinois, may include the boundaries
of a portion of the Town of Centreville in St. Clair County, Illinois,

WHEREAS, the said sewerage treatment facilities and projects consist of structures constructed of concrete and other materials having a life expectancy well in excess of fifty (50) years.

Said primary sewerage treatment plant is located as follows:

In the vicinity of the Mississippi River in the City of East St. Louis, Illinois; and

WHEREAS, an Agreement by and between the City of East St. Louis, Illinois and the Town of Centreville in St. Clair County, Illinois, was approved by the said City of East St. Louis, Illinois and the said Town of Centreville, Illinois, on May 11, 1966, a copy of which is to this Agreement attached, and by reference incorporated herein and made a part hereof; and

WHEREAS, the Town of Centreville in St. Clair County, Illinois did construct and maintain a sanitary sewer system as set forth in said agreement; and

WHEREAS, the Town of Centreville in St.Clair County, Illinois has granted, bargained, sold and transfered said sanitary sewer system to the Commonfields of Cahokia Public Water District in St. Clair County, Illinois, which Commonfields of Cahokia Public Water District has agreed to operate and maintain said sanitary sewer system; and

WHEREAS, it is to the best interest of the parties hereto that this Agreement be approved.

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements herein contained, it is hereby agreed by and between the parties hereto as follows:

Section 1. Sewer Service

The City agrees to accept from the District its sanitary sewage and industrial wastes and to treat and dispose of same; provided

and industrial wastes shall originate within

wastes which may be accepted for treatment and disposal. Preliminary standards have been set (Exhibit "A" attached) and are hereby made a part of this Agreement.

### Section 2. Facilities for Service

After service is first tendered to the District, the City shall, subject to the terms and conditions of this Agreement, continuously hold itself ready, willing and able to supply such service herein set forth to the'District.

### Section 3. Pretreatment

The District agrees that all of its sanitary sewage and industrial wastes which do not fully comply, as to standard, character and quality, with the City's rules and regulations establishing the standard, character and quality of such sewerage and wastes which may be introduced into the City facilities will be treated by the District to the extent necessary to effect such compliance prior to introduction of such sanitary sewage and industrial wastes to the City System. The City shall have the right to inspect plants and buildings and to take samples of the sewage discharged.

### Section 4. Other Treatment Facilities

The District agrees that sanitary sewage and industrial wastes originating within the area defined herein which the City facilities will effectively treat will be introduced into the City facilities during the term of this Agreement, and that during the term of this Agreement, the District will not construct or cause or permit or consent to the construction of sewage treatment and disposal facilities of any kind or nature within the jurisdiction of the District; provided, however, that if at any time the City is incapable of treating and

the City in writing six (6) months prior to the commencement of
construction of any District sewage treatment facility, and the City
shall refuse within ninety (90) days of receipt of such notice to
increase the capacity to the extent necessary to provide for the
treatment and disposal of such excess sanitary sewage and industrial
wastes. Nothing herein contained shall prohibit the District from
constructing sewage treatment and disposal facilities or making
other necessary arrangements for the treatment and disposal of
sanitary sewage and industrial wastes as required by Section 3.

Section 5. Mandatory Connection

The District hereby agrees that a District Ordinance shall
require all residents, commercial establishments, and industrial
plants and all persons having domestic sewage or industrial wastes to
connect to the District system for treatment by the City facilities
where feasible and reasonable considering location. The District
Ordinance shall further provide a maximum time limit of twelve (12)
months for connection after the sewage facilities become available
to the user.

Section 6. Service Charges

The City has approved the recommendations of the Engineers to
the City for the rates to be charged the users of the City system,
its improvements and extentions, which are:

        All users within incorporated area        $2.15 per month
        All users not in incorporated area        $3.00 per month

All commercial users shall be charged the same rate and/or rates
as set forth in Ordinance 4054 in the City of East St. Louis, Illinois,
plus 15%.

Each residential unit in a multi-family structure shall be

The City of East St. Louis shall have free access to examine
the books and records of the Commonfields of Cahokia Public Water
District Sewer Department to determine the number of users, or
for any other legitimate reason.

### Section 7. Service Charge Revisions

The rates herein stated may be changed by the City in the event
that such existing and effective rates are not sufficient to cover all
expenses of the City System including maintaining and operating
treatment and disposal facilities and terms of the City Revenue Bond
Ordinance. The City shall provide a minimum of ninety (90) days prior
written notice of an adjustment of its rates. If requested, the City
will assist the District in any reasonable manner to obtain adjust-
ments in affected rates established by the District.

### Section 8. Delinquencies

Payments shall be due and payable on or before the last day of
the month after date billed at intervals of not less than one month.
The District shall pay to the City for all customers tapped onto the
District laterals that feed sewage into the City trunk line, whether
collected by the District or not, and payment by the District to
the City shall discharge the District of any further obligations
with respect to such payment.

In the event such payments are not made in accordance ·with the
foregoing premises, the City may, at its option, discontinue the
service to the District until the amount due the City is paid in full.

### Section 9. Lien

Payments declared in default under the terms of this Contract shall
be subject to the imposition of a lien or liens under ordinary process
of law against any individual property owner benefited by the service

is expected that the rate ordinance to be adopted by the District will provide that the owner of the prejises, the occupant thereof and the user of the service shall be jointly and severally liable to pay for the service.

Section 10. Restrictions

The plans, specifications and engineers data for any collection system to be installed by the District must first receive the approval of the Sanitary Water Board of the State of Illinois in order to insure that the collection system will be of a proper type and·present unreasonable infilitration. The City shall have the right to inspect the installation and construction of the collection system and to require that the work be done in accordance with the plans and specifications so approved.

Certain wastes, which by composition or concentration are detrimental to the sewage system or treatment processes, shall not be included in the terms of this contract. Unacceptable wastes shall be those designated by the City in Exhibit "A" attached hereto which may be amended by theCity from time to time.

Sewage Flow shall be limited to the used water supply of the structure attached to the system and shall specifically exclude any ground, surface or storm waters except those permitted by infilitration under the standards of the Sanitary Water Board of the State of Illinois.

Section 11. Point of Delivery The District shall deliver all sanitary sewage to be treated to the trunk sewer of the City leading to the sewage treatment facilities wholly at the District's cost. Sewage treatment facilities under this Contract are located as previously designated. Other point or points of reception may be agreed by the City and the District by amendments to this Contract.

into the City trunk line.

### Section 13. Commencement

The date that the District connects its sewage system and facilities to the City's trunk line shall constitute the date when the services were initially rendered; and customers tapped to the District sewerage system shall be billed and the District shall collect the charges hereinbefore set forth for the City and additional customers of the District's sewer system shall be billed from the date said additional customers tap into the District's sewage system.

### Section 14. Liabilities

The City agrees to operate and maintain treatment and disposal facilities which will be adequate and sufficient to treat and dispose of all sanitary sewage collected and brought to the point of delivery by the District. The operation and maintenance of such facilities shall be at the City's sole cost except as herein provided.

### Section 15. Term of Contract

The Contract shall continue in full force and effect for forty (40) years or until terminated by mutual consent and agreement unless otherwise limited by applicable laws in which event, it shall automatically be extended for like periods to the maximum term permitted. Termination shall be by written agreement of both parties hereto. In no event shall termination be prior to the full life of any Revenue Bonds issued by the City for said treatment and disposal facilities or prior to the full life of any Revenue Bonds issued by the District for District sewerage system.

### Section 16. Modification

Except as herein provided, this Contract may be changed or modified only upon mutual consent. Such change or modification may

changes shall not be made except under the provision of Section 7. The original purchaser of any bonds issued to carry out the financing of the facilities covered in this Agreement shall also be notified by written notice and shall, at his discretion, be represented at any such meeting or meetings.

### Section 17. Arbitration

In the event of a dispute on any point herein, or any proposed change or modification, with the exception of points of law, every party hereto shall select a representative, competent in the field involved. The representative so selected shall select a third competent person mutually agreeable. The board so formed shall rule upon the merits of the disputed point and the decision so reached by the majority of the board shall be binding on both parties hereto.

### Section 18. Severability

Should any part, term or provision of this Contract be declared illegal by the courts or in conflict with any law, the validity of the remaining portions or provisions shall not be affected thereby.

### Section 19. Assignment

This Contract shall inure to and be binding on the successors and assigns of the parties hereto, provided that no assignment shall be made by either party without the express consent and approval of the other party.

### Section 20.

It is further mutually understood and agreed by and between the parties hereto that the Ordinances of the Commonfields of Cahokia Public Water District entitled, "AN ORDINANCE AUTHORIZING THE ACQUISITION OF THE SEWERAGE SYSTEM OF THE TOWNSHIP OF CENTREVILLE,

CENTREVILLE, ST. CLAIR COUNTY, ILLINOIS, BY THE COMMONFIELDS OF CAHOKIA
PUBLIC WATER DISTRICT, ST. CLAIR COUNTY, ILLINOIS, AUTHORIZING THE
ISSUANCE OF $1,700,000 SEWER REVENUE REFUNDING BONDS, TO FINANCE
PART OF THE COST OF SAID ACQUISITION; PROVIDING FOR THE SECURITY,
REMEDIES AND RIGHTS OF THE HOLDERS THEREOF", be and the same are
hereby incorporated herein and made a part of this Agreement, the
terms of which shall be binding upon the District and the City
respectively; and it is further mutually agreed that the City may
require enforcement of each and every provision of said Ordinances
from time to time if the violations thereof adversely affect the City
in its operation of its sewage system or sewage treatment plant.

This section shall apply to said Ordinances and any subsequent
amendments thereto.

IN WITNESS WHEREOF, the City of East St. Louis, Illinois, and
the Commonfields of Cahokia Public Water District in St. Clair County,
Illinois, have cause this instrument to be executed, seals affixed
hereunto where needed and attested or witnessed where necessary, all
as of the day and year first above written.

THE CITY OF EAST ST. LOUIS, ILLINOIS,
a Municipal Corporation

ATTEST:

By _____
                Mayor

CLIFF DEPUTY CLERK

_____
        City Clerk

(SEAL)

COMMONFIELDS OF CAHOKIA PUBLIC WATER
DISTRICT, a Municipal Corporation
in St. Clair County, Illinois

By _____
                Chairman

ATTEST:

## CLERK'S CERTIFICATE

I, Robert Mays, City Clerk of the City of East St. Louis, Illinois, do hereby certify that I am the duly qualified and acting City Clerk of the City of East St. Louis, Illinois, and as such official I do further certify that I am the keeper of the records of the Mayor and Board of Aldermen of said City of East St. Louis, Illinois.

I do further certify the foregoing Resolution No. 76-20123 authorizing the execution of the therein mentioned Agreement by and between the City of East St. Louis, Illinois, and the Commonfields of Cahokia Public Water District, St. Clair County, Illinois, is a true, correct and complete copy of the original thereof now on file in my said office.

I do further certify the foregoing to be a true, correct and complete copy of said Agreement by and between the City of East St. Louis, Illinois and the Commonfields of Cahokia Public Water District, St. Clair County, Illinois.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of said City of East St. Louis, Illinois, this 11th day of June, A.D. 1976.

_9/til Chomus_

---
CITY CLERK

(SEAL)

## EXHIBIT A

## COMMONFIELDS OF CAHOKIA PUBLIC WATER DISTRICT
## ST. CLAIR COUNTY, ILLINOIS

### SEWER USE REGULATIONS

### ARTICLE I - DEFINITIONS OF TERMS

Section 101 - Board of Trustees shall mean the Board of Trustees of the Commonfields of Cahokia Public Water District,

Section 102 - District shall mean the Commonfields of Cahokia Public Water District, its Board of Trustees, or its duly authorized representative.

Section 103 - Garbage shall mean the residue from the preparation and dispensing of food, and from the handling, storage, and sale of food products and produce.

Section 104 - Ground Garbage shall mean the residue from the preparation, cooking and dispensing of food that has been shredded to such degree that all particles will be carried freely in suspension under the flow conditions normally prevailing in public sewer with no particle greater than one-half inch (1/2") in any dimension.

Section 105 - Industrial Waste shall mean any solid, liquid, or gaseous substance discharged, permitted to flow or escaping from any industrial manufacturing establishment or process, or from the development, recovery, or processing of any nature resource.

Section 106 - Parts per Million shall mean a weight-to-weight ratio; the parts-per-million value multiplied by the factor 8.345 shall be equivalent to pounds per million gallons of water. The ratio of milligrams per liter may be considered to be synonymous with parts per million.

Section 108 - Public Sewer shall mean a sewer provided by or subject to the jurisdiction of the District. It shall include sewers within or without the District boundaries that serve one or more persons and ultimately discharged into the District sanitary or combined sewer system, even though those sewers may not have been constructed or maintained with District funds.

Section 109 - pH shall mean the logarithm (base 10) of the reciprocal of the hydrogen-ion concentration expressed in moles per liter. It shall be determined by one of the procedures outlined in "Standard Methods".

Section 110 - Sanitary Sewer shall mean a sewer that conveys sewage or industrial wastes or a combination of both, and into which storm, surface, and ground waters or unpolluted industrial wastes are not intentionally admitted.

Section 111 - Sewage shall mean the water-carried human, animal, and household wastes in a public or private drain, and may include ground water infilitration, surface drainage, and industrial wastes.

Section 112 - Sewage Treatment Plant shall mean an assemblage of devices, structures, and equipment for treating sewage and industrial wastes.

Section 113 - Sewer shall mean a pipe or conduit for conveying sewage or any other waste liquids, including storm, surface, and ground water drainage.

Section 114 - Sewerage shall mean the system of sewers and appurtenances for the collection, transportation, and pumping of sewage and industrial wastes.

Section 115 - "Shall" is mandatory; "May" is permissible.

Section 116 - Standard Methods shall mean the

Section 117 - Suspended Solids shall mean solids that either float on the surface of, or are in suspension in water, sewage, or industrial wastes, and which are removable by a laboratory filtration device. Quantitative determination of suspended solids shall be made in accordance with procedures set forth in "Standard Methods".

Section 118 - Unpolluted Water shall mean any water with a pH between 6.0 and 9.5 containing none of the following: Emulsified grease or oil; substances that may impart significant taste and odor or color characteristics; deleterious amounts of toxic or poisonous substances in suspension, colloidal state or solution, odorous or otherwise obnoxious gases.

It shall contained not more than 20 parts per million of Biochemical Exygen Demand (B.O.D.) and not more than 80 parts per million of suspended solids. Analytical determinations shall be made in accordance with procedures set forth in "Standard Methods".

ARTICLE II - ADMISSION OF INDUSTRIAL WASTES INTO PUBLIC SEWERS

Section 201 - Approval Required. Review and acceptance of the District shall be obtained by the contributor prior to the discharge into the public sewers of any waters or wastes having:

      A. A suspended solids content greater than 1,000 ppm. or

      B. A pH less than 5.5 or more than 10.5.

Section 202 - Pre-Treatment. Where required, in the opinion of the District, to modify or eliminate wastes that are harmful to the structures, processes, or operation of the sewage disposal works, the waste contributor shall provide at his own expense such preliminary treatment or processing facilities as may be determined necessary to render his wastes acceptable for admission to the public sewers.

Section 204 - Equalized Discharge. here the discharge of industrial wastes if variable incomposition, at the discretion of the District, the person discharging such wastes shall construct and maintain at his own expense, a suitable storage and flow-control facility to ensure equalization of discharge over a 24-hour period. This facility shall have a capacity of at least 25 per cent of the total normal volume of the wastes with variable composition over a 24-hour period, and the outlet shall be equipped with a suitable device for the control of the rate of discharge of the wastes, subject to the approval of the District.

## ARTICLE III - PROHIBITED DISCHARGES

Section 301 - Sanitary Sewers. No person shall cause to be discharged any storm water, surface drainage, roof run-off, cooling water, or unpolluted water into any sanitary sewer.

Section 302 - Prohibitions and Limitations. Except as hereinafter provided, no person shall discharge into the public sewers:

    a. Any solids, liquids, or gases which by themselves or by interaction with other substances may cause fire or explosion hazards, or in any other way be injurious to persons, property, or the operation of the sewage disposal works.

    b. Any noxious or malodorous solids, liquids, or gases, which either singly or by interaction with other substances, is capable of creating a public nuisance or hazard to life or preventing entry into sewers for their maintenance and repair.

    c. Any solids, greases, slurries, or fiscous materials

d. Any toxic substances, chemical elements or compounds in
   quantities sufficient to impair the operation or efficiency
   of the sewage treatment facilities, or that will pass
   through the sewage treatment plan and cause the effluent
   thereof to exceed State or Interstate water quality
   requirements for the receiving stream.

e. Any liquids having a pH lower than 5.5 or higher than
   10.5, or having any corrosive property capable of
   causing damage or hazards to structures, equipment,
   or personnel of the sewage disposal works.

f. Any radioactive isotopes without obtaining a special
   permit from the District.

g. Any liquid or vapor having a temperature greater than
   120 degrees Fahrenheit.

h. Any garbage that has not been ground or shredded.

Section 303 - Special Agreements. No statement contained in
these regulations shall be construed as prohibiting any special
agreement or arrangement between the District and any person whereby
an industrial waste of unusual strength or character may be admitted
to the sewage disposal works, either before or after pre-treatment,
provided that there is no impairment of the functionining of the
sewage disposal works by reason of the admission of such wastes, and
no extra costs are incurred by the District without recompense by the
person.

ARTICLE IV - CONTROL OF ADMISSABLE WASTES

Section 401 - Submission of Basic Data. Within three months after
passage of these regulations, each person who discharges industrial
wastes to a public sewer shall prepare and file

Section 402 - Extension of Time. When it can be demonstrated that circumstances exist which would create an unreasonable burden on the person to comply with the time schedule imposed by Section 401, a request for an extension of time may be presented for consideration by the District.

Section 403 - Control Manholes. When required by the District, any person discharging industrial wastes into a public sewer shall construct and maintain one or more control manholes or access points to facilitate observation, measurement, and sampling of his wastes, including domestic sewage.

Control manholes or access facilities shall be located and built in a manner acceptable to the District. If measuring devices are to be permanently installed, they shall be of a type acceptable to the District.

Control manholes, access facilities, and related equipment shall be installed by the person discharging the wastes at his expense, and shall be maintained by him so as to be in safe condition, accessible, and in proper operating condition at all times. Plans for the installation of the control manholes or access facilities and related equipment shall be approved by the District prior to the beginning of construction.

Section 404 - Metering of Wastes. Devices for measuring the volume of waste discharged may be required by the District if these volumes cannot otherwise be determined from the metered water consumption records.

Metering devices for determining the volume of wastes shall be installed, owned and maintained by the person. Following approval and installation, such meters may not be removed without the consent of the District.

Section 405 - Waste Sampling. Industrial wastes discharged to

the District. Every care shall be exercised in the collection of samples to ensure their preservation in a state comparable to that at the time the sample was taken.

Installation, operation, and maintenance of the sampling facilities shall be the responsibility of the person discharging the wastes and shall be subject to the approval of the District. Access to the sampling location shall be granted to the District or its duly authorized representatives at all times.

Section 406.- Analysis. Determinations of the character and concentration of the industrial wastes shall be made by the person discharging them, or his agent, as designated and required by the District. The District may also make its own analysis of the wastes and these determinations shall be binding as a basis for sewer service charges. Laboratory procedures used in the examination of industrial wastes shall be those set forth in "Standard Methods". However, alternate methods for certain analysis of industrial wastes may be used subject to mutual agreement between the District and the person.

## EXHIBIT B

### AREA DEFINED AND COVERED BY THIS AGREEMENT

The "AREA" covered by the terms, conditions and covenants of
this Agreement is that part of the Commonfields of Cahokia Public
Water District in St. Clair County, Illinois Sewerage System
heretofore known as "Phase II, Centreville Township Sanitary
Sewers", including but not limited to that part of the Town of
Centreville being a part of the City of Centreville lying easterly
of Lake Drive Boulevard and northerly of Illinois S.B.I. Route 157.
The area is immediately adjacent to the southerly and westerly
corporate limits of the City of East St. Louis, Illinois, and that
part of the Town of Centreville lying southerly of Illinois S.B.I.
Route 157 and westerly of the corporate limits of the City of
Belleville, Illinois, and any extensions or additions thereto, all
in the Town of Centreville, St. Clair County, Illinois.

RESOLUTION NO. 76-2012?

WHEREAS, an Agreement by and between the City of East St. Louis, Illinois, and the Town of Centreville in St. Clair County, Illinois, was approved by the said City of East St. Louis, Illinois, and the said Town of Centreville, Illinois, on May 11, 1966, a copy of which is to this Resolution attached, and by reference incorporated herein and made a part hereof; and

WHEREAS, the Town of Centreville in St. Clair County, Illinois did construct and maintain a sanitary sewer system as set forth in said agreement; and

WHEREAS, the Town of Centreville in St. Clair County, Illinois has granted, bargained, sold and transferred said sanitary sewer system to the Commonfields of Cahokia Public Water District in St. Clair County, Illinois, which Commonfields of Cahokia Public Water District has agreed to operate and maintain said sanitary sewer system; and

WHEREAS, an Agreement by and between the City of East St.Louis, Illinois and the Commonfields of Cahokia Public Water District, an Illinois municipal corporation in St. Clair County, Illinois, was approved by the Commonfields of Cahokia Public Water District, a copy of which said Agreement is hereto attached, by reference incorporated herein and made a part of this Resolution; and

WHEREAS, it is to the best interest of the City of East St. Louis, Illinois, that said last aforementioned Agreement by and between the City of East St. Louis, Illinois, and the Commonfields of Cahokia Public Water District, St. Clair County, Illinois, be approved.

NOW, THEREFORE, BE IT RESOLVED by the Mayor and Board of Aldermen of the City of East St. Louis, Illinois, that the City of

BE IT FURTHER RESOLVED that the Mayor and City Clerk of the City of East St. Louis, Illinois, be and they are hereby authorized and directed to sign and execute said Agreement on behalf of the City of East St. Louis, Illinois aforesaid.

THIS RESOLUTION PRESENTED the 26th day of _May_ , A.D. 1976.

PASSED the 26th day of _May_ , A.D. 1976.

MAYOR, CITY OF EAST ST. LOUIS, ILLINOIS

ATTEST:
ROBERT MAYS
By _____
CHIEF DEPUTY CLERK

CITY CLERK, CITY OF EAST ST. LOUIS,
ILLINOIS

(SEAL)

# Appendix B

# Wastewater Collection System Maps

# Water Infrastructure

# Water Infrastructure



Water Infrastructure

# Water Infrastructure







# Water Infrastructure



# Water Infrastructure



# Water Infrastructure

# Water Infrastructure











# Water Infrastructure


Water Infrastructure



Water Infrastructure

# Water Infrastructure


Water Infrastructure

# Appendix C

# Pump Station Information



| No. | Lift Station Name | Location | Nearest Intersection | # of Pumps | Pump Manufacturer | Pump Horsepower | Warning Light | Bypass | Previous No. |
|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | |
| 2 | | | | | | | | | |
| 3 | | | | | | | | | |
| 4 | | | | | | | | | |
| 5 | | | | | | | | | |
| 6 | | | | | | | | | |
| 7 | | | | | | | | | |
| 8 | | | | | | | | | |
| 9 | | | | | | | | | |
| 10 | | | | | | | | | |
| 11 | | | | | | | | | |
| 12 | | | | | | | | | |
| 13 | | | | | | | | | |
| 14 | | | | | | | | | |
| 15 | | | | | | | | | |
| 16 | | | | | | | | | |
| 17 | | | | | | | | | |
| 18 | | | | | | | | | |
| 19 | | | | | | | | | |
| 20 | | | | | | | | | |
| 21 | | | | | | | | | |
| 22 | | | | | | | | | |
| 23 | | | | | | | | | |
| 24 | | | | | | | | | |
| 25 | | | | | | | | | |
| 26 | | | | | | | | | |
| 27 | | | | | | | | | |
| 28 | | | | | | | | | |
| 29 | | | | | | | | | |
| 30 | | | | | | | | | |
| 31 | | | | | | | | | |
| 32 | | | | | | | | | |
| 33 | | | | | | | | | |

Water Infrastructure

# Water Infrastructure



City of Cahokia Heights List of Sewer Line Bypasses as of June 8, 2022

Address                                    at Pump Sta.

1   
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

# Appendix D

# Manhole Inspection Sheet

# MANHOLE INSPECTION SHEET

CLIENT: _____     NOTE TAKER: _____

FACILITY: _____     INSPECTOR: _____

PROJECT NO. _____     WEATHER: _____

STRUCTURE ID: _____     TIME: _____ DATE: _____

NORTH     EAST     ELV. T/R                    FLOW PATTERN

MH LOCATION: _____ _____ _____

MH DEPTH: _____ MH STEPS: GOOD _____ FAIR _____ POOR _____

MH LID:     SUBJ. TO INUNDATION: YES _____ NO _____ INFLOW _____
            SOLID _____ VENTED _____ INFLOW _____
            BROKEN _____ MISSING _____ INFLOW _____

MH RING:    GOOD _____ BROKEN _____ MISSING _____

MH WALLS:   BRICK _____ PRECAST _____ OTHER _____
            DEBRIS ON MH WALLS: HEAVY _____ LIGHT _____
            ROOTS IN WALLS _____ INFILTRATION _____   DEPTH OF FLOW: _____
            PAST SURCHARGING _____ HEIGHT ABOVE INVERT _____
            DETERIORATED WALLS _____ INFILTRATION _____
            HOLE IN MH WALLS _____ INFILTRATION _____ INFLOW _____
            CRACK IN MH WALLS _____ INFILTRATION _____ INFLOW _____
            HOLE IN MH CONE _____ INFILTRATION _____ INFLOW _____
            CRACK IN MH CONE _____ INFILTRATION _____ INFLOW _____
            OTHER DEFECTS _____ INFILTRATION _____ INFLOW _____

MH BENCH:   DETERIORATED _____ INFILTRATION _____ INFLOW _____
            SEDIMENT ON BENCH: HEAVY _____ MEDIUM _____ LIGHT _____ TYPE _____
            OTHER: _____

MH INVERT:  DETERIORATED _____ INFILTRATION _____ INFLOW _____
            SEDIMENT IN INVERT: HEAVY _____ MEDIUM _____ LIGHT _____ TYPE _____

| LINE DESCRIPTION | | | | |
|---|---|---|---|---|
| LINE NUMBER: | 1 | 2 | 3 | 4 |
| LINE SIZE | | | | |
| MATERIAL | PVC   HDPE   OTHER | PVC   HDPE   OTHER | PVC   HDPE   OTHER | PVC   HDPE   OTHER |
| DEPTH FROM MP TO FL | | | | |

GENERAL COMMENTS:

# Appendix E

# Pump Station inspection Checklist

# PUMP STATION INSPECTION CHECKLIST

## CITY OF CAHOKIA HEIGHTS WATER AND SEWER DEPARTMENT

Pump Station Name: _____    Inspection Date: _____

Pump Station Location: _____    Inspected By: _____

Number of Pumps: _____

Pump Manufacturer: _____

Pump Horsepower: _____

**WETWELL:**

- [ ] Inspect interior and exterior surfaces
- [ ] Check for proper access hatch operation
- [ ] Verify float system operating condition
- [ ] Inspect pump guide rails

**PUMPS:**

- [ ] Pull and reset pump (if needed)
- [ ] Check for ease of removal and proper seating at disconnect flange
- [ ] Check pump chords for obstructions
- [ ] Check pump for normal operation
- [ ] Check for unusual noises and/or vibration

**VALVE VAULT:**

- [ ] Check sump pump operation
- [ ] Verify pressure gauges are in place (if applicable)
- [ ] Check for proper access hatch operation

**CONTROL PANEL:**

- [ ] Verify that wiring schematic is on file in Sewer Department Office
- [ ] Inspect enclosure for damage
- [ ] Inspect wiring
- [ ] Perform operational test
- [ ] Verify that electrical conduits are sealed
- [ ] Verify high water warning light operation

**COMMENTS:** _____

_____
_____
_____
_____
_____
_____
_____

Date_____ Daily Job Sheet Sheet ___ of ___

| Sewer Department | Comments |
|---|---|
| **Address** | |
| **Jobs Completed** | |
| **Employees on Job** | |
| **Vehicles or Equip. Used** | |

| Sewer Department | |
|---|---|
| **Address** | |
| **Job Completed** | |
| **Employees on Job** | |
| **Vehicles or Equip. Used** | |

| Meter Readers | |
|---|---|
| **Employees on Job** | |
| **Areas - Read** | |
| **Vehicles Used** | |

**General Foreman**_____

# Daily Sheets

Name:_____Week Start Date _____ Week End Date_____

| Day | Address | Work Performed | ST | OT | DT |
|-----|---------|----------------|----|----|----|
|     | Address | Work Performed |    |    |    |
|     | Address | Work Performed |    |    |    |
|     | Address | Work Performed |    |    |    |
|     | Address | Work Performed |    |    |    |

Total Hours   _____

Straight Time _____          Overtime _____     Double Time _____

Comments: